Craig A. Wolfe (CA Bar No. 200870)
Jason R. Alderson (CA Bar No. 233176)
**KELLEY DRYE & WARREN LLP**
101 Park Avenue
New York, New York  10178-0002
Telephone: (212) 808-7800
Facsimile:  (212) 808-7897
E-mail:  cwolfe@kelleydrye.com; jalderson@kelleydrye.com
*Counsel for Debtor*

Jeffrey N. Pomerantz (CA Bar No. 143717)
Jeffrey W. Dulberg (CA Bar No. 181200)
**PACHULSKI STANG ZIEHL & JONES LLP**
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:jpomerantz@pszjlaw.com; jdulberg@pszjlaw.com
*Local/Conflicts Counsel for Debtor*

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

|  |  |
|---|---|
| In re:<br><br>CONTESSA PREMIUM FOODS, INC.,<br><br>Debtor.[1] | Case No.:  2:11-bk-13454-PC<br><br>Chapter 11<br><br>**NOTICE OF FILING OF FORM OF ASSET PURCHASE AGREEMENT IN CONNECTION WITH MOTION FOR ORDER (A) APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEE, IN CONNECTION WITH THE PROPOSED SALE AT AUCTION OF THE CONTESSA ENTERPRISE; (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF REAL AND PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH; (C) APPROVING SALE OF ALL OR CERTAIN CONTESSA ENTERPRISE ASSETS TO THE HIGHEST AND BEST BIDDER AT AUCTION; AND (D) GRANTING RELATED RELIEF**<br><br>**Hearing**<br>Date:  May 4, 2011<br>Time: 9:30 a.m. (PT)<br>Place: Courtroom 1539<br>        Edward R. Roybal Federal Bldg.<br>        255 East Temple Street<br>        Los Angeles, CA 90012<br>        Judge: Peter H. Carroll |

---

[1]    The Debtor is a California corporation, Fed. Tax I.D. No. 33-0020606.  The Debtor's address is 222 West 6th  Street, 8th  Floor, San Pedro, California 90731.

KELLEY DRYE &
WARREN LLP
101 PARK AVENUE
NEW YORK, NY 10178

NY01/ALDEJ/1471839.3

**TO THE HONORABLE PETER H. CARROLL, UNITED STATES BANKRUPTCY JUDGE, AND ALL PARTIES ENTITLED TO NOTICE:**

**PLEASE TAKE NOTICE** that on April 26, 2011, Contessa Premium Foods, Inc., a California Corporation and the above-captioned debtor and debtor-in-possession ("Debtor"), filed a Notice Of Motion ("Notice") And Motion For Order (A) Approving Sale Procedures, Including Break-Up Fee, In Connection With The Proposed Sale At Auction Of The Contessa Enterprise, (B) Approving Procedures For The Assumption And Assignment Of Real And Personal Property Leases And Executory Contracts In Connection Therewith, (C) Approving Sale Of All Or Certain Contessa Enterprise Assets To The Highest And Best Bidder At Auction, and (D) Granting Related Relief (the "Motion") (Dkt No. 208).

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on May 4, 2011 at 9:30 a.m. (prevailing Pacific Time) before the Honorable Peter H. Carroll in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, Courtroom 1539, Edward R. Roybal Federal Bldg., 255 East Temple Street, Los Angeles, CA. 90012.

**PLEASE TAKE FURTHER NOTICE** that, as set forth in the Notice, attached hereto as **Exhibit A** is a copy of the Debtor's form of asset purchase agreement to be annexed to the proposed Sale Procedures as Exhibit 2 ("Form Agreement Notice").[2]

**PLEASE TAKE FURTHER NOTICE** that the Debtor served this Form Agreement Notice,[3] by overnight mail, upon (a) the Office of the United States Trustee; (b) counsel to the Official Committee of Unsecured Creditors; (c) Wells Fargo Bank, N.A. and its counsel, Paul,

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3]    As limited by the Order Establishing Notice Procedures And Permitting Debtor and Debtor-In-Possession to Serve Insured Depository Institutions By First Class Mail, entered on February 1, 2011 (Dkt. No. 32).

Hastings, Janofsky & Walker LLP; (d) counsel to General Electric Capital Corporation and GE

Capital Public Finance, Inc.; (e) counsel to Dedeaux Enterprises, LLC; (f) all counterparties to

the Green Cuisine Plant Leases and other Executory Contracts (as defined in the Motion); (g) the

Internal Revenue Service So. Cal.; and (h) all entities on the Rule 2002 service list as of the date

hereof.[4]

Dated:     May 2, 2011                    PACHULSKI STANG ZIEHL & JONES LLP

                                          By:      */s/ Jeffrey W. Dulberg*
                                                 Jeffrey N. Pomerantz (CA Bar No. 143717)
                                                 Jeffrey W. Dulberg (CA Bar No. 181200)
                                                 *Local/Conflicts Counsel for Debtor*


                                          KELLEY DRYE & WARREN LLP

                                                 Craig A. Wolfe (CA Bar No. 200870)
                                                 Jason R. Alderson (CA Bar No. 233176)
                                                 *Counsel for Debtor*

---

[4]    Imperial will provide this Form Agreement Notice to all entities who have executed non-disclosure agreements with the Debtor in connection with the potential acquisition of any or all of the Contessa Enterprise or who have otherwise expressed to the Debtor an interest in purchasing the Contessa Enterprise or any part thereof.

KELLEY DRYE &
WARREN LLP
101 PARK AVENUE
NEW YORK, NY 10178

**EXHIBIT A**

_____

**ASSET PURCHASE AGREEMENT**

_____

**BY AND BETWEEN**

**CONTESSA PREMIUM FOODS, INC.**

**- and -**

**[PURCHASER]**

**Dated as of June _____, 2011**

# TABLE OF CONTENTS

**Page**

| ARTICLE I | DEFINITIONS | 1 |
|---|---|---|
| Section 1.1 | Recitals | 1 |
| Section 1.2 | Definitions | 1 |
| Section 1.3 | Other Terms | 11 |
| Section 1.4 | Headings | 11 |
| Section 1.5 | Interpretation | 11 |
| Section 1.6 | Time | 11 |

| ARTICLE II | AGREEMENT OF PURCHASE AND SALE | 12 |
|---|---|---|
| Section 2.1 | Purchase and Sale | 12 |
| Section 2.2 | Assumed Liabilities | 12 |
| Section 2.3 | Excluded Liabilities | 12 |
| Section 2.4 | Procedures for Assumption and Assignment of Agreements | 13 |
| Section 2.5 | [Allocation of Purchase Price | 13 |
| Section 2.6 | Purchase Price; Closing Payment | 14 |
| Section 2.7 | Purchase Price Adjustment | 14 |
| Section 2.8 | Deposit | 17 |

| ARTICLE III | BANKRUPTCY MATTERS | 17 |
|---|---|---|

| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF SELLER | 17 |
|---|---|---|
| Section 4.1 | Organization and Good Standing | 18 |
| Section 4.2 | Authorization of Agreement | 18 |
| Section 4.3 | Conflicts; Consents of Third Parties | 18 |
| Section 4.4 | Real Property | 18 |
| Section 4.5 | Material Contracts | 19 |
| Section 4.6 | Environmental Matters | 19 |
| Section 4.7 | Intellectual Property | 20 |
| Section 4.8 | Insurance | 20 |
| Section 4.9 | Employee Benefits Plans | 20 |
| Section 4.10 | Labor | 21 |
| Section 4.11 | Permits | 21 |
| Section 4.12 | Taxes | 21 |
| Section 4.13 | Financial Advisors | 22 |
| Section 4.14 | OFAC | 22 |
| Section 4.15 | Legal Proceedings | 22 |
| Section 4.16 | Title to Purchased Assets; Sufficiency of Purchased Assets | 22 |
| Section 4.17 | No Other Representations or Warranties; Schedules; Disclaimer of Warranty | 22 |

| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 23 |
|---|---|---|
| Section 5.1 | Organization and Good Standing | 23 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 5.2 | Authorization of Agreement | 23 |
| Section 5.3 | Conflicts; Consents of Third Parties | 23 |
| Section 5.4 | Litigation | 24 |
| Section 5.5 | Financial Advisors | 24 |
| Section 5.6 | Financial Capability | 24 |
| Section 5.7 | Condition of the Business | 25 |

ARTICLE VI    COVENANTS AND AGREEMENTS ....................... 25

| | | |
|---|---|---|
| Section 6.1 | Covenants of the Seller | 25 |
| Section 6.2 | Covenants of the Purchaser | 25 |
| Section 6.3 | Access to Information | 26 |
| Section 6.4 | Joint Obligations | 26 |
| Section 6.5 | HSR Act; Cooperation | 27 |
| Section 6.6 | Consents; Further Assurances | 28 |
| Section 6.7 | Notice of Default | 28 |
| Section 6.8 | Confidentiality | 29 |
| Section 6.9 | Disclosure Schedules; Supplementation and Amendment of Schedules | 29 |
| Section 6.10 | Post-Closing Employee Covenants | 29 |
| Section 6.11 | Publicity | 31 |
| Section 6.12 | Survival | 31 |

ARTICLE VII    CONDITIONS TO CLOSING ................................ 31

| | | |
|---|---|---|
| Section 7.1 | Conditions for the Purchaser | 31 |
| Section 7.2 | Conditions for the Seller | 32 |

ARTICLE VIII    CLOSING ............................................................. 33

| | | |
|---|---|---|
| Section 8.1 | Closing Arrangements | 33 |
| Section 8.2 | Seller's Deliveries | 33 |
| Section 8.3 | the Purchaser's Deliveries | 33 |
| Section 8.4 | Tax Matters | 34 |

ARTICLE IX    TERMINATION OF AGREEMENT ...................... 36

| | | |
|---|---|---|
| Section 9.1 | Termination | 36 |
| Section 9.2 | Effect of Termination | 37 |

ARTICLE X    MISCELLANEOUS ............................................. 37

| | | |
|---|---|---|
| Section 10.1 | Obligations as Covenants | 37 |
| Section 10.2 | Relationship of the Parties | 37 |
| Section 10.3 | Amendment of Agreement | 37 |
| Section 10.4 | Notices | 37 |
| Section 10.5 | Specific Performance | 38 |
| Section 10.6 | Fees and Expenses | 38 |
| Section 10.7 | Governing Law; Jurisdiction; Service of Process | 39 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Section 10.8 | Further Assurances | 39 |
| Section 10.9 | Entire Agreement | 39 |
| Section 10.10 | Waiver | 39 |
| Section 10.11 | Survival | 39 |
| Section 10.12 | Assignment | 39 |
| Section 10.13 | Successors and Assigns | 40 |
| Section 10.14 | No Third-Party Beneficiaries | 40 |
| Section 10.15 | Severability of Provisions | 40 |
| Section 10.16 | Counterparts | 40 |

EXHIBIT A                       FORM OF ESCROW AGREEMENT

EXHIBIT B                       FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C                       FORM OF BILL OF SALE

EXHIBIT D                       FORM OF SALE APPROVAL ORDER

Schedule 1.2(a)      Assumed Contracts
Schedule 1.2(b)      Excluded Assets
Schedule 1.2(c)      Excluded Contracts
Schedule 1.2 (g)     Purchased Intellectual Property Rights
Schedule 4.3         Conflicts; Consents of Third Parties
Schedule 4.4         Existing Real Property Leases and Assumed Real Property Leases
Schedule 4.5(ii)     Material Contracts; Notices of Default
Schedule 4.8         Insurance Policies
Schedule 4.9         Seller Benefit Plans
Schedule 4.10        Labor
Schedule 4.12(b)     Taxes
Schedule 4.13        Financial Advisors
Schedule 4.15        Legal Proceedings
Schedule 4.16        Liens
Schedule 5.3(a)      Purchaser Conflicts

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (the "**Agreement**"), dated as of June ____, 2011, by and between CONTESSA PREMIUM FOOD, INC., a California corporation (the "**Seller**"), [      ] and [_____] (the "**Purchaser**").

## RECITALS:

A.    The Seller is a leading importer, manufacturer exporter and distributor of farm raised shrimp, convenience meals, stir fry vegetables and other food products worldwide (collectively, the "**Business**").

B.    The Seller operates in two primary segments: premium seafood (the "**Seafood Business**") and convenience meals (the "**Convenience Meals Business**") and owns a state of the art manufacturing plant in Commerce, California (the "**Green Cuisine Plant**").

C.    Commencing on January 26, 2011, the Seller filed a case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") by filing a voluntary petition for relief with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**").

D.    On May [   ], 2011, the Bankruptcy Court entered an order authorizing the Seller, among other things, to conduct a sale process for either the entire Business, or for the Seafood Business, the Convenience Meals Business, and the Green Cuisine Plant separately, and approving the procedures with respect thereto (the "**Sale Procedures Order**");

E.    In accordance with the Sale Procedures Order, the Seller now desires to sell the Purchased Assets (as herein defined) on the terms and conditions contained in this Agreement, including obtaining an order of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing the Transaction (as herein defined) (the "**Sale Approval Order**").

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1**    **Recitals**.  The recitals set forth above are incorporated by reference and are expressly made part of this Agreement.

**Section 1.2**    **Definitions**.  The following definitions shall apply to and constitute part of this Agreement and all Exhibits and Schedules attached hereto:

"**Accountant**" shall have the meaning set forth in Section 2.7(f).

"**Affiliate**" shall mean a person or entity that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the person or

entity specified.  For purposes of this definition, "control" shall mean (a) a fifty percent (50%) or more common equity ownership or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Allocation Schedule**" shall have the meaning set forth in Section 2.5.

"**Applicable Laws**" shall mean all domestic or foreign statutes, laws, by-laws, regulations, rules, ordinances and orders of Governmental Authority having jurisdiction.

"**Assignment and Assumption Agreement**" shall mean an assignment by the Seller and of the Seller's right, title and interest in and to the Purchased Assets, including the Assumed Contracts and the Assumed Real Property Leases, and an assumption by the Purchaser of the Assumed Liabilities, such agreement substantially in the form attached hereto as Exhibit B.

"**Assumed Contracts**" shall mean the Contracts set forth on Schedule 1.2(a), which Contracts shall be assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court.

"**Assumed Liabilities**" shall mean all of the Liabilities of the Seller other than the Excluded Liabilities.

"**Assumed Real Property Leases**" shall have the meaning set forth in Section 4.4(a).

"**Assumed Seller Benefit Plan**" shall have the meaning set forth in Section [6.11].

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Benefit Plans**" shall mean (a) "employee benefit plans," as defined in Section 3(3) of ERISA, (b) employment, consulting, retention, or change in control Contracts, and (c) other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, incentive, equity or equity-based compensation, or deferred compensation arrangements, termination, or severance plans or arrangements, stock purchase, sick leave, vacation pay, salary continuation for disability, hospitalization, medical insurance, and life insurance plans and programs (excluding, in each case, collective bargaining agreements).

"**Bill of Sale**" shall mean a bill of sale with respect to the Purchased Assets, substantially in the form of Exhibit C.

"**Business**" shall have the meaning set forth in the Recitals.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York or California are authorized or obligated to close under Applicable Laws.

"**Chapter 11 Case**" shall have the meaning set forth in the Recitals.

"**Closing**" shall mean the consummation of the Transaction in accordance with the terms set forth in Article VIII.

"**Closing Date**" shall mean the first (1st) Business Day following satisfaction or waiver of all the conditions set forth in Article VII, or such other date as the Seller and the Purchaser shall mutually agree upon in writing.

"**Closing Date Schedule**" shall have the meaning set forth in Section 2.7(b).

"**Closing Documents**" shall mean any agreements, instruments and other deliveries to be delivered at the Closing pursuant to Sections 8.2 and 8.3.

"**Closing Net Working Capital Amount**" means as of 11:59 pm on the day immediately preceding the Closing Date: (i) all current assets that constitute Purchased Assets, as determined in accordance with GAAP, *minus* (ii) all current liabilities that constitute Assumed Liabilities, as determined in accordance with GAAP.

"**COBRA**" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended and Section 4980B of the IRC.

"**Green Cuisine Plant**" shall have the meaning set forth in the Recitals.

"**Confidentiality Agreement**" shall have the meaning set forth in Section 6.8.

"**Contract**" shall mean any legally binding agreement, contract, subcontract, settlement agreement, instrument, note, warranty, purchase order, license, sublicense or other legally binding commitment.

"**Convenience Meals Business**" shall have the meaning set forth in the Recitals.

"**Cure Costs**" shall mean any and all costs, expenses or actions that the Seller is required to pay or perform to assume any of the Assumed Contracts and Assumed Real Property Leases pursuant to section 365(b) of the Bankruptcy Code.

"**Current Seller Employees**" shall mean all employees of the Seller employed immediately prior to the Closing Date.

"**Deposit**" shall have the meaning set forth in Section 2.8.

"**Dispute Notice**" shall have the meaning set forth in Section 2.7(d).

"**Encumbrances**" shall mean all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional

sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting title to the Purchased Assets or any part thereof or interest therein.

"**Environmental Laws**" shall mean all applicable federal, state, municipal and local laws, statutes, regulations and other legal requirements relating to the protection of the environment or natural resources.

["**Environmental Permits**" shall mean all material licenses, permits, approvals, consents, certificates, registrations and other authorizations issued pursuant to Environmental Laws in respect of the Green Cuisine Plant.]

["**Environmental Reports**" shall mean accurate and complete copies of any material reports, studies, analyses, evaluations, assessments or monitoring data that have been performed with regard to the Green Cuisine Plant which are in the possession or control of the Seller.]

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under Section 414 of the IRC or Section 4001 of ERISA.

"**Escrow Agent**" shall have the meaning set forth in Section 2.8.

"**Escrow Agreement**" shall have the meaning set forth in Section 2.8.

"**Estimated Net Working Capital Amount**" shall have the meaning set forth in Section 2.7(a).

"**Excluded Assets**" shall mean:

(a) any records, documents or other information relating to Excluded Seller Employees, and any materials containing information about any Transferred Employee the disclosure of which would violate any Applicable Law;

(b) all preference or avoidance claims and actions any of the Seller, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(c) (i) any documents that the Seller is required by Applicable Law to retain, (ii) minute books and other corporate books and records to the extent relating to its organization and existence, (iii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items to the extent

relating to any Excluded Assets or Excluded Liabilities, (iv) any books and records to the extent relating to Taxes of the Seller, or Excluded Employees, Tax Returns filed by or with respect to Seller, or any materials to the extent containing information about any Transferred Employee, disclosure of which would violate any Applicable Law  and (v) all financial statements of the Seller (collectively, the "**Excluded Books and Records**"); *provided, however*, the Seller shall, to the extent permitted by Applicable Law, provide a copy of all Excluded Books and Records relating to the Purchased Assets, Assumed Liabilities or Business (other than those described in the foregoing clause (ii) or (iv)), redacted to the extent necessary to remove information relating to any Excluded Assets or Excluded Liabilities;

(d)    any and all rights of the Seller under this Agreement and all other ancillary documents entered into in connection herewith, and all consideration payable or deliverable to the Seller pursuant to the terms and provisions hereof and all bank accounts and any right, claims or causes of actions of Seller under this Agreement;

(e)    the Excluded Contracts and any and all rights thereunder and prepaid assets related thereto;

(f)    any prepaid Tax, Tax receivable or Tax refund, rebate, credit or similar item of the Seller;

(g)    any Seller Benefit Plan or any right, title or interest in any assets of or relating thereto, excluding any Seller Benefit Plan which is an Assumed Agreement, if any;

(h)    any insurance contracts or policies under which Seller is a party, a named insured or a beneficiary, including those set forth on Schedule 4.9 and rights to proceeds thereof;

(i)    any rights, claims or causes of action of the Seller against third parties relating to assets, properties, business or operations of the Seller arising out of events occurring on or prior to the Closing Date;

(j)    all cash on hand, cash on deposit, checks received but not yet deposited or cleared, wire transfers transmitted but not yet received, cash equivalents, certificates of deposit and marketable securities, including interest accrued thereon, held by or on behalf of the Seller;

(k)    the Seller's right, title and interest in any assets to the extent not used in the conduct of, or related to, the Business and not otherwise set forth in clauses (a) through (l) of the definition of Excluded Assets; and

(l)    [the assets listed on Schedule 1.2(b)].

"**Excluded Contracts**" shall mean the Contracts set forth on Schedule 1.2(c) and any other Contract of Seller which is [not used exclusively in the [Business] [Seafood Business] [Convenience Meals Business]] [not exclusively related to the Green Cuisine Plant] or which is not assigned to the Purchaser.

"**Excluded Liabilities**" shall have the meaning set forth in Section 2.3.

"**Excluded Seller Employees**" shall mean all Current Seller Employees and Former Seller Employees, other than any Current Seller Employees or Former Seller Employees who are Transferred Employees.

"**Existing Real Property Leases**" shall have the meaning set forth in Section 4.4(a).

"**Final Calculations**"  shall have the meaning set forth in Section 2.7(f).

"**Former Seller Employees**" shall mean all individuals who have been employed by the Seller who are not Current Seller Employees.

"**GAAP**" shall mean United States generally accepted accounting principles in effect from time to time.

"**GAAP Accounting Principles**" shall have the meaning set forth in Section 2.7(a).

"**Governmental Authority**" shall mean any domestic, foreign or local government, quasi-governmental authority, regulatory authority, government department, agency, commission, board, arbital or other tribunal or court having jurisdiction or power of any nature over the Purchased Assets.

"**HSR**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Intellectual Property Rights**" shall mean all trade or brand names, business names, trademarks (including logos), trademark registrations and applications, service marks, service mark registrations and applications, copyrights, copyright registrations and applications, issued patents and pending applications and other patent rights, industrial design registrations, pending applications and other industrial design rights, trade secrets, proprietary and confidential information and know-how, equipment and parts lists and descriptions, instruction manuals, inventions, inventors' notes, research data, blue prints, drawings and designs, formulae, processes, technology, domain names, and other intellectual property.

"**IRC**" shall mean the Internal Revenue Code of 1986, as amended.

"**IRS**" shall mean the Internal Revenue Service of the United States.

"**Knowledge**" shall mean the actual knowledge of each of [   ].

"**Legal Proceedings**" shall mean any suit, action, arbitration, legal or judicial proceeding, administrative, quasi- administrative or enforcement proceeding or arbitration proceeding before any Governmental Authority.

"**Liability**" shall mean any debt, obligation or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the Seller (taken as a whole) or (ii) the ability of Seller to consummate the Transaction, other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which the Seller operates as of the date hereof; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by the Purchaser or its Affiliates with respect to the Transaction, pursuant to this Agreement or with respect to the Seller or Business; (v) any matter of which the Purchaser is aware on the date hereof; (vi) the effect of any changes in Applicable Laws or accounting rules; or (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Transaction.

"**Notice**" shall mean any notice, request, consent, acceptance, waiver or other communication required or permitted to be given pursuant to this Agreement.

["**OFAC**" shall have the meaning set forth in Section 4.14.]

"**Offeree**" shall have the meaning set forth in Section 6.13(a).

"**Ordinary Course of Business**" shall mean the operation and conduct of the affairs of an enterprise in the ordinary course of its business, consistent with past practice and the businesses in which the Seller operates, but taking into account its status as a debtor in possession [and subject to the requirements of any budget].

"**Outside Date**" shall have the meaning set forth in Section 9.1(b).

"**Permits**" shall mean all the right, title, benefit and interest of the Seller in any and all licenses, franchises, governmental and other approvals, development rights and permits relating to the Business or Leased Real Property.

"**Permitted Encumbrances**" shall mean: (i) the Assumed Real Property Leases and rights of tenants thereunder; (ii) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for ad valorem Taxes and statutory liens not yet due and payable, (iii) discrepancies, conflicts in boundary lines, shortage in area, encroachments and any other state of facts that would be shown on any accurate survey prepared by a professionally licensed land surveyor and any easements, rights of way, covenants and conditions of record that would be shown on any current title report prepared by a professionally licensed title company, including, without limitation, (A) standard exclusions from coverage and (B) such exclusions that would be revealed under Schedule B of such title report, that, individually and in the aggregate, do not and will not materially interfere with the use and operation of the property or assets to which they relate in the manner and for the purposes

heretofore used by the Seller; (C) Encumbrances that constitute Assumed Liabilities (including Encumbrances under the Assigned Contracts); (D) landlords', carriers', warehousemens', mechanics', suppliers', materialmens', repairmens' liens or other like Encumbrances arising in the Ordinary Course of Business with respect to amounts not yet overdue and any other Encumbrances that will be irrevocably released in full (of record, as appropriate) on or prior to the Closing.

"**Person**" shall mean an individual, partnership, limited liability company, corporation, trust, unincorporated organization, Governmental Authority, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"**Post-Closing Tax Period**" shall mean (i) any taxable period beginning after the Closing Date, and (ii) the portion of any Straddle Period beginning on the day after the Closing Date.

"**Pre-Closing Tax Period**" shall mean (i) any taxable period ending on or before the Closing Date, and (ii) the portion of any Straddle Period ending on the Closing Date.

"**Purchase Price**" shall mean [_____] Dollars ($_____), subject to the adjustments provided for in Section 2.7.

"**Purchased Assets**" shall mean, together with the Assumed Contracts and the Assumed Real Property Leases, all of the assets and properties that are owned, held or used by the Seller exclusively [in the conduct of [the Business] [the Seafood Business] [the Convenience Meals Business]] [in connection with the Green Cuisine Plant], as set forth on Schedule 1.2( ), other than the Excluded Assets.

"**Purchased Intellectual Property Rights**" shall mean all (i) Intellectual Property Rights (including all goodwill associated therewith) owned by the Seller and used exclusively in the Business and all Intellectual Property Rights licensed or sublicensed to the Seller under any Assumed Contracts (but only to the extent of the Seller's rights under, and subject to all terms and conditions of, such Assumed Contracts), in each of the foregoing cases used in, held for use in or necessary for the conduct of the [Business] [Seafood Business] [Convenience Meals Business]] [the Green Cuisine Plant], including (x) any trademark, trade name or other Intellectual Property Right owned by the Seller and used exclusively in the [Business] [Seafood Business] [Convenience Meals Business] [the Green Cuisine Plant] and (y) those described on [Schedule 1.2(d)] and (ii) rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the Applicable Laws (except that, for Intellectual Property Rights of Seller under such Assumed Contracts, such rights and remedies are only to the extent of the Seller's rights under, and subject to all terms and conditions of, such Assumed Contracts).

"**Purchaser**" shall have the meaning set forth in the Preamble.

"**Purchaser Benefit Plans**" shall have the meaning set forth in Section 6.10(b).

"**Purchaser Default Termination**" shall have the meaning set forth in Section 2.8.

"**Purchaser Documents**" shall have the meaning set forth in Section 5.2.

"**Representatives**" of a Person shall mean controlling persons, partners, directors, officers, managers, trustees, employees, agents, representatives, consultants, affiliates, advisors, counsel or nominees of such Person.

"**Review Period**" shall have the meaning set forth in Section 2.7(d).

"**Sale Approval Order**" shall mean the order of the Bankruptcy Court, substantially in the form of Exhibit D, authorizing, among other things, the sale of the Purchased Assets to the Purchaser pursuant to this Agreement and the consummation of the Transaction.

"**Sale Procedures Order**" shall have the meaning set forth in the Recitals.

"**Seafood Business**" shall have the meaning set forth in the Recitals.

"**Seller Benefit Plans**" shall mean each material Benefit Plan sponsored, maintained by, contributed to by or required to be contributed to by, Seller for the benefit of Current Seller Employees or Former Seller Employees.

"**Seller Multiemployer Plan**" shall have the meaning set forth in Section 4.9(a).

"**Seller**" shall have the meaning set forth in the Preamble.

"**Straddle Period**" shall mean any taxable period that commences on or before the Closing Date and that ends after the Closing Date.

"**Target Net Working Capital Amount**" shall mean $[_____].

"**Tax**" or "**Taxes**" shall mean any federal, state, local or foreign net income, gross income, gross receipts, commercial activity, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, payroll, social security, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, intangible taxes or environmental tax, escheat payments or any other tax, custom, duty, governmental fee or other like assessment or charge (together with any and all interest, penalties and additions to tax imposed with respect thereto) imposed on or with respect to the Purchased Assets by any Tax Authority.

"**Tax Authority**" means any Governmental Authority having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"**Tax Contest**" shall have the meaning set forth in Section 8.4(d).

"**Tax Return**" or "**Tax Returns**" shall mean all returns, declarations of estimated tax payments, reports, estimates, claims for refunds, information returns and statements,

including any related or supporting information, disclosures, notices, elections, schedules or forms with respect to any of the foregoing, filed or to be filed with any Tax Authority in connection with the determination, assessment, collection or administration of any Taxes.

"**Termination Payment**" shall have the meaning set forth in [                    ].

"**Transaction**" shall mean the transactions contemplated herein, including the purchase and sale of the Purchased Assets provided for in this Agreement.

"**Transfer Taxes**" shall mean any transfer, documentary, sales, use, stamp, registration and other such taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties, interest and additions to Tax in respect thereof).

"**Transferred Employee**" shall have the meaning set forth in Section 6.10(a).

"**Treasury Regulations**" shall mean final or temporary regulations promulgated under the IRC.

"**U.S. Publicly Traded Entity**" shall have the meaning set forth in Section 4.14.

"**Vacation Accrual**" shall have the meaning set forth in Section 6.10(b).

"**WARN Act**" shall mean the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

**Section 1.3    Other Terms**.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement. As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "*include*", "*includes*", and "*including*" will be deemed to be followed by "*without limitation*". Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "*this Agreement*", "*herein*", "*hereof*", "*hereby*", "*hereunder*", and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The word "or" is not exclusive.  References in this agreement to Articles, Sections, Schedules or Exhibits are to Articles or Sections of, Schedules or Exhibits to, this Agreement, except to the extent otherwise specified herein.

**Section 1.4    Headings**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

**Section 1.5    Interpretation**.  The parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto

and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.6    **Time**.  Time shall be of the essence of this Agreement.  Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period.  If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day.  Whenever action must be taken (including the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 5:00 p.m. (Eastern) on such date.  The time limited for performing or completing any matter under this Agreement may be extended or abridged by an agreement in writing by the parties or by their respective solicitors. All references herein to time are references to New York time.

**ARTICLE II**
**AGREEMENT OF PURCHASE AND SALE**

Section 2.1    **Purchase and Sale**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver to the Purchaser all of the Seller's right, title and interest in, to and under the Purchased Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.

Section 2.2    **Assumed Liabilities**.  Pursuant to the Sale Approval Order and to the extent permitted by Applicable Law, on the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume, effective as of the Closing, and shall timely perform, pay and discharge in accordance with their respective terms, the Assumed Liabilities.

Section 2.3    **Excluded Liabilities**.  Notwithstanding anything to the contrary in this Agreement, the Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Excluded Liabilities.  "**Excluded Liabilities**" shall mean:

(a)    all Liabilities of the Seller or an Affiliate of the Seller relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services performed in connection with this Agreement or the Transactions;

(b)    except (1) to the extent expressly assumed by the Purchaser pursuant to Section 2.2 or 6.10 or (2) with respect to any Seller Benefit Plan which shall transfer to the Purchaser pursuant to Applicable Laws, all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan (including any Liabilities related to any Seller Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or Section 412 of the IRC);

(c)      all Liabilities with respect to any Excluded Seller Employee with respect to any period;

(d)      all Liabilities relating to Excluded Assets, including the Excluded Contracts;

(e)      all Liabilities for Taxes of the Seller (or otherwise relating to the Business or the Purchased Assets) for all Pre-Closing Tax Periods;

(f)      obligations, Liabilities or amounts payable to any Affiliate of the Seller, other than those incurred in the Ordinary Course of Business.

### Section 2.4      Procedures for Assumption and Assignment of Agreements.

(a)      Pursuant to the Sale Approval Order, to the extent permitted by Applicable Law, the Seller shall provide for the assumption and assignment by the Seller to the Purchaser of the Purchased Assets on the terms and conditions set forth in this Section 2.4(a):

(i)      At the Closing, the Seller shall assign to the Purchaser the Assumed Contracts and Assumed Real Property Leases that constitute Purchased Assets.

(ii)      To the extent that any Assumed Contract or Assumed Real Property Lease that is a Purchased Asset is subject to Cure Costs pursuant to section 365 of the Bankruptcy Code, the Purchaser shall be responsible for such Cure Costs and to pay any amounts related to such cure obligations prior to the Closing.

(iii)      Upon satisfaction of any Cure Costs and at Closing, pursuant to section 365(k) of the Bankruptcy Code, the assumption and assignment of the Assumed Contracts and Assumed Real Property Lease by the Seller to the Purchaser shall relieve the Seller's estate from any Liability for any breach of such Assumed Contracts and Assumed Real Property Leases.  The Purchaser agrees that the Seller shall have no further liability or obligations with respect to such Assumed Contracts and Assumed Real Property Leases pursuant to section 365(k) of the Bankruptcy Code.

Section 2.5      [**Allocation of Purchase Price**.  Within ninety (90) days after the Closing Date, the Purchaser shall provide the Seller with a schedule (the "**Allocation Schedule**") setting forth the Purchaser's allocation of the Purchase Price for the purposes of, and in accordance with, §1060 of the IRC and the Treasury Regulations and any applicable provision of state, local or foreign law, among the various classes of assets listed on IRS Form 8594.  Such allocation shall be deemed final unless the Seller has notified the Purchaser in writing of any disagreement with the Allocation Schedule within thirty (30) days after submission thereof by the Purchaser.  If the allocation is deemed final or the Purchaser and the Seller reach such agreement, the Purchaser and the Seller shall execute and file all Tax Returns in a manner consistent with the allocation determined pursuant to this Section 2.5.  If the parties do not agree to a purchase price allocation in accordance with this Section 2.5, then the Seller and the Purchaser shall refer the disagreement to the Accountant.  The Accountant shall resolve any disagreement within 30 days and the Seller and the Purchaser agree that the decision of the Accountant shall be conclusive and binding on both the Seller and the Purchaser.  The

Accountant will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed portions of the Allocation Schedule as originally submitted to the Accountant. For example, should the disputed portions total in amount to $1,000 and the Accountant awards $600 in favor of the Seller's position, 60% of the costs of its review would be borne by the Purchaser and 40% of the costs would be borne by the Seller.  The Purchaser and the Seller shall execute and file all Tax Returns and other related documents in a manner consistent with the Accountant's determination.]

### Section 2.6      Purchase Price; Closing Payment.

(a)      In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Approval Order as of the Closing Date, the Purchaser shall assume the Assumed Liabilities and pay the Purchase Price, as the same may be adjusted in accordance with Section 2.7.

(b)      At the Closing, the Purchase Price shall be satisfied by payment of an amount equal to the Purchase Price, *less* (i) the Deposit, *plus* (ii) the amount, if any, by which the Estimated Net Working Capital Amount exceeds the Target Net Working Capital Amount, *less* (iii) the amount, if any, by which the Target Net Working Capital Amount exceeds the Estimated Net Working Capital Amount, plus (iv) the amount of the Cure Costs by a wire transfer of immediately available funds to an account designated by the Seller or the Escrow Agent, as applicable; it being understood that the Deposit shall be delivered to the Seller at the Closing in accordance with Section 2.8.

### Section 2.7      Purchase Price Adjustment.

(a)      No later than three (3) Business Days before the Closing, the Seller shall deliver to the Purchaser a certificate of the Seller that (i) sets forth in reasonable detail the Seller's reasonable estimate of the Closing Net Working Capital Amount (the "**Estimated Net Working Capital Amount**"), along with reasonable supporting detail therefor, with such estimate prepared in accordance with GAAP applied in a manner consistent with the preparation of the Seller's financial statements on a going concern basis and using the same accounting methods, policies, practices and year-end procedures, with consistent classifications, judgments and estimation methodology, as were used in preparation of the Seller's financial statements, including a reconciliation of all significant accounts (the "**GAAP Accounting Principles**"), and (ii) confirms that the Estimated Net Working Capital Amount was prepared in good faith and in accordance with the GAAP Accounting Principles.

(b)      As promptly as practicable, but in no event later than sixty (60) days following the Closing Date, the Purchaser shall, at its expense, (i) cause to be prepared, in accordance with the GAAP Accounting Principles, an unaudited Closing Balance Sheet (which shall contain all of the line items referred to in the definition of, and necessary to calculate, the Closing Net Working Capital Amount), together with a statement (the "**Closing Date Schedule**") setting forth in reasonable detail each of the line items comprising, and the Purchaser's calculation of, the Closing Net Working Capital Amount, and (ii) deliver to the Seller, the Closing Balance Sheet and the Closing Date Schedule, together with a certificate of

the Purchaser confirming that the Closing Balance Sheet and the Closing Date Schedule were prepared in good faith and in accordance with the GAAP Accounting Principles.

(c)    the Purchaser and the Seller shall, and shall cause their respective Affiliates and representatives to, cooperate and assist in the preparation of the Closing Balance Sheet, the Closing Date Schedule, and the calculation of the Closing Net Working Capital Amount, and in the conduct of the review referred to in this Section 2.7.  Without limiting the foregoing, from and after the Closing until the end of the Review Period (as defined herein), the Purchaser shall provide the Seller with reasonable access to the books, records and employees of the Purchaser, upon reasonable notice and during regular business hours, for the purposes of enabling the Seller to calculate, and to review the Purchaser's calculation of, the Closing Net Working Capital Amount and, and to review the Purchaser's preparation of the Closing Balance Sheet and the Closing Date Schedule.

(d)    If the Seller disputes the preparation of the Closing Balance Sheet or the Closing Date Schedule, the determination of any item shown thereon, or the omission of any item therefrom, or the calculation of the Closing Net Working Capital Amount, then the Seller shall deliver a written notice disagreeing with the preparation of the Closing Balance Sheet, the Closing Date Schedule or the calculation of the Closing Net Working Capital Amount and setting forth the Seller's disagreement with respect thereto (a "**Dispute Notice**") to the Purchaser at any time during the thirty (30) day period commencing upon receipt by the Seller of the Closing Balance Sheet, the Closing Date Schedule and the related certificate from the Purchaser, all as prepared by the Purchaser in accordance with the requirements of Section 2.7(b) (the "**Review Period**").  The Dispute Notice shall set forth the basis for the dispute of any relating calculation, to the extent applicable, in reasonable detail.

(e)    If the Seller does not deliver a Dispute Notice to the Purchaser prior to the expiration of the Review Period, the Closing Balance Sheet as delivered by the Purchaser and the Purchaser's calculation of the Closing Net Working Capital Amount set forth in the Closing Date Schedule, shall be deemed final and binding on the Seller and the Purchaser for all purposes, except to the extent otherwise agreed in writing by the Seller and the Purchaser.

(f)    If the Seller delivers a Dispute Notice to the Purchaser prior to the expiration of the Review Period, then the Seller and the Purchaser shall use commercially reasonable efforts to reach agreement on the disputed matter.  If the Seller and the Purchaser are unable to reach agreement on such disputed matter within thirty (30) days after the end of the delivery of the Dispute Notice, the Seller and the Purchaser shall refer such dispute to [                                    ] (the "**Accountant**") for resolution and (A) each of the Purchaser and the Seller shall have a reasonable opportunity to meet with the Accountant to provide its views to the Accountant as to any disputed issues with respect to such disputed matter, (B) the Accountant shall determine the final Closing Balance Sheet or Closing Date Schedule, in accordance with the terms of this Agreement within thirty (30) days of such referral and upon reaching such determination shall deliver a copy of the final Closing Balance Sheet and its calculations of the Closing Net Working Capital Amount (the "**Final Calculations**") to the Purchaser and the Seller, and (C) the Final Calculations shall be final and binding on the Seller and the Purchaser for all purposes of this Agreement.  In preparing the final Closing Balance Sheet and calculating the Closing Net Working Capital Amount, the

Accountant, acting as an expert and not an arbiter, (x) shall be limited to addressing any particular disputes referred to in the Dispute Notice and (y) any such calculation of the Closing Net Working Capital Amount shall, with respect to any disputed item, be no greater than the higher amount calculated by the Seller or the Purchaser, and no less than the lower amount calculated by the Seller or the Purchaser, as the case may be.  The Final Calculations shall reflect in detail the differences, if any, between the Closing Net Working Capital Amount reflected therein and the Closing Net Working Capital Amount set forth in the Closing Date Schedule.  The Accountant will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed portions of the Closing Net Working Capital Amount, the Closing Date Schedule and the Closing Balance Sheet as originally submitted to the Accountant. For example, should the disputed portions total in amount to $1,000 and the Accountant awards $600 in favor of the Seller's position, 60% of the costs of its review would be borne by the Purchaser and 40% of the costs would be borne by the Seller.

(g)    (i) If (A) the Estimated Net Working Capital Amount is greater than (B) the Closing Net Working Capital Amount, as finally determined in accordance with Section 2.3(f), by an amount exceeding [$50,000], then the Seller shall pay (or cause to be paid) to the Purchaser, an amount equal to the difference between the Estimated Net Working Capital Amount and the Closing Net Working Capital Amount (from dollar one). For the avoidance of doubt, no payment shall be made by the Seller to the Purchaser pursuant to this clause (i) if such difference does not exceed [$50,000].  (ii) If (A) the Closing Net Working Capital Amount, as finally determined in accordance with Section 2.7(f), is greater than (B) the Estimated Net Working Capital Amount by an amount exceeding $10,000, then the Purchaser shall pay (or cause to be paid) to the Seller an amount equal to the difference between the Closing Net Working Capital Amount and the Estimated Net Working Capital Amount (from dollar one).  No payment shall be made by the Purchaser to the Seller pursuant to this clause (ii) if such difference does not exceed [$50,000].

(h)    Any amounts payable pursuant to Section 2.7(g) shall be paid in cash within two (2) Business Days following the final determination of the Closing Net Working Capital Amount by wire transfer of immediately available funds to an account designated by the Seller or the Purchaser, as applicable.  Any amounts at any time payable under this Section 2.7 shall be deemed allowed administrative claims in the Chapter 11 Case of the Seller in accordance with sections 503(b) and 507 of the Bankruptcy Code.

**Section 2.8    Deposit**.  On the date hereof, the Seller and the Purchaser shall enter into an escrow agreement substantially in the form of Exhibit A (the "**Escrow Agreement**"), with [*] as escrow agent (the "**Escrow Agent**"), and the Purchaser shall deposit into escrow with the Escrow Agent an amount equal to [_____] Dollars ($_____)[5] (such amount, together with any interest accrued thereon prior to the Closing Date, the "**Deposit**") by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of the Seller or the Purchaser.  The Deposit shall become payable

---

[5] Deposit amount shall be equal to 10% of the Purchase Price.

to the Seller upon the earlier of (i) the Closing, (ii) the termination of this Agreement by the Seller pursuant to Section 9.1(b) in a situation where the failure to consummate the Transaction prior to the Outside Date was due to any failure on the part of the Purchaser, (iii) the termination of this Agreement by the Seller pursuant to Section 9.1(c), or (iv) the termination of this Agreement by the Seller pursuant to Section 9.1(e), (the termination of this Agreement in the circumstances described in clauses (ii), (iii) or (iv) shall be referred to herein as a "**the Purchaser Default Termination**").  At the Closing, the Deposit shall be delivered to an account designated by the Seller by wire transfer of immediately available funds as payment of a portion of the Purchase Price.  If the Deposit becomes payable to the Seller by reason of a Purchaser Default Termination, the Escrow Agent shall, within three (3) Business Days after receiving notice of such the Purchaser Default Termination from the Seller (which notice the Seller shall simultaneously deliver to the Purchaser), disburse the deposit to an account designated by the Seller by wire transfer of immediately available funds to be retained by the Seller for its own account); *provided*, *however*, that no such funds shall be disbursed if the Purchaser delivers a written objection to a the Purchaser Default Termination, signed by an officer of the Purchaser and setting forth in reasonable detail the reasons for such objection, to the Seller and the Escrow Agent within two (2) Business Days of receipt of notice thereof.  If this Agreement is terminated other than for a termination that constitutes a Purchaser Default Termination, the Seller and the Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to the Purchaser the Deposit by wire transfer of immediately available funds.  The Escrow Agent's escrow fees and charges shall be paid by the Purchaser.

## ARTICLE III
## BANKRUPTCY MATTERS

In addition to the conditions set forth in Article VII, it shall be a condition precedent to the obligations of each of the parties to this Agreement that the Bankruptcy Court shall have entered the Sale Approval Order, after notice and a hearing as defined in section 102(1) of the Bankruptcy Code, approving the terms and conditions of this Agreement and authorizing the Seller to perform all acts necessary to consummate the Transaction.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Purchaser as follows:

**Section 4.1**    **Organization and Good Standing**.  The Seller (a) is duly formed and subsisting under the laws of jurisdiction in which it was formed, is properly qualified to do business in such jurisdiction and in each other jurisdiction in which it is required to register as a result of the conduct of its business, and (b) has the corporate power, authority, right and capacity to own, operate or lease the Purchased Assets and to operate the Business in all respects as currently conducted.  The Seller has the corporate power, authority, right and capacity to enter into, execute and deliver this Agreement and, subject to the entry of the Sale Approval Order, to carry out the Transaction in the manner contemplated by this Agreement.

**Section 4.2    Authorization of Agreement**.  The Transaction has been duly and validly authorized by all requisite corporate or other proceedings of the Seller and subject to the entry of the Sale Approval Order, upon execution and delivery by the Purchaser, this Agreement and all other documents and agreements to be delivered by the Seller pursuant to this Agreement shall constitute legal, valid and binding obligations of the Seller.

**Section 4.3    Conflicts; Consents of Third Parties**.  Except (i) as set forth on Schedule 4.3 or (ii) as otherwise provided for pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court, to the Knowledge of the Seller, neither the execution of this Agreement nor its performance by the Seller will result in a breach of any material term or material provision, or constitute a default under, or conflict with or cause the acceleration of any material obligation of the Seller under its constituent documents or by laws or any indenture, mortgage, deed of trust or any other material agreement to which it is a party, or by which it is bound, and, other than the Sale Approval Order and any applicable approvals of any Governmental Authority, no consent, approval or other documentation is necessary to enable the Seller to complete the Transaction pursuant to this Agreement in compliance with all Company Licenses and existing obligations and Permits of the Seller and in compliance with all Applicable Laws, Permitted Encumbrances and any other obligations or agreements which affect the Seller.

**Section 4.4    Real Property**.

(a)    Schedule 4.4 sets forth a complete list of (i) all leases of real property by the Seller, whether as lessee or lessor, used or held for use in connection with the operation and conduct of [the Business] [the Seafood Business] [the Convenience Meals Business]] [the Green Cuisine Plant] (the "**Existing Real Property Leases**") and (ii) the **Existing Real Property Leases which shall be assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court** (each, an "**Assumed Real Property Lease**", and collectively, the "**Assumed Real Property Leases**").

(b)    Leased Real Property.  The Seller has a valid leasehold or licensed interest in all of the Assumed Real Property Leases, free any clear of any Encumbrances other than Permitted Encumbrances.  A true, complete and correct copy of each Assumed Real Property Lease has been made available to the Purchaser and each such Assigned Real Property Lease is in full force and effect and enforceable against the Seller and, to the Knowledge of the Seller, the other parties thereto, in accordance with its terms.  Except for any default resulting from the insolvency of the Seller, the Seller is not in material default under, and there are no outstanding notices of material default or termination under, any of the Assigned Real Property Leases.  At the Closing, there shall not exist a material default or an event which, with the passage of time or the giving of notice or both, would constitute a material default on the part of the Seller or, to the Knowledge of the Seller, the other parties thereto, under any of the Assumed Real Property Leases.

**Section 4.5    Material Contracts**.  To the Knowledge of the Seller, (i) Other than the Excluded Contracts, the Assumed Contracts are the only material Contracts relating to the Purchased Assets or otherwise material to [the operation and conduct of the [Business]

[Seafood Business] [Convenience Meals Business] [the Green Cuisine Plant] taken as a whole, and at Closing there shall not be any Contracts affecting the Purchased Assets or otherwise material to the operation and conduct of the Business taken as a whole, other than the Assumed Contracts; (ii) except for any default resulting from the insolvency of the Seller [and other than as set forth on Schedule 4.5], the Seller has neither given or received notice of any default, and the Seller is not in material default under any of the Assumed Contracts and, on the Closing Date, there shall not exist any default or event which, with the passage of time or the giving of notice or both, would constitute a material default in the performance or observance of the obligations on the part of the Seller under any of the Assumed Contracts (including the Permitted Encumbrances); and (iii) each of the Assumed Contracts (including the Permitted Encumbrances) is in full force and effect, in all material respects and is a valid and binding obligation of the Seller and, to the Knowledge of the Seller, the other parties thereto, in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 4.5, and (z) as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 4.6    Environmental Matters**.  The representations and warranties contained in this Section 4.6 are the sole and exclusive representations and warranties of the Seller pertaining or relating to any environmental, health or safety matters, including any arising under any Environmental Laws.  Except as described in the Environmental Reports made available to the Purchaser in the electronic dataroom as of the date hereof, and except as would not be reasonably be expected to result in the Company incurring material Liability under Environmental Law: (i) to the Knowledge of the Seller, the Green Cuisine Plant and the use thereof is in material compliance with Environmental Laws; (ii) the Seller is in compliance with Environmental Laws, which compliance includes obtaining, maintaining, and complying with any Environmental Permits; (iii) the Seller is not subject to any Claim or, to the Knowledge of the Seller, any threatened Claim alleging that the Seller may be in violation of any Environmental Law or Environmental Permit, or may have any liability under Environmental Law; and (iv) to the Knowledge of the Seller, no facts, circumstances or conditions exist with respect to the Purchased Assets or the Seller that would in each case or in the aggregate reasonably be expected to result in liability under Environmental Laws.  The Seller has made available to the Purchaser a copy of all Environmental Reports.

**Section 4.7    Intellectual Property**.  The Seller has good, valid and marketable title to, or the right to use, all of the Purchased Intellectual Property Rights.  To the Knowledge of the Seller, all current and former employees of the Seller have assigned to the Seller all of such employees' Intellectual Property Rights in the Purchased Intellectual Property Rights that such employees have created while in the scope of their employment with the Seller, including copyrights in works made for hire and patents, except where failure to assign such Intellectual Property Rights would not reasonably be expected to materially impair the ability of the Seller to continue to obtain free of charge the benefits of such Purchased Intellectual Property Rights. Schedule 4.7 lists (a) each registered Purchased Intellectual Property Right owned by the Seller and (b) each material Assumed Contract pursuant to which the Seller has granted any Person the right to reproduce, distribute, market or exploit Purchased Intellectual Property Rights.  There is no action pending against the Seller or, to the Knowledge of  the Seller, threatened against the

Seller that challenges the validity of ownership of any Purchased Intellectual Property Rights owned by the Seller or the use of any Purchased Intellectual Property Rights by the Seller.  To the Knowledge of the Seller, no third party's operations or products infringe on the Purchased Intellectual Property Rights owned by the Seller in any material respect.  To the Knowledge of the Seller, the operation and conduct of the Business as currently conducted do not infringe in any material respect on the Intellectual Property Rights of any third Person.  The Seller has not received during the preceding three (3) years any written claim of infringement with respect to any Intellectual Property Rights used in connection with the operation and conduct of the Business.

Section 4.8    **Insurance**.  Schedule 4.8 hereto sets forth a complete list of all material insurance policies with respect to which the Seller is a party, a named insured or otherwise the beneficiary of coverage relating to the Business.

Section 4.9    **Employee Benefits Plans**.

(a)    Schedule 4.9(a) sets forth a complete and correct list of each Seller Benefit Plan and identifies each Seller Benefit Plan.  No Seller Benefit Plan is (i) a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA ("Multiemployer Plan"), (ii) a single employer plan subject to Title IV of ERISA (a "Title IV Plan") or (iii) an employee benefit plan that is maintained by more than one employer within the meaning of Section 413(i) of the Code.

(b)    True and complete copies of the following documents, with respect to each Seller Benefit Plan that is an Assumed Agreement (each an "**Assumed Seller Benefit Plan**") have been made available to the Purchaser by the Seller, to the extent applicable: (i) any plans, all amendments thereto and related trust documents, and amendments thereto; (ii) the most recent Forms 5500 and all schedules thereto and the most recent actuarial report, (iii) the most recent IRS determination letter, if any, and (iv) the most recent summary plan descriptions.

Section 4.10    **Labor**.

(a)    Seller has no labor or collective bargaining agreement or other similar agreement or arrangement to which the Seller, is a party with a union, works council, trade union or other employee organization.

(b)    Except as set forth on Schedule 4.10(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending, or to the Knowledge of the Seller, threatened against or involving it or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Seller, threatened by or on behalf of any employee or group of employees of the Seller, except in each case as would not have a Material Adverse Effect.

Section 4.11    **Permits**.  The Seller holds all material licenses, permits, approvals, consents, certificates, registrations and similar authorizations (whether governmental, regulatory or otherwise) necessary to conduct the Business as currently conducted by it or to own or lease any of the property or assets utilized by it in the Business as such property or assets are currently owned, leased or utilized (a "**Company License**").  Each Company License is valid, subsisting

and in good standing and Seller is not in default or breach of such Company License or material Permit and, to the Knowledge of the Seller, no Legal Proceeding is pending or threatened to revoke or limit any Company License or material Permit.

**Section 4.12    <u>Taxes</u>**.

(a)    All material Tax Returns required to be filed by the Seller with respect to the Business, or the Purchased Assets have been timely filed with the appropriate Tax Authorities (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, correct, and complete in all material respects.  All material Taxes shown as due and payable on such Tax Returns have been fully and timely paid. The Seller is not currently the beneficiary of any extension of time within which to file any Tax Return concerning the Business or the Purchased Assets, and the Seller has not waived in writing or been requested in writing to waive any statute of limitations in respect of Taxes concerning the Business or the Purchased Assets.

(b)    There are no audits, examinations, or investigations by any Tax Authority in progress, pending, or threatened in writing with respect to material Taxes of the Seller concerning the Business or the Purchased Assets.  There are no administrative or court proceedings in progress, pending, or threatened in writing with respect to material Taxes of the Seller concerning the Business or the Purchased Assets.  Except as set forth on <u>Schedule 4.12(b)</u>, there is no existing, pending, or threatened claim, proposal, or assessment with respect to material Taxes of the Seller concerning the Business or the Purchased Assets.

(c)    There are no Encumbrances for material Taxes owed by the Seller or concerning the Business or the Purchased Assets other than Permitted Encumbrances.

**Section 4.13    <u>Financial Advisors</u>**.  Except as set forth on <u>Schedule 4.13</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller in connection with the Transactions and no such Person is entitled to any fee or commission or like payment from the Purchaser in respect thereof.

**Section 4.14    <u>OFAC</u>**.  [Neither the Seller nor any Person owning an interest in the  Seller is:  (i) identified on the "Specially Designated Nationals or Blocked Persons List" maintained by the Office of Foreign Purchased Assets Control, Department of Treasury (the "**OFAC**") or any other similar list maintained by the OFAC or the United States Department of Commerce, Bureau of Industry and Security of any other United States Governmental Authority pursuant to Applicable Laws; and (ii) a Person with whom a United States person is prohibited to engage in transactions pursuant to any trade embargo, economic sanction, or other prohibition of Applicable Laws, or Executive Order of the President of the United States or United Nations decree or resolution; *provided*, *however*, that this Section shall not apply to any Person to the extent that such Person's interest in the Seller is through a U.S. Publicly-Traded Entity and as used in this Agreement, "**U.S. Publicly-Traded Entity**" means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person.]

**Section 4.15    Legal Proceedings**.  Except as set forth on Schedule 4.15, there are no material Legal Proceedings pending or, to the Knowledge of the Seller, threatened against the Seller relating to the Business or the Purchased Assets.

**Section 4.16    Title to Purchased Assets; Sufficiency of Purchased Assets**. Except as set forth in Schedule 4.16, the Seller owns and has good title to each of the Purchased Assets, free and clear of all Liens other than Permitted Exceptions.  The Purchased Assets constitute all of the assets [necessary together with the Sellers' agreements hereunder for the Purchaser to conduct of the [Business] [Seafood Business] [Convenience Meals Business]] [related to the Green Cuisine Plant] as of the Closing Date without interruption and in the Ordinary Course of Business, except [insurance, management, legal and other corporate services and] the Excluded Assets.

**Section 4.17    No Other Representations or Warranties; Schedules; Disclaimer of Warranty**.  Except for the representations and warranties contained in this Article IV (as modified by the Schedules hereto), neither the Seller nor any other Person makes any other express or implied representation or warranty with respect to the Seller, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and the Seller disclaims any other representations or warranties, whether made by the Seller, any Affiliate of the Seller or any of their respective Representatives.  Except for the representations and warranties contained in Article IV hereof (as modified by the Schedules hereto as supplemented or amended), **the Seller (i) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials)** and (ii) hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Purchaser by any Representative of the Seller or any of its Affiliates).  The Seller make no representations or warranties to the Purchaser regarding the probable success or profitability of the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant].  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to and in favor of the Seller, as follows:

**Section 5.1    Organization and Good Standing**. the Purchaser is a [limited liability company/corporation] duly organized, validly existing and in good standing under the laws of the State of [Delaware] and has all requisite [limited liability company] [corporate] power, authority, right and capacity to enter into this Agreement and to carry out the Transaction in the manner contemplated by this Agreement.

**Section 5.2** __Authorization of Agreement__. the Purchaser has full [limited liability] [corporate] company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "**the Purchaser Documents**"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Purchaser of this Agreement and each the Purchaser Document have been duly authorized by all necessary [limited liability company] [corporate] action on behalf of the Purchaser.  This Agreement has been, and each the Purchaser Document will be at or prior to the Closing, duly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each the Purchaser Document when so executed and delivered will constitute, the, legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.3** __Conflicts; Consents of Third Parties__.

(a)   Except (i) as set forth on __Schedule 5.3(a)__ hereto, or (ii) as otherwise provided for pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any material violation of or material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and by-laws of the Purchaser; (ii) any Contract or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound; (iii) any Order of any Governmental Authority applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound; or (iv) any applicable Law (in each case except as would not materially interfere with or prevent the Purchaser from consummating the Transaction).

(b)   No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of the Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by the Purchaser of any other action contemplated hereby, except for compliance with the applicable requirements of the HSR Act and [specify any other applicable regulatory requirements or required consents or filings].

**Section 5.4** __Litigation__.  There are no Legal Proceedings pending or, to the knowledge of the Purchaser, threatened that are reasonably likely to prohibit or restrain the ability of the Purchaser to enter into this Agreement or consummate the transactions contemplated hereby.

**Section 5.5**    **Financial Advisors**.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

**Section 5.6**    **Financial Capability**.  the Purchaser (i) has, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by the Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities. the Purchaser has delivered to the Seller true, correct and complete copies of (a) executed equity commitment letters between the Purchaser and [_____], to provide equity financing to the Purchaser in an aggregate amount of $[___] million, and (b) an executed commitment letter from [_____] pursuant to which [_____] has committed to provide the Purchaser with debt financing in an aggregate amount of $[_____] million] (together, the "**Financing Documents**").  Each of the Financing Documents delivered to the Seller is a legal, valid and binding obligation of the parties thereto and is in full force and effect as of the date hereof.  No event has occurred which, with or without notice, lapse of time or both, would constitute a default on the part of any party under the Financing Documents.  The Purchaser has no reason to believe that it will be unable to satisfy on a timely basis any term or condition of closing to be satisfied by it contained in the Financing Documents.  The Purchaser has fully paid any and all commitment fees and other fees required by the Financing Documents to be paid as of the date hereof.

**Section 5.7**    **Condition of the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant]**.  Notwithstanding anything contained in this Agreement to the contrary, the Purchaser acknowledges and agrees that the Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Seller in Article IV hereof (as modified by the Schedules hereto as supplemented or amended), and the Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the [Business  [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] are being transferred on a "where is" and, as to condition, "as is" and "with all faults" basis.  Any claims the Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of the Seller set forth in Article IV hereof (as modified by the Schedules hereto as supplemented or amended).  The Purchaser further represents that neither the Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Seller, the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or the Transactions not expressly set forth in this Agreement, and none of the Seller, any of its Affiliates nor or any other Person will have or be subject to any liability to the Purchaser or any other Person resulting from the distribution to the Purchaser or its representatives or the Purchaser's use of, any such information distributed on behalf of the Seller relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or other publications or data room information provided to the Purchaser or its representatives, or any other document or information in any form provided to

the Purchaser or its representatives in connection with the sale of the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] and the Transactions contemplated hereby.  The Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] and, in making the determination to proceed with the transactions contemplated by this Agreement, the Purchaser has relied on the results of its own independent investigation.  As of the date hereof, the Purchaser is not aware of any facts, events or circumstances that would cause any of the representations or warranties of the Seller set forth in Article IV hereof to be untrue or incorrect in any respect.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

### Section 6.1    Covenants of the Seller.

(a)    If following the Closing, the Seller receives or become aware that it holds any property, right, claim, demand or asset that constitutes a Purchased Asset then the Seller shall transfer such property, right, claim, demand or asset to the Purchaser as promptly as practicable for no additional consideration.

(b)    From and after the date hereof, the Seller covenants and agrees unless the Purchaser otherwise agrees in writing, which approval of the Purchaser shall not be unreasonably withheld or delayed, between the date of this Agreement and the Closing Date, the Seller shall conduct its business in the Ordinary Course of Business.

(c)    The Seller shall, and shall cause its Affiliates to, refrain from taking any action which would cause any representation or warranty contained in Article IV to be untrue or incorrect in any material respect as of the Closing.

(d)    Subject to the express provisions of this Agreement, the Seller shall use reasonable efforts (i) to perform and satisfy all conditions to each of the Purchaser's and the Sellers' obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by the Seller under this Agreement, and (ii) to cause the Closing to occur as promptly as practicable and the Seller shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

### Section 6.2    Covenants of the Purchaser.

(a)    The Purchaser shall, and shall cause its Affiliates to, refrain from taking any action which would cause any representation or warranty contained in Article V to be untrue or incorrect in any material respect as of the Closing.

(b)    Subject to the express provisions of this Agreement, the Purchaser shall use reasonable best efforts (i) to perform and satisfy all conditions to each of the Purchaser's and Sellers' obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by the Purchaser under this Agreement, and (ii) to cause the Closing to occur as promptly as practicable and the Purchaser shall not, and shall not permit any of its

Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

(c)    If following the Closing, the Purchaser receives or becomes aware that it holds any property, right, claim, demand or asset that constitutes an Excluded Asset, then the Purchaser shall transfer such property, right, claim, demand or asset to the Seller as promptly as practicable for no additional consideration.

## Section 6.3    Access to Information.

(a)    Prior to the Closing, the Purchaser shall be entitled, through its Representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Seller relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] and the Purchased Assets and such examination of the books and records of the Seller relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] and the Purchased Assets as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under Applicable Law. The Seller shall cause its with the Purchaser and the Purchaser's Representatives in connection with such investigation and examination, and (i) the Purchaser and its Representatives shall cooperate with the Seller and its Representatives and shall use reasonable efforts to minimize any disruption to the Business, (ii) a Representative of the Seller shall accompany the Purchaser and its Representatives during all inspections if reasonably practicable, (iii) the Purchaser and its Representatives shall not conduct any inspections or take any actions not permitted under the Seller's real property leases, and (iv) the Purchaser shall indemnify Seller from any and all costs, damages, expenses and fees arising from the acts or omissions of the Purchaser and its Representatives in connection with such inspection. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require the Seller to disclose (i) information about any business of the Seller other than the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or the Purchased Assets (ii) technical, financial or operating information (including price or cost data on any basis other than an aggregate basis) which, in the reasonable judgment of the Seller contain information the disclosure of which would be detrimental to Seller or (iii) information subject to attorney-client privilege or conflict with any confidentiality obligations to which the Seller is bound. Notwithstanding anything to the contrary contained herein, prior to the Closing, without the prior written consent of the Seller, which may be withheld for any reason, (x) the Purchaser shall not contact any suppliers to, or customers of, the Seller, and (y) the Purchaser shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Seller.

(b)    For a period of two years after the Closing, the Purchaser will give the Seller or its Representatives  reasonable access during the Purchaser's regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under Applicable Law to books and records transferred to the Purchaser to the extent necessary for the preparation of financial statements and regulatory filings of the Seller or any of its Affiliates in respect of periods ending on or prior to Closing, or in connection with

any Legal Proceedings.  The Seller shall be entitled, at its sole cost and expense, to make copies of the books and records to which they are entitled to access pursuant to this Section 6.3(b).

Section 6.4   **Joint Obligations**.  The parties shall proceed diligently and in good faith to attempt to settle, on or before the Closing Date or such earlier date as may be expressly set forth herein, the contents of all Closing Documents to be executed and delivered by the Seller and the Purchaser; *provided*, *however*, that, in the case of any Closing Documents to be executed and delivered in the forms attached hereto as Exhibits, such forms shall not be subject to further negotiations and the Seller and the Purchaser shall provide all details or information necessary to complete such documents, subject to the other's approval of the accuracy of such details and information, such approval not to be unreasonably withheld.

Section 6.5   **HSR Act; Cooperation**.

(a)   Subject to Section 6.5(c), as soon as reasonably practicable (and, in any event, within ten (10) Business Days) following the date of this Agreement, the Seller and the Purchaser shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed with respect to the Transaction under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice.  Each of the Purchaser and the Seller shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall, subject to Section 6.5(c), take all other actions necessary to cause any waiting period under the HSR Act to terminate or expire at the earliest practicable date after the date of filing.  The Purchaser shall be responsible for payment of the applicable filing fee under the HSR Act, and each party shall be responsible for payment of its own respective costs and expenses (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)   The Seller and the Purchaser (i) shall promptly inform each other of any communication from any Governmental Authority concerning the HSR Act and any filing, notification or request for approval related thereto and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto.  In addition, neither the Seller nor the Purchaser shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to the HSR Act unless such party consults with the other in advance and, to the extent permitted by any such Governmental Authority, gives the other the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to any restrictions under Applicable Law, each of the Purchaser and the Seller shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to the HSR Act (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Racetrack or the Business) or any such filing, notification or request for approval.  The Seller and the Purchaser shall also furnish the other with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation

of necessary filings, registration or submissions of information to the Governmental Authority in connection with the HSR Act and any such filing, notification or request for approval.

(c)    Notwithstanding anything in this Agreement to the contrary, neither the Purchaser or its Affiliates nor the Seller or their Affiliates shall be required to (i) offer, negotiate, commit to or effect, by consent decree, hold separate order or otherwise, the sale, divestiture, license or other disposition of any of its capital stock, properties, assets, rights, products or businesses, or (ii) permit or suffer to be imposed on it any other restrictions on its activities or the Purchased Assets.

### Section 6.6    Consents; Further Assurances.

(a)    The Purchaser and the Seller shall use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions contemplated by this Agreement, *provided, however*, that no party shall be obligated to pay any consideration to any third party from whom consent or approval is requested (other than in connection with compliance with the HSR Act).

(b)    Subject to, and not in limitation of, Section 6.5, each of the Purchaser and the Seller shall use their respective commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(c)    The Seller shall use its commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required from any third parties in order for the Seller to assign to the Purchaser the Contracts pursuant to which the Seller has been granted any licenses or sublicenses to any Intellectual Property Rights owned by third parties and used in connection with the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant]; provided, however, that (i) Seller shall not be obligated to pay any consideration to any third party from whom such consent or approval is requested, (ii) if the Seller is unable to obtain any such consent or approval after using their commercially reasonable efforts, such inability to obtain such consent or approval shall not be deemed a breach of this Agreement and (iii) Seller's obligation to use such commercially reasonable efforts to obtain such consents and approvals shall terminate sixty (60) days after the Closing Date, after which time the Seller shall have no obligation to use any efforts to obtain any such consents and approvals.

### Section 6.7    Notice of Default.

(a)    The Seller shall, within five (5) Business Days of receipt thereof, provide to the Purchaser a copy of any notices of any material default that it receives in respect of any Assumed Contract and any notices of default under any Assumed Contract or Assumed Real Property Lease that it sends to another Person, in either case after the date of this Agreement.

(b)    The Seller on the one hand and the Purchaser on the other hand shall promptly notify the other of:

        (i)      any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transaction, and

        (ii)     any inaccuracy of any representation or warranty or breach of covenant or agreement contained in this Agreement at any time during the term hereof that would make any of such Party's representations under Articles IV or V of this Agreement, as applicable, false in any material respect,

*provided*, *however*, that delivery of any notice pursuant to this Section 6.7(b) shall not modify the representations, warranties, covenants, agreements or obligations of the parties (or remedies with respect thereto) or the conditions to the obligations of the parties under this Agreement.

        **Section 6.8**     **Confidentiality**.  The Purchaser acknowledges that the information provided to it in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between the Purchaser and the Seller dated _____, 2011 (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate.

        **Section 6.9**     **Disclosure Schedules; Supplementation and Amendment of Schedules.**  The Seller may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the entire Agreement and not just such section.  From time to time prior to the Closing, the Seller shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement.

        **Section 6.10**     **Post-Closing Employee Covenants**.

        (a)      Prior to the Closing, the Purchaser shall offer to employ all or substantially all Current Seller Employees relating to [the Business] [Seafood Business] [Convenience Meals Business] with employment  commencing as of the Closing.  Schedule 6.10 sets forth a list, as of the date hereof, of all Current Seller Employees relating to [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant].  For purposes of this Agreement, each Current Seller Employee who receives such an offer of employment shall be referred to as an "**Offeree**."  At least five (5) Business Days prior to the Closing Date, the Purchaser will provide the Seller with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "**Transferred Employee**".  The Purchaser hereby agrees that the offer to an Offeree shall include a level of base salary, base wages and benefits eligibility that is substantially comparable in the aggregate to the base salary, base wages and benefit eligibility provided to such Offeree as of the Closing Date.  Notwithstanding anything to the contrary contained in this Section 6.10(a), with respect to each "site of employment" (within the meaning of the WARN

Act) of the Seller, the Purchaser shall hire a sufficient number of Offerees at each such site of employment such that the Seller shall incur no obligations or Liability under the WARN Act with respect to such site of employment.   The Purchaser acknowledges and agrees that the Purchaser shall be exclusively liable for any claims related to discrimination that arise solely from the Purchaser's actions taken in selecting any Offerees.

(b)    As of the Closing, the Purchaser shall credit each Transferred Employee with the unused and outstanding vacation, sick days, personal days or leave earned or accrued by each Transferred Employee through the Closing pursuant to the Seller Benefit Plans (including, in each case, any applicable Labor Agreement) applicable to such Transferred Employee that are paid time off plans and policies (the "**Vacation Accrual**"); provided, however, that no later than three (3) Business Days prior to the Closing Date, the Seller shall provide to the Purchaser a schedule setting forth all Vacation Accruals for each applicable Offeree.  In addition, Transferred Employees shall receive credit for all purposes (including for purposes of eligibility to participation, vesting, benefit accrual and eligibility to receive benefits) under each Benefit Plan established or maintained by the Purchaser or its Affiliate after the Closing (the "**Purchaser Benefit Plan**") under which each Transferred Employee may be eligible to participate on or after the Closing to the same extent recognized by the Seller under the Seller Benefit Plan that most closely resembles such Purchase Benefit Plan, if any, as of the Closing Date.  With respect to any Purchaser Benefit Plan that is a welfare benefit plan and in which a Transferred Employee may be eligible to participate on or after the Closing, the Purchaser shall, (i) waive, or cause its insurance carrier to waive, all limitations as to pre-existing, waiting period or actively-at-work conditions, if any, with respect to participation and coverage requirements applicable to each Transferred Employee under such Purchaser Benefit Plan, and (ii) provide credit to each Transferred Employee (and such Transferred Employee's beneficiaries) for any co-payments, deductibles and out of pocket expenses paid by such Transferred Employee (and such Transferred Employee's beneficiaries) under the Seller Benefit Plans that are medical, dental, vision or other welfare plans during the relevant plan year; provided, however, that such credit shall not operate to duplicate any benefit.

(c)    The Seller shall provide COBRA continuation coverage (within the meaning of Section 4980B of the IRC and the Treasury Regulations thereunder) to all Current Seller Employees (including Current Seller Employees who are Transferred Employees), Former Seller Employees and their respective qualified beneficiaries, in each case, who are M&A Qualified Beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation Section 54.4980B-9) with respect to the sale of the Purchased Assets to the Purchaser.

(d)    Subject to Applicable Law, the Seller shall retain all Liabilities for all short- and long-term disability benefits expenses for each Current Seller Employee (including Current Seller Employees who are Transferred Employees) and Former Seller Employee and their eligible beneficiaries and dependents with respect to claims incurred before the Closing Date, regardless of when such claims are submitted.  The Purchaser shall be responsible for all Liabilities with respect to claims incurred on or after the Closing Date by the Transferred Employees and their eligible beneficiaries and dependents for short- and long-term disability benefits.

(e)      Nothing in this Agreement shall affect the Purchaser's right to terminate the employment of its employees.  Nothing in this Agreement shall be construed to grant any employee of the Seller a right to continued employment by, or to receive any payment or benefits from, Seller or the Purchaser or through any Benefit Plan.  This Agreement shall not limit the Purchaser's or its Affiliates' ability or right to amend or terminate any benefit or compensation plan or program of the Purchaser or its Affiliates and nothing contained herein shall be construed as an amendment to or modification of any such plan. Nothing contained in this Section 6.10, express or implied, shall constitute an amendment to any Seller Benefit Plan, or the Purchaser Benefit Plan, create any third party beneficiary rights or inure to the benefit of or be enforceable by any employee of the Purchaser or Seller or any Person representing the interest of employees.

**Section 6.11    Publicity**.  Except as required by Applicable Law or the rules or regulations of any applicable securities exchange or for any filings by the Seller with the Bankruptcy Court, neither the Seller nor the Purchaser shall issue any press release or public announcement concerning this Agreement or the Transaction without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, provided that the party intending to make any such release it deems required by Applicable Law shall use its commercially reasonable efforts consistent with such Applicable Law to consult with the other parties with respect to the text thereof.

**Section 6.12    Survival**.  The parties agree that the representations contained in this Agreement or in any Closing Documents shall not survive the Closing.  Notwithstanding anything contained in this Agreement to the contrary, all of the representations, shall be subject to the following conditions and limitation: in the event that, prior to the Closing, the Purchaser gains current actual knowledge of a fact or circumstance which, by its nature and plainly on its face, indicates that a representations is, was, or will become untrue or inaccurate, then the Purchaser shall not have the right to bring any lawsuit or other legal action against the Seller, nor pursue any other remedies against the Seller, as a result of the breach of the representations caused thereby, but the Purchaser's sole right shall be to terminate this Agreement and not to proceed with the Transaction, in which event there shall be no liability on the part of the Seller for breaches of representations of which the Purchaser had current actual knowledge prior to the Closing.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1    Conditions for the Purchaser**.  Notwithstanding any other provision of this Agreement to the contrary, the obligation of the Purchaser to complete the Transaction shall be subject to the satisfaction of each of the following conditions, as determined by the Purchaser in its sole and absolute discretion:

(a)      All the terms, covenants and conditions of this Agreement to be complied with or performed or satisfied by the Seller shall have been complied with or performed or satisfied in all material respects, *provided*, *however*, that, in the case of any term, covenant or condition qualified by "materiality" or other similar qualifications pursuant to the terms of this

Agreement, such term, covenant or condition shall have been complied with or performed in all respects;

(b)      The representations and warranties of the Seller set forth in Article IV hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing (except to the extent such representations and warranties relate to an earlier date in which case such representations and warranties shall be true and correct on and as of such earlier date); *provided*, *however*, that, in the case of any representation or warranty qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such representation or warranty shall be true and correct in all respects; *provided, further*, that in the event of a breach of a representation or warranty the condition set forth in this Section 9.1(b) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of the Company, dated the Closing Date, to the foregoing effect;

(c)      No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to seek leave to appeal;

(d)      All applicable time periods under HSR, as such time periods may be modified by the Bankruptcy Code, shall have expired and no action, suit or proceeding relating HSR shall have been instituted and remain pending before a court or other governmental body by any governmental agency or public authority to restrain, prohibit or otherwise challenge the Transaction, nor shall any governmental agency have notified any party hereto that consummation of such transactions would or might violate such law; and

(e)      Each of the Sale Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been modified, amended, reversed or stayed.

The conditions set forth in this Section 7.1 are for the sole benefit of the Purchaser, and may be waived in whole or in part by the Purchaser by notice to the Seller in writing without prejudice to the Purchaser's rights under this Agreement or at law, if any, in the event of the non-fulfillment of any other condition or conditions.

**Section 7.2      Conditions for the Seller**.  The obligation of the Seller to complete the Transaction shall be subject to the satisfaction of the following conditions:

(a)      All the terms, covenants and conditions of this Agreement to be complied with or performed or satisfied by the Purchaser shall have been complied with or performed or satisfied in all material respects, including all deliveries required to be made pursuant to Article VIII hereof; *provided*, *however*, that, in the case of any term, covenant or condition qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such term, covenant or condition shall have been complied with or performed in all respects;

(b)    The representations and warranties of the Purchaser set out in Article V hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing; *provided*, *however*, that, in the case of any representation or warranty qualified by "materiality" or other similar qualifications pursuant to the provisions of Article V such representation or warranty shall be true and correct in all respects as of the date of this Agreement and as of the Closing;

(c)    No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to such leave to appeal;

(d)    All applicable time periods under HSR, as such time periods may be modified by the Bankruptcy Code, shall have expired and no action, suit or proceeding relating HSR shall have been instituted and remain pending before a court or other governmental body by any governmental agency or public authority to restrain, prohibit or otherwise challenge the Transaction, nor shall any governmental agency have notified any party hereto that consummation of such transactions would or might violate such law; and

(e)    Each of the Sale Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been modified, amended, reversed or stayed.

The conditions set forth in this Section 7.2 are for the sole benefit of the Seller, and may be waived in whole or in part by the Seller by notice to the Purchaser in writing without prejudice to the Seller's rights under this Agreement or at law, if any, in the event of non-fulfillment of any other condition or conditions.

## ARTICLE VIII
## CLOSING

**Section 8.1    Closing Arrangements**.  Upon all conditions precedent to the Purchaser's and the Seller's obligation to close the transactions as set forth in this Agreement having been satisfied and fulfilled, or waived, as the case may be, the Closing shall take place on the Closing Date, at 10:00 a.m., local time, at the offices of [Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178], or at such other time or place as may be mutually agreed to by the parties.

**Section 8.2    Seller's Deliveries**.  On or before the Closing Date, the Seller shall deliver or cause to be delivered the following items and documents to the Purchaser, with each such document to be effective as of the Closing:

(a)    a certified copy of each of the Sale Procedures Order and the Sale Approval Order;

(b)    the Bill of Sale executed by Seller;

(c)    the Assignment and Assumption Agreement executed by the Seller;

(d)     a certificate of good standing of the Seller; and

(e)     all other conveyances and other documents which are required and which the Purchaser has reasonably requested on or before the Closing Date to give effect to this Transaction, including the proper transfer, assignment and conveyance of the Purchased Assets by the Seller to the Purchaser, free and clear of all Encumbrances except the Permitted Encumbrances.

**Section 8.3     Purchaser's Deliveries**.  On or before the Closing Date, the Purchaser shall deliver or cause to be delivered the following items and documents to the Seller, with each such document to be effective as of the Closing:

(a)     the Purchase Price in accordance with Section 2.6;

(b)     the Assignment and Assumption Agreement executed by the Purchaser; and

(c)     all other documents which the Seller has reasonably requested on or before the Closing Date to give effect to this Transaction.

**Section 8.4     Tax Matters**.

(a)     (i)     The Seller shall be responsible for Taxes relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or the Purchased Assets for any Pre-Closing Tax Period.  The Purchaser shall be responsible for all Taxes relating to the Business or the ownership, leasing, possession or use of the Purchased Assets for all Post-Closing Tax Periods. The Seller and the Purchaser, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party pursuant to this Section 8.4(a)(i). Within [10] days prior to the payment of such Tax, the party paying such Tax shall give notice to the other party of its portion of the Tax payable, and such party shall promptly deliver its portion of such Tax. Failure to do so will not relieve the other party from its liability hereunder. The Seller shall prepare or cause to be prepared all Tax Returns relating to the Business or the Purchased Assets for taxable periods ending on or before the Closing Date in accordance with past practice, except as required by law.  The Purchaser shall prepare or cause to be prepared all Tax Returns relating to the Business or the Purchased Assets for all taxable periods beginning after the Closing Date and for Straddle Tax Periods, in accordance with past practice, except as required by Applicable Law.

(ii)     For the purposes of this Section 8.4, whenever it is necessary to determine liability for Taxes in respect of the Purchased Assets or the Business for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (A) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (B) in the case of any Tax based upon or related to income or receipts, be

deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.

(b)     Solely to the extent not exempt in accordance with Section 1146 of the Bankruptcy Code, the Purchaser shall have the responsibility of payment of all state and local Transfer Taxes, if any, as well as any notary fees incurred in connection therein; *provided, however*, that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes, including a request that the Seller's sale of the Purchased Assets be exempted from Transfer Taxes pursuant to Section 1146 of the Bankruptcy Code.

(c)     Any refunds (and any interest received thereon) of any Tax relating to any of the Business or the Purchased Assets received by the Purchaser for any Pre-Closing Tax Period, provided that such Tax was either paid on or before the Closing Date or was paid by any of the Seller (or any Affiliate thereof) after the Closing Date, shall be paid over to the Seller within five (5) Business Days of receipt.  The Purchaser shall, if the Seller so requests and at its expense, file for and obtain any refunds to which it is entitled under this Section 8.4(c).  The Purchaser shall permit the Seller to control (at the Seller's expense) the prosecution of any such refund claim; *provided, however*, that the Seller shall not take any action in the prosecution of such refund claims that would be reasonably expected to be detrimental to the Purchaser.

(d)     After the Closing, the Purchaser shall promptly notify the Seller in writing upon the commencement of any Tax audit, suit, action or proceeding (each a "**Tax Contest**") relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or the Purchased Assets with respect to a Pre-Closing Tax Period for which the Seller is primarily liable under this Agreement.  The Seller shall have control over such Tax Contests, which control shall include, the right to settle, compromise or concede any such Tax Contest and the right to employ counsel of its choice at its expense; *provided, however*, that the Seller shall keep the Purchaser apprised of all developments relating to the Tax Contest, provide the Purchaser with copies of all correspondence from any Tax Authority relating to any such Tax Contest, and conduct the defense of such Tax Contest diligently and in good faith.  In the case of a Tax Contest that relates to a Straddle Period, the Purchaser shall control the conduct of such Tax Contest, but Seller shall have the right to participate in such Tax Contest at its own expense, and the Purchaser shall not settle, compromise or concede such Tax Contest without the consent of the Seller, which consent shall not be unreasonably withheld or delayed.

(e)     The Seller and the Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax Authorities.  The Seller and the Purchaser shall retain all Tax Returns, schedules and work papers, records and other documents in its possession relating to Taxes relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or the Purchased Assets for a taxable period first ending after the Closing Date and for all prior taxable periods until the later of: (a)

the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods; or (b) six (6) years following the due date (without extension) for such Tax Returns.  Any information obtained under this Section 8.4(e) shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(f)    Except as required by Applicable Law, neither the Purchaser nor any of its Affiliates shall amend, refile, or otherwise modify any Tax Return relating to the [Business] [Seafood Business] [Convenience Meals Business] [Green Cuisine Plant] or the Purchased Assets with respect to Pre-Closing Tax Periods without the prior written consent of the Seller, which consent shall not be unreasonably withheld.

**ARTICLE IX**
**TERMINATION OF AGREEMENT**

**Section 9.1    Termination**.  This Agreement may be terminated:

(a)    by written mutual consent of the Seller and the Purchaser;

(b)    by either the Purchaser or the Seller, if the Closing has not occurred on or prior to 5:00 p.m. on [                ], 2011 (the "**Outside Date**"); *provided*, *however*, that, if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by the Purchaser or the Seller, then the breaching party may not terminate this Agreement pursuant to this Section 9.1(b);

(c)    by either the Purchaser or the Seller, if a court or other Governmental Authority of competent jurisdiction shall have issued a final order or taken any other nonappealable final action, in each case, having the effect of permanently restraining, enjoining or otherwise prohibiting the Transaction; *provided*, *however*, that if such final order or other nonappealable final action shall have been issued or taken by such Governmental Authority primarily due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by either the Purchaser or the Seller then the breaching party may not terminate this Agreement pursuant to this Section 9.1(c);

(d)    by the Purchaser, if the Seller has breached in any material respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in Section 7.1 if occurring or continuing on the Closing Date, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) ten (10) calendar days after written notice thereof and (y) the Outside Date; *provided*, *however*, that the Purchaser's right to terminate this Agreement under this Section 9.1(d) shall not be available if, at the time of such intended termination, the Seller have (or would have after the passage of time) the right to terminate this Agreement under Section 9.1(e);

(e)      by the Seller, if the Purchaser has breached in any material respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in Section 7.2 if occurring or continuing on the Closing Date and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) ten (10) calendar days after written notice thereof and (y) the Outside Date; *provided*, *however*, that the Seller' right to terminate this Agreement under this Section 9.1(e) shall not be available if, at the time of such intended termination, the Purchaser has (or would have after the passage of time) the right to terminate this Agreement under Section 9.1(d);

(f)      by either the Purchaser or the Seller, if the Sale Approval Order is not entered by the Bankruptcy Court on or prior to [                ], 2011; *provided*, *however*, that the right to terminate pursuant to this Section 9.1(g) shall not be available to any party or its Affiliates whose failure to perform or comply in all material respects with the covenants and agreements of such party or its Affiliates set forth in this Agreement shall have been the principal cause of or resulted in the failure of the Sale Approval Order to be entered by the Bankruptcy Court by such date; or

(g)      by the Purchaser or the Seller, if the Chapter 11 Case is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason.

**Section 9.2      Effect of Termination**.  Except as otherwise provided herein and subject to Section 2.8 and 6.12, in the event of termination of this Agreement, this Agreement (other than the terms and provisions set forth in this Section 9.2 and Section 2.8, which shall survive such termination) shall become null and void and be deemed of no force and effect, with no liability on the part of any party hereto (or of any of its Representatives), and no party hereto shall have any obligations to any other party hereto arising out of this Agreement; *provided*, *however*, that no such termination shall relieve or release any Party from any liabilities or damages resulting from any willful or intentional breach by a Party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1      Obligations as Covenants**.  Each agreement and obligation of each party hereto in this Agreement, even though not expressed as a covenant, shall be considered for all purposes to be a covenant.

**Section 10.2      Relationship of the Parties**.  Nothing in this Agreement shall be construed so as to make the Purchaser a partner of the Seller.

**Section 10.3      Amendment of Agreement**.  This Agreement may not be supplemented, modified or amended except by a written agreement executed by each Party to be affected by such supplement, modification or amendment.

**Section 10.4      Notices**.  Any Notice shall be in writing and shall be deemed to have been duly given or made when personally delivered or when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows, or to such other

addresses as may be furnished hereafter by notice, in writing, to the other Party on at least three
(3) Business Days' prior notice, to the following parties:

      (a)    If to the Purchaser, to:

      with a copy given in like manner to:

      (b)    If to the Seller , to:

      Attention:
      Telecopy:  (905) 726-2585

      with a copy given in like manner to:

      Kelley Drye & Warren LLP
      101 Park Avenue
      New York, NY 10178
      Attention:  Craig A. Wolfe
      Telecopy:  (212) 808-7896

      -and-

      Pachulski Stang Ziehl & Jones LLP
      10100 Santa Monica Blvd., 11th Floor
      Los Angeles, CA  90067-4100
      Attention:  [         ], Esq.
      Telecopy:  (310) 201-0760

      Any Notice which is delivered or is sent by telecopy shall be deemed to have been
validly and effectively given and received on the date it is delivered or sent, unless it is delivered
or sent after 5:00 p.m. on any given day or on a day which is not a Business Day, in which case it
shall be deemed to have been validly and effectively given and received on the Business Day
next following the day it was delivered or sent, provided that, in the case of a Notice sent by
telecopy it shall not be deemed to have been sent unless there has been confirmation of
transmission.

      **Section 10.5**  **Specific Performance**.  It is understood and agreed by the parties
that money damages would not be a sufficient remedy for any breach of this Agreement by any

Party and each non-breaching Party should be entitled to specific performance and injunctive or other equitable relief as a remedy of such a breach.

    **Section 10.6 Fees and Expenses**.  If any party hereto brings an action against any other party hereto based upon a breach by the other party hereto of its obligations under this Agreement, the prevailing party shall be entitled to all reasonable expenses incurred, including reasonable attorneys' fees and expenses.  Except as expressly provided in this Agreement, the parties agree that all costs and expenses of the parties relating to the Transaction shall be paid by the party incurring such expenses.

    **Section 10.7 Governing Law; Jurisdiction; Service of Process**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York [California], without giving effect to any principles of conflicts of law.  By its execution and delivery of this Agreement, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any of the Seller, on the one hand, and the Purchaser, on the other hand, with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  In the event any such action, suit or proceeding is commenced, the parties hereby agree and consent that service of process may be made, and personal jurisdiction over any party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the party at the address of such party set forth in Section 10.4 hereof, unless another address has been designated by such party in a notice given to the other parties in accordance with the provisions of Section 10.4 hereof.

    **Section 10.8 Further Assurances**.  Each of the parties hereto shall, at its own cost, from time to time hereafter and upon any reasonable request of the other, execute and deliver, make or cause to be made all such further acts, deeds, assurances and things as may be required or necessary to more effectually implement and carry out the true intent and meaning of this Agreement.

    **Section 10.9 Entire Agreement**.  This Agreement constitutes the full and entire agreement between the parties hereto pertaining to the Transaction and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto made by any Party, and there are no other warranties or representations and no other agreements between the parties hereto in connection with the Transaction except as specifically set forth in this Agreement.

    **Section 10.10 Waiver**.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided.  All waivers hereunder must be in writing to be effective.

**Section 10.11**  **Survival**.  None of the representations and warranties contained in Article IV shall survive the Closing and shall thereupon terminate, including any actions for damages in respect of any breach.  This Section 10.11 shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be preformed, or prohibit actions, subsequent to the Closing.

**Section 10.12**  **Assignment**.  Neither the Seller nor the Purchaser shall assign their respective rights or obligations hereunder (or agree to do so) without the prior written consent of the other Party, which consent may be withheld by such Party in its sole and absolute discretion.

**Section 10.13**  **Successors and Assigns**.  All of the covenants and agreements set forth in this Agreement are intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns and be enforceable by the parties hereto and their respective successors and their permitted assigns pursuant to the terms and conditions of this Agreement.

**Section 10.14**  **No Third-Party Beneficiaries**.  No provision of this Agreement is intended to, or shall, confer any third-party beneficiary or other rights or remedies upon any Person other than the parties hereto.

**Section 10.15**  **Severability of Provisions**.  If any provision or any portion of any provision of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby.  If the application of any provision or any portion of any provision of this Agreement to any Person or circumstance shall be held invalid or unenforceable, the application of such provision or portion of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby.

**Section 10.16**  **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof.  Any delivery of an executed copy of this Agreement by way of telecopy shall constitute delivery hereof, provided that any party delivering by way of telecopy shall, as soon as reasonably practicable, deliver an originally executed counterpart of this Agreement to the other parties.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**[PURCHASER]**

By: _____
     Name:
     Title:


**[SELLER]**

By: _____
     Name:
     Title:

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 11th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document *NOTICE OF FILING OF FORM OF ASSET PURCHASE AGREEMENT IN CONNECTION WITH MOTION FOR ORDER (A) APPROVING SALE PROCEDURES, INCLUDING BREAK-UP FEE, IN CONNECTION WITH THE PROPOSED SALE AT AUCTION OF THE CONTESSA ENTERPRISE; (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF REAL AND PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH; (C) APPROVING SALE OF ALL OR CERTAIN CONTESSA ENTERPRISE ASSETS TO THE HIGHEST AND BEST BIDDER AT AUCTION; AND (D) GRANTING RELATED RELIEF* will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 2, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **May 2, 2011** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 2, 2011** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**By Personal Delivery**
Honorable Peter H. Carroll, United States Bankruptcy Judge
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Bin outside of Suite 1534
Los Angeles, CA 90012

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| May 2, 2011 | Myra Kulick | */s/ Myra Kulick* |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 **F 9013-3.1.PROOF.SERVICE**

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

*Russell Clementson on behalf of U.S. Trustee United States Trustee (LA)*
*russell.clementson@usdoj.gov*

*Bradley L Cornell on behalf of Creditor Superior Foods International LLC*
*bcornell@cornell-lawfirm.com*

*Jeffrey W Dulberg on behalf of Debtor Contessa Premium Foods Inc*
*jdulberg@pszjlaw.com*

*M Douglas Flahaut on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*flahaut.douglas@arentfox.com*

*Jeffrey B Gardner on behalf of Creditor Haliburton International Foods, Inc.*
*Jeff.Gardner@sbgk.com, mary.do@sbgk.com*

*Richard H Golubow on behalf of Creditor Louis Wang*
*rgolubow@winthropcouchot.com, pj@winthropcouchot.com*

*Jeffrey S Goodfried on behalf of Creditor Boardman Foods, Inc.*
*jgoodfried@perkinscoie.com*

*Peter L Isola on behalf of Creditor Farm Credit Services of Mid-America*
*peterisola@dwt.com*

*John H Kim on behalf of Interested Party Courtesy NEF*
*jkim@cookseylaw.com*

*Andy Kong on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*Kong.Andy@ArentFox.com*

*Mette H Kurth on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*kurth.mette@arentfox.com*

*Katie A Lane on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*lane.katie@arentfox.com*

*Nicole S Magaline on behalf of Interested Party U.S. Foodservice, Inc.*
*nmagaline@schiffhardin.com*

*Scotta E McFarland on behalf of Attorney ----- Pachulski Stang Etal*
*smcfarland@pszjlaw.com, smcfarland@pszjlaw.com*

*Frank F McGinn on behalf of Interested Party Courtesy NEF*
*ffm@bostonbusinesslaw.com*

*Lawrence H Meuers on behalf of Creditor Agroindustria Legumex, S.A.*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9013-3.1.PROOF.SERVICE**

lmeuers@meuerslawfirm.com,
sdefalco@meuerslawfirm.com;nbucciarelli@meuerslawfirm.com;lcastle@meuerslawfirm.com

Aram Ordubegian on behalf of Creditor Committee The Official Committee of Unsecured Creditors
ordubegian.aram@arentfox.com

Bertrand Pan on behalf of Creditor Dedeaux Properties, LLC
bertrand.pan@dlapiper.com

Jeffrey N Pomerantz on behalf of Interested Party Courtesy NEF
jpomerantz@pszjlaw.com

Kurt Ramlo on behalf of Creditor Dedeaux Properties, LLC
kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com

Christopher O Rivas on behalf of Creditor Sargento Foods Inc.
crivas@reedsmith.com

Katherine A Traxler on behalf of Creditor Wells Fargo Bank, N.A. and Wells Fargo Bank Northwest, N.A.
katietraxler@paulhastings.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Joseph M VanLeuven on behalf of Interested Party Courtesy NEF
joevanleuven@dwt.com

Elizabeth Weller on behalf of Creditor Tarrant County
dallas.bankruptcy@publicans.com

Marc J Winthrop on behalf of Creditor Louis Wang
mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

Craig A Wolfe on behalf of Debtor Contessa Premium Foods Inc
kdwbankruptcydepartment@kelleydrye.com

**II.  <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>**

*Please see attached service list*

**III.  <u>SERVED BY EMAIL</u>**

**Attorneys for General Electric Capital Corporation
GE Capital Public Finance, Inc.
Farm Credit Services of Mid-America**
Harvey S. Schochet
Davis Wright Tremaine LLP
***Via Email:*** *harveyschochet@dwt.com*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                              **F 9013-3.1.PROOF.SERVICE**

**Attorneys for Dedeaux Properties**
George B. South III
DLA Piper LLP (US)
*Via Email*:  *george.south@dlapiper.com*

**Counsel for Wells Fargo Bank, N.A.**
**and Wells Fargo Bank Northwest**
Jesse H. Austin, III, Partner, Corporate Dept
Cassie Coppage
Paul Hastings Janofsky & Walker
*Via Email*:  *jessaustin@paulhastings.com*
        *cassiecoppage@paulhastings.com*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                **F 9013-3.1.PROOF.SERVICE**

**Attorneys for**
**General Electric Capital Corporation**
**GE Capital Public Finance, Inc.**
**Farm Credit Services of Mid-America**
Peter L. Isola
Joseph M. VanLeuven
Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800

**Counsel for Louis Wang**
Richard H Golubow
Winthrop Couchot
660 Newport Center Drive Ste 400
Newport Beach, CA 92660

**Counsel for Wells Fargo Bank, N.A. and Wells Fargo**
**Bank Northwest, N.A.**
Katherine A Traxler
John Francis Hilson
Connie L. Hilton
Paul Hastings Janofsky & Walker LLP
515 S Flower St 25th Fl
Los Angeles, CA 90071

**Superior Foods International LLC**
Bradley L Cornell
Cornell Law Firm
2596 Mission St Ste 300
San Marino, CA 91108

Frank F McGinn
Bartlett Hackett Feinberg PC
155 Federal St 9th Flr
Boston, MA 02110

Internal Revenue Service
Small Business/Self-Employed Division
Insolvency Unit, Area West, Territory 14, Gp7
Mail Stop 5022
300 N. Los Angeles Street
Los Angeles, CA 90012

Internal Revenue Service So. Cal.
IRS – Los Angeles
300 North Los Angeles Street, Room 1216
Los Angeles, CA  90012

**Attorneys for Creditor**
**Haliburton International Foods, Inc.**
Jeffrey B. Gardner
~   Barry, Gardner & Kincannon
A Professional Corporation
2214 Faraday Avenue
Carlsbad, CA 92008

**Counsel for Dickinson Frozen Foods, Inc.**
**Boardman Foods, Inc.**
Jeffrey S Goodfried
Perkins Cole LLP
1888 Century PK E Ste 1700
Los Angeles, CA 90067

**Counsel for Tarrant County**
Elizabeth Weller
Linebarger Goggan Blair & Sampson LLP
2323 Bryan St Ste 1600
Dallas, TX 75201

John H Kim
Cooksey, Toolen, Gage, Duffy & Woog
535 Anton Blvd 10th Fl
Costa Mesa, CA 92626-1977

Agroindustria Legumex, S.A.
Inn Foods, Inc
Smith Frozen Foods, Inc.
Lawrence H Meuers
Meuers Law Firm
5395 Park Central Court
Naples, FL 34109

Sargento Foods Inc.
Christopher O Rivas
Reed Smith LLP
355 S Grand Ave Ste 2900
Los Angeles, CA 90071-1514

Jeffrey Michael Goldman
Pepper Hamilton LLP
4 Park Plaza, Suite 1200
Irvine, CA 92614