Craig A. Wolfe (CA Bar No. 200870)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York  10178-0002
Telephone: (212) 808-7800
Facsimile:  (212) 808-7897
E-mail:  cwolfe@kelleydrye.com
Counsel for Debtor

Jeffrey N. Pomerantz (CA Bar No. 143717)
Jeffrey W. Dulberg (CA Bar No. 181200)
Scotta E. McFarland (CA Bar No. 165391)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
E-mail:jpomerantz@pszjlaw.com; jdulberg@pszjlaw.com;
smcfarland@pszjlaw.com
California/Conflicts Counsel for Debtor

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.: 2:11-bk-13454-PC |
| CONTESSA PREMIUM FOODS, INC., | Chapter 11 |
| Debtor | **NOTICE OF FILING EXHIBIT "A" TO ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF** |

Date:     June 29, 2011
Time:     9:30 a.m.
Place:    Courtroom 1539
          255 East Temple Street
          Los Angeles, CA  90012
Judge:    Honorable Peter H. Carroll

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:237611.1 15343-001

# <u>EXHIBIT A</u>

---

**ASSET PURCHASE AGREEMENT**

---

**BY AND BETWEEN**

**CONTESSA PREMIUM FOODS, INC.**

**- and -**

**PREMIUM FOODS ACQUISITION, INC.**

**Dated as of June 29, 2011**

**TABLE OF CONTENTS**

**Page**

ARTICLE I        DEFINITIONS ......................................................................................... 1

    Section 1.1    Recitals ..................................................................................... 1
    Section 1.2    Definitions ................................................................................ 1
    Section 1.3    Other Terms ............................................................................ 12
    Section 1.4    Headings.................................................................................. 12
    Section 1.5    Interpretation .......................................................................... 13
    Section 1.6    Time......................................................................................... 13

ARTICLE II       AGREEMENT OF PURCHASE AND SALE............................................ 13

    Section 2.1    Purchase and Sale ................................................................... 13
    Section 2.2    Assumed Liabilities................................................................. 13
    Section 2.3    Excluded Liabilities................................................................ 13
    Section 2.4    Procedures for Assumption and Assignment of Agreements ....................... 14
    Section 2.5    Allocation of Purchase Price .................................................. 15
    Section 2.6    Purchase Price; Closing Payment ........................................... 15
    Section 2.7    Purchase Price Adjustment..................................................... 16
    Section 2.8    Deposit.................................................................................... 18

ARTICLE III      BANKRUPTCY MATTERS .................................................................. 19

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLER ...................... 19

    Section 4.1    Organization and Good Standing ............................................ 19
    Section 4.2    Authorization of Agreement ................................................... 19
    Section 4.3    Conflicts; Consents of Third Parties....................................... 19
    Section 4.4    Real Property .......................................................................... 19
    Section 4.5    Material Contracts .................................................................. 20
    Section 4.6    Environmental Matters ........................................................... 21
    Section 4.7    Intellectual Property ............................................................... 21
    Section 4.8    Insurance ................................................................................ 21
    Section 4.9    Employee Benefits Plans........................................................ 21
    Section 4.10   Employee Relations................................................................ 22
    Section 4.11   Permits; Compliance with Laws............................................. 22
    Section 4.12   Taxes....................................................................................... 23
    Section 4.13   Financial Advisors.................................................................. 24
    Section 4.14   OFAC ...................................................................................... 24
    Section 4.15   Legal Proceedings .................................................................. 24
    Section 4.16   Title to Purchased Assets; Sufficiency of Purchased Assets ......................... 24
    Section 4.17   Financial Statements............................................................... 24
    Section 4.18   No Adverse Changes .............................................................. 25
    Section 4.19   Foreign Corrupt Practices Act................................................ 25
    Section 4.20   No Other Representations or Warranties; Schedules; Disclaimer of
                             Warranty.................................................................................. 25

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF THE
                   PURCHASER ...................................................................................... 26

i

**TABLE OF CONTENTS**
**(continued)**

Page

Section 5.1     Organization and Good Standing .................................................. 26
Section 5.2     Authorization of Agreement ........................................................ 26
Section 5.3     Conflicts; Consents of Third Parties............................................ 26
Section 5.4     Litigation ................................................................................... 26
Section 5.5     Financial Advisors ..................................................................... 27
Section 5.6     Financial Capability ................................................................... 27
Section 5.7     Condition of the Business........................................................... 27

ARTICLE VI     COVENANTS AND AGREEMENTS ......................................... 27

Section 6.1     Covenants of the Seller............................................................... 27
Section 6.2     Covenants of the Purchaser ........................................................ 29
Section 6.3     Access to Information ................................................................. 29
Section 6.4     Joint Obligations........................................................................ 30
Section 6.5     Consents; Further Assurances ..................................................... 30
Section 6.6     Notice of Default........................................................................ 30
Section 6.7     Confidentiality............................................................................ 31
Section 6.8     Name Change ............................................................................. 31
Section 6.9     Disclosure Schedules; Supplementation and Amendment of
                  Schedules................................................................................... 31
Section 6.10    Post-Closing Employee Covenants ............................................. 31
Section 6.11    Publicity..................................................................................... 33
Section 6.12    Survival ..................................................................................... 33

ARTICLE VII    CONDITIONS TO CLOSING .................................................... 33

Section 7.1     Conditions for the Purchaser ...................................................... 33
Section 7.2     Conditions for the Seller............................................................. 34

ARTICLE VIII    CLOSING................................................................................. 35

Section 8.1     Closing Arrangements ................................................................ 35
Section 8.2     Seller's Deliveries....................................................................... 35
Section 8.3     Purchaser's Deliveries ................................................................ 36
Section 8.4     Tax Matters ................................................................................ 36

ARTICLE IX     TERMINATION OF AGREEMENT.......................................... 38

Section 9.1     Termination ................................................................................ 38
Section 9.2     Breakup Fee and Expense Reimbursement .................................. 39
Section 9.3     Effect of Termination ................................................................. 39

ARTICLE X     MISCELLANEOUS .................................................................. 40

Section 10.1    Obligations as Covenants ........................................................... 40
Section 10.2    Relationship of the Parties.......................................................... 40
Section 10.3    Amendment of Agreement .......................................................... 40
Section 10.4    Notices....................................................................................... 40
Section 10.5    Specific Performance .................................................................. 43
Section 10.6    Fees and Expenses...................................................................... 43
Section 10.7    Governing Law; Jurisdiction; Service of Process........................ 43
Section 10.8    Further Assurances ..................................................................... 43

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | |
|---|---|---|
| Section 10.9 | Entire Agreement | 43 |
| Section 10.10 | Waiver | 43 |
| Section 10.11 | Survival | 43 |
| Section 10.12 | Assignment | 44 |
| Section 10.13 | Successors and Assigns | 44 |
| Section 10.14 | No Third-Party Beneficiaries | 44 |
| Section 10.15 | Severability of Provisions | 44 |
| Section 10.16 | Counterparts | 44 |

| | |
|---|---|
| EXHIBIT A | FORM OF ESCROW AGREEMENT |
| EXHIBIT B | FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT |
| EXHIBIT C | FORM OF BILL OF SALE |
| EXHIBIT D | FORM OF SALE APPROVAL ORDER |
| EXHIBIT E | FORM OF LEASE AMENDMENT |

| | |
|---|---|
| Schedule 1.2(a) | Assumed Contracts |
| Schedule 1.2(b) | Excluded Assets |
| Schedule 1.2(c) | Closing Net Working Capital |
| Schedule 4.3 | Conflicts; Consents of Third Parties |
| Schedule 4.4 | Existing Real Property Leases and Assumed Real Property Leases |
| Schedule 4.5 | Material Contracts; Notices of Default |
| Schedule 4.7(a)(i) | Owned Intellectual Property |
| Schedule 4.7(a)(ii) | Licenses |
| Schedule 4.8 | Insurance Policies |
| Schedule 4.9(a) | Seller Benefit Plans |
| Schedule 4.10 | Labor |
| Schedule 4.12(b) | Taxes |
| Schedule 4.13 | Financial Advisors |
| Schedule 4.15 | Legal Proceedings |
| Schedule 4.16 | Encumbrances |
| Schedule 4.17 | Financial Statements |
| Schedule 5.3(a) | Purchaser Conflicts |
| Schedule 6.10 | Current Seller Employees |
| Schedule 7.1(g) | GE Modification Terms |

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (the "**Agreement**"), dated as of June 29, 2011, by and between CONTESSA PREMIUM FOOD, INC., a California corporation (the "**Seller**"), and PREMIUM FOODS ACQUISITION, INC., a Delaware corporation (the "**Purchaser**").

### RECITALS:

A.     The Seller is a leading importer, manufacturer, exporter and distributor of farm raised shrimp, convenience meals, stir fry vegetables and other food products worldwide (collectively, the "**Business**").

B.     The Business primarily consists of its premium seafood business (the "**Seafood Business**"), convenience meals business (the "**Convenience Meals Business**"), and its interests in a large, state of the art production facility in the City of Commerce, California (the "**Green Cuisine Plant**").

C.     On January 26, 2011 (the "**Petition Date**"), the Seller commenced a case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") by filing a voluntary petition for relief with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**").

D.     On May 9, 2011, the Bankruptcy Court entered an order authorizing the Seller, among other things, to conduct a sale process for either the entire Business, or for the Seafood Business, the Convenience Meals Business, and the Green Cuisine Plant separately, and approving the procedures with respect thereto (the "**Sale Procedures Order**");

E.     In accordance with the Sale Procedures Order, the Seller now desires to sell the Purchased Assets (as herein defined) on the terms and conditions contained in this Agreement, including obtaining an order of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing the Transaction (as herein defined) (the "**Sale Approval Order**").

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the parties hereto covenant and agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.1     Recitals**.  The recitals set forth above are incorporated by reference and are expressly made part of this Agreement.

**Section 1.2     Definitions**.  The following definitions shall apply to and constitute part of this Agreement and all Exhibits and Schedules attached hereto:

"**Accounts Receivable**" means all accounts receivable, notes receivable and other monies due for sales and deliveries of goods or performance of services by the Seller.

"**Acquisition Proposal**" means a proposal (other than by the Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of 10% or more of the Purchased Assets pursuant to one or more transactions, the sale of 50% or more of the outstanding shares of capital stock or equity interests of the Seller (including, without limitation, by way of a tender

offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one or more third parties and the Seller.

"**Affiliate**" shall mean a person or entity that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the person or entity specified.  For purposes of this definition, "control" shall mean (a) a fifty percent (50%) or more common equity ownership or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Allocation Schedule**" shall have the meaning set forth in Section 2.5.

"**Applicable Laws**" shall mean all domestic or foreign statutes, laws, by-laws, regulations, rules, ordinances and orders of any Governmental Authority having jurisdiction.

"**Assignment and Assumption Agreement**" shall mean an assignment and assumption agreement substantially in the form and substance attached hereto as Exhibit B.

"**Assumed Contracts**" shall mean the Contracts set forth on Schedule 1.2(a), as such schedule may be amended, modified or supplemented from time to time at the Purchaser's sole discretion prior to the Closing by notifying the Seller in writing of such designation, which Contracts shall be assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court.

"**Assumed Liabilities**" shall mean:

(a)  only to the extent reflected in the Final Calculations, all of the Current Liabilities incurred in the Ordinary Course of Business since the Petition Date and not discharged prior to Closing;

(b)  with respect to each of the Seller's trade vendors whose liability is included in clause (a) above, and any trade creditors of the Seller to whom the Seller has a trade account payable incurred in the Ordinary Course of Business prior to the Petition Date and which has not been discharged prior to the Closing, a trade credit payable to each of such trade vendors equal to twelve percent (12%) of the average monthly trade receivables owed to such trade vendor from the Purchaser, excluding shipping and handling charges, discounts, mark downs, taxes, duties, returns, bad debt and collection expenses, calculated for a twelve (12) month period ending on each one-year anniversary of the Closing Date and payable to such trade vendor within forty-five (45) days of each one-year anniversary of the Closing Date until the earlier of (i) the Purchaser paying an aggregate of $1,000,000 of such trade credits in accordance with this provision or (ii) the date that is forty-five (45) days after the third (3rd) anniversary of the Closing;

(c)  all Liabilities related to or arising out of the Assumed Contracts to the extent such Liabilities arise after the Closing Date;

(d)  subject to, and as amended and modified by the Lease Amendment, all Liabilities arising out of the Assumed Real Property Leases to the extent such Liabilities arise after the Closing Date; and

(e)  subject to, and as amended and modified by, the GE Terms, the GE Obligations.

Assumed Liabilities shall not include any other Liabilities, including the Seller's secured debt obligations to Wells Fargo without the prior written consent of Wells Fargo (as applicable).

"**Assumed Real Property Leases**" shall have the meaning set forth in Section 4.4(a).

"**Audited Financial Statements**" shall have the meaning set forth in Section 4.17.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Benefit Plans**" shall mean (a) "employee benefit plans," as defined in Section 3(3) of ERISA, (b) employment, consulting, retention, or change in control Contracts, and (c) other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, incentive, equity or equity-based compensation, or deferred compensation arrangements, termination, or severance plans or arrangements, stock purchase, sick leave, vacation pay, salary continuation for disability, hospitalization, medical insurance, and life insurance plans and programs (excluding, in each case, collective bargaining agreements).

"**Bill of Sale**" shall mean a bill of sale with respect to the Purchased Assets, substantially in the form and substance attached hereto as <u>Exhibit C</u>.

"**Blazevich Parties**" shall have the meaning set forth in Section 2.1.

"**Breakup Fee**" shall have the meaning set forth in Section 9.2.

"**Business**" shall have the meaning set forth in the Recitals.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York or Los Angeles, California are authorized or obligated to close under Applicable Laws.

"**Business Intellectual Property**" shall have the meaning set forth in Section 4.7.

"**Chapter 11 Case**" shall have the meaning set forth in the Recitals.

"**Closing**" shall mean the consummation of the Transaction in accordance with the terms set forth in Article VIII.

"**Closing Date**" shall mean the first (1st) Business Day following satisfaction or waiver of all the conditions set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing), or such other date as the Seller and the Purchaser shall mutually agree upon in writing.

"**Closing Date Schedule**" shall have the meaning set forth in Section 2.7(b).

"**Closing Documents**" shall mean any agreements, instruments and other deliveries to be delivered at the Closing pursuant to Sections 8.2 and 8.3.

"**Closing Net Working Capital Amount**" means as of 11:59 pm on the day immediately preceding the Closing Date: (a) all Current Assets that constitute Purchased Assets, as determined in accordance with GAAP, *minus* (b) all Current Liabilities that constitute Assumed Liabilities, as

determined in accordance with GAAP and the Seller's past accounting practices, in each case, in the form as set forth on Schedule 1.2(c) (the "**Closing Net Working Capital Schedule**").

"**COBRA**" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended and Section 4980B of the IRC.

"**Committee**" shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case.

"**Confidentiality Agreement**" shall have the meaning set forth in Section 6.7.

"**Contract**" shall mean any legally binding agreement, contract, subcontract, lease, settlement agreement, instrument, note, warranty, purchase order, license, sublicense or other legally binding commitment.

"**Convenience Meals Business**" shall have the meaning set forth in the Recitals.

"**Creditor Notice Parties**" shall mean Wells Fargo, GECC, GECPF, Dedeaux and the Committee.

"**Cure Costs**" shall mean any and all costs, expenses, obligations or actions that the Seller is required to pay or perform to assume any of the Assumed Contracts and Assumed Real Property Leases pursuant to section 365(b) of the Bankruptcy Code.

"**Current Assets**" shall mean the aggregate of the following current assets of the Seller, in each case without duplication: (a) Accounts Receivable net of any reserve for write-downs and write-offs, (b) all prepaid expenses (but only to the extent that the Purchaser will receive the benefit thereof), and (c) inventory, net of any reserves, including for excessive, spoiled or obsolete inventory.

"**Current Liabilities**" shall mean the Seller's current trade liabilities, other accounts payable, including any outstanding checks, and accrued expenses incurred in the Ordinary Course of Business after the Petition Date (and in the case of such accounts payable or accrued expenses related to any current or former employee of the Seller, only such accounts payable and accrued expenses related to Transferred Employees) none of which shall relate to the administration of the Chapter 11 Case.

"**Current Seller Employees**" shall mean all employees of the Seller employed immediately prior to the Closing Date.

"**Dedeaux**" shall mean Dedeaux Enterprises, LLC.

"**Deposit**" shall have the meaning set forth in Section 2.8.

"**Designation Period**" shall mean a period of not less than ninety (90) days following the Closing Date.

"**Dispute Notice**" shall have the meaning set forth in Section 2.7(d).

"**Disputed Property**" shall have the meaning set forth in Section 9.1(h).

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional

requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Purchased Assets or used or held for use in connection with the Business in each case whether or not in electronic form.

"**Encumbrances**" shall mean all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting title to the Purchased Assets or any part thereof or interest therein.

"**Environmental Laws**" shall mean all applicable federal, state, municipal and local laws, statutes, regulations and other legal requirements relating to the protection of the environment or natural resources.

"**Environmental Permits**" shall mean all material licenses, permits, approvals, consents, certificates, registrations and other authorizations issued pursuant to Environmental Laws in respect of the Business.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under Section 414 of the IRC or Section 4001 of ERISA.

"**Escrow Agent**" shall have the meaning set forth in Section 2.6(c).

"**Escrow Agreement**" shall have the meaning set forth in Section 2.8.

"**Estimated Current Liabilities**" shall mean the Current Liabilities set forth in the certificate prepared and delivered by the Seller pursuant to in Section 2.7(a).

"**Estimated Net Working Capital Amount**" shall have the meaning set forth in Section 2.7(a).

"**Excluded Assets**" shall mean:

(a) any records, documents or other information relating to Excluded Seller Employees, and any materials containing information about any Transferred Employee the disclosure of which would violate any Applicable Law;

(b) all preference or avoidance claims and actions any of the Seller, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(c) (i) any documents that the Seller is required by Applicable Law to retain, (ii) minute books and other corporate books and records to the extent relating to its organization and existence, (iii) books, records, information, files, data and plans (whether written, electronic or in any other medium),

advertising and promotional materials and similar items to the extent relating to any Excluded Assets or Excluded Liabilities, (iv) any books and records to the extent relating to Taxes of the Seller, or Excluded Employees, Tax Returns filed by or with respect to Seller, or any materials to the extent containing information about any Transferred Employee, disclosure of which would violate any Applicable Law and (v) all financial statements of the Seller (collectively, the "**Excluded Books and Records**"); *provided, however*, the Seller shall, to the extent permitted by Applicable Law, provide a copy of all Excluded Books and Records relating to the Purchased Assets, Assumed Liabilities or Business (other than those described in the foregoing clause (iv)), redacted to the extent necessary to remove information relating to any Excluded Assets or Excluded Liabilities;

(d)  any and all rights of the Seller under this Agreement and all other ancillary documents entered into in connection herewith, and all consideration payable or deliverable to the Seller pursuant to the terms and provisions hereof and all bank accounts and any right, claims or causes of actions of Seller under this Agreement;

(e)  the Excluded Contracts and any and all rights thereunder and prepaid assets related exclusively thereto;

(f)  any prepaid Tax, Tax receivable or Tax refund, rebate, credit or similar item of the Seller on account of taxable periods ending on or prior to the Closing Date and any refund of any Tax payable to the Seller pursuant to Section 8.4(c);

(g)  any Seller Benefit Plan or any right, title or interest in any assets of or relating exclusively thereto, except as otherwise provided herein;

(h)  any insurance contracts or policies under which Seller is a party, a named insured or a beneficiary, including those set forth on <u>Schedule 4.9(a)</u> and rights to proceeds thereof relating to the Business as conducted by the Seller prior to the Closing Date;

(i)  any rights, claims or causes of action of the Seller against third parties relating to assets, properties, business or operations of the Seller arising out of events occurring on or prior to the Closing Date other than any claims, rights, causes of action or defenses of the Seller against any third parties under any Assumed Real Property Leases or with respect to payment or performance (including, without limitation, any rights of setoff or recoupment) arising directly out of or in connection with any Assumed Liability;

(j)  all cash on hand, cash on deposit, checks received but not yet deposited or cleared, wire transfers transmitted but not yet received, cash equivalents, certificates of deposit and marketable securities, including interest accrued thereon, held by or on behalf of the Seller, but excluding any security deposits held by third parties;

(k)  all rights or claims of the Seller to the refund of any income or franchise Taxes (whether any such refund is received prior to, on or after the Closing Date) or any other Taxes paid relating to any period prior to the Closing, and any refunds, rebates, credits or other rights to payment, settlement or adjustment of the Seller from any Governmental Authority; and

(l)  the assets listed on <u>Schedule 1.2(b)</u>.

"**Excluded Contracts**" shall mean all Contracts that are not Assigned Contracts.

"**Excluded Liabilities**" shall have the meaning set forth in Section 2.3.

"**Excluded Seller Employees**" shall mean all Current Seller Employees and Former Seller Employees, other than any Current Seller Employees or Former Seller Employees who are Transferred Employees.

"**Existing Real Property Leases**" shall have the meaning set forth in Section 4.4(a).

"**Expense Reimbursement**" shall have the meaning set forth in Section 9.2.

"**Final Calculations**" shall have the meaning set forth in Section 2.7(f).

"**Financial Statements**" shall have the meaning set forth in Section 4.17.

"**Former Seller Employees**" shall mean all individuals who have been employed by the Seller who are not Current Seller Employees.

"**FCPA**" shall have the meaning set forth in Section 4.19.

"**FDA**" shall have the meaning set forth in Section 4.11(b).

"**FFDCA**" shall have the meaning set forth in Section 4.11(b).

"**FTC**" shall have the meaning set forth in Section 4.11(b).

"**Furniture and Equipment**" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned by the Seller in conduct of the Business, including all owned artwork, desks, chairs, tables, computer systems, software, hardware, photo processing equipment, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"**GAAP**" shall mean United States generally accepted accounting principles in effect from time to time.

"**GAAP Accounting Principles**" shall have the meaning set forth in Section 2.7(a).

"**GECC**" shall mean General Electric Capital Corporation.

"**GECPF**" shall mean GE Capital Public Finance, Inc.

"**GE Obligations**" shall mean all Liabilities of the Seller to GECC and GECPF pursuant to (a) that certain Industrial Revenue Bond Loan Agreement, dated June 1, 2007, by and among GECPF, California Municipal Finance Authority, and the Seller, and (b) that certain Master Lease Agreement, dated October 25, 2007, by and between GECC and the Seller.

"**GE Modification Terms**" shall have the meaning set forth in Section 7.1(f), which terms shall include a waiver of Cure Costs related to the GE Obligations.

"**Governmental Authority**" shall mean any domestic, foreign or local government, quasi-governmental authority, regulatory authority, government department, agency, commission, board, arbitral or other tribunal or court having jurisdiction or power of any nature over the Purchased Assets.

"**Green Cuisine Plant**" shall have the meaning set forth in the Recitals.

"**Intellectual Property**" means any and all: patents and patent applications; trademarks, service marks, trade names, brand names, trade dress, slogans, logos Internet domain names, and their associated goodwill; franchises, inventions, discoveries, ideas, processes, specifications, recipes, formulae, designs, models, industrial designs, know-how, confidential information, proprietary information, and trade secrets, whether or not patented or patentable; copyright rights, writing, and other copyrightable works and works in progress, data and databases, website content, and software (whether in source, object, or executable code, and including related documentation); all other intellectual property rights (including the rights of publicity and privacy) and foreign equivalent or counterpart rights and forms of protection of a similar or analogous nature or having similar effect in any jurisdiction throughout the world; all registrations and application for registration of any of the foregoing; any renewals, extensions, continuations, continuations-in-part, divisionals, reexaminations, or reissues or equivalent or counterpart of any of the foregoing in any jurisdiction throughout the world; and the right to sue for and to collect the remedies resulting from past and future infringement thereof for any of the foregoing in any jurisdiction in the world.

"**Interim Financial Statements**" shall have the meaning set forth in Section 4.17.

"**IRC**" shall mean the Internal Revenue Code of 1986, as amended.

"**IRS**" shall mean the Internal Revenue Service of the United States.

"**Knowledge**" shall mean the actual knowledge, after reasonable investigation, of any of John Z. Blazevich, Daniel Halford, Suzanne Nuzzi, Edward Redd, Maria White, Robert Santich or Ann Schmidt.

"**Lease Amendment**" shall have the meaning set forth in Section 7.1(g), which amendment shall include a waiver of Cure Costs related to such Existing Real Property Lease.

"**Leased Real Property**" shall have the meaning set forth in Section 4.4(a).

"**Legal Proceedings**" shall mean any suit, action, arbitration, legal or judicial proceeding, administrative, quasi- administrative or enforcement proceeding or arbitration proceeding before any Governmental Authority.

"**Liability**" shall mean any debt, obligation or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**Licenses-Out**" shall have the meaning set forth in Section 4.7.

"**Licenses-In**" shall have the meaning set forth in Section 4.7.

"**Material Adverse Effect**" shall mean any event, change, circumstance, effect or other matter that is materially adverse to (a) the business, results of operations, conditions (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets or (c) the ability of Seller to consummate the Transaction, other than, with respect to clauses (a) or (b), an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which the Seller operates as of the date hereof; (iii) the effect of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or

terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any changes in Applicable Laws or accounting rules after the date hereof; or (vi) any effect resulting from the public announcement of this Agreement as permitted by this Agreement, compliance with terms of this Agreement or the consummation of the Transaction; provided, however, that any event, change, circumstance, effect or other matter referred to in clauses (i), (ii), (iii), or (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, change, circumstance, effect or other matter has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Notice**" shall mean any notice, request, consent, acceptance, waiver or other communication required or permitted to be given pursuant to this Agreement.

"**OFAC**" shall have the meaning set forth in Section 4.14.

"**Offeree**" shall have the meaning set forth in Section 6.9(a).

"**Ordinary Course of Business**" shall mean the operation and conduct of the affairs of an enterprise in the ordinary course of its business of normal day-to-day operations, consistent in nature, scope and magnitude with past practice and the businesses in which the Seller operates, but taking into account its status as a debtor in possession.

"**Outside Date**" shall have the meaning set forth in Section 9.1(b).

"**Owned Intellectual Property**" means all Intellectual Property owned or purported to be owned by Seller.

"**Permits**" shall mean all the right, title, benefit and interest of the Seller in any and all licenses, franchises, governmental and other approvals, development rights and permits relating to the Business or Leased Real Property.

"**Permitted Encumbrances**" shall mean: (i) the Assumed Real Property Leases and rights of tenants thereunder; (ii) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for ad valorem Taxes and statutory liens not yet due and payable, (iii) discrepancies, conflicts in boundary lines, shortage in area, encroachments and any other state of facts that would be shown on any accurate survey prepared by a professionally licensed land surveyor and any easements, rights of way, covenants and conditions of record that would be shown on any current title report prepared by a professionally licensed title company, including, without limitation, (A) standard exclusions from coverage, (B) such exclusions that would be revealed under Schedule B of such title report, that, in each case, individually and in the aggregate, do not and will not materially interfere with the present or future value, occupancy, ownership, use and operation of the property or assets to which they relate and (C) Encumbrances under Assumed Contracts that are leases; (iv) landlords', carriers', warehousemens', mechanics', suppliers', materialmens', repairmens' liens or other like Encumbrances arising in the Ordinary Course of Business with respect to amounts not yet overdue and any other Encumbrances that will be irrevocably released in full (of record, as appropriate) on or prior to the Closing.

"**Person**" shall mean an individual, partnership, limited liability company, corporation, trust, unincorporated organization, Governmental Authority, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"**Petition Date**" shall have the meaning set forth in the Recitals.

"**Post-Closing Tax Period**" shall mean (i) any taxable period beginning after the Closing Date, and (ii) the portion of any Straddle Period beginning on the day after the Closing Date.

"**Pre-Closing Tax Period**" shall mean (i) any taxable period ending on or before the Closing Date, and (ii) the portion of any Straddle Period ending on the Closing Date.

"**Purchase Price**" shall mean $28,000,000, subject to the adjustments provided for in Section 2.7.

"**Purchased Assets**" shall mean all of the assets and properties that are owned, held or used by the Seller in the conduct of the Business, other than the Excluded Assets, including:

(a)  the Assumed Real Property Leases, together with the Seller's interest in all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Real Property Leases;

(b)  all inventory as of the Closing Date;

(c)  all goodwill associated with the Business or the Purchased Assets;

(d)  the Assumed Contracts;

(e)  all Furniture and Equipment;

(f)  (i) all rights in and to Intellectual Property, to the broadest extent the Seller is permitted by Applicable Laws to transfer such Intellectual Property, including as set forth on Schedule 4.7(a)(i) and on Exhibit B to the Sale Procedures Order and (ii) to the extent such Intellectual Property may not be legally transferred to the Purchaser, the Seller shall be deemed to have granted to Purchaser an exclusive, perpetual, royalty-free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by Applicable Laws;

(g)  all Documents, but excluding any Documents exclusively related to an Excluded Asset;

(h)  all Permits, to the extent assignable;

(i)  all Accounts Receivable; and

(j)  all prepaid expenses, deposits, utility deposits, claims for refunds and rights to offset of the Seller that relate to the Purchased Assets, Assumed Contracts, Assumed Real Property Leases or Permits.

"**Purchaser**" shall have the meaning set forth in the Preamble.

"**Purchaser Benefit Plans**" shall have the meaning set forth in Section 6.10(a).

"**Purchaser Default Termination**" shall have the meaning set forth in Section 2.8.

"**Purchaser Documents**" shall have the meaning set forth in Section 5.2.

"**Representatives**" of a Person shall mean controlling persons, partners, directors, officers, managers, trustees, employees, agents, representatives, consultants, affiliates, advisors, counsel or nominees of such Person.

"**Review Period**" shall have the meaning set forth in Section 2.7(d).

"**Sale Approval Order**" shall mean the order of the Bankruptcy Court, substantially in the form of Exhibit D, authorizing, among other things, the sale of the Purchased Assets to the Purchaser pursuant to this Agreement and the consummation of the Transaction.

"**Sale Procedures Order**" shall have the meaning set forth in the Recitals.

"**San Pedro Office**" shall have the meaning set forth in Section 6.1(e).

"**San Pedro Office Lease**" shall have the meaning set forth in Section 6.1(e).

"**Seafood Business**" shall have the meaning set forth in the Recitals.

"**Seller**" shall have the meaning set forth in the Preamble.

"**Seller 401(k) Plan**" shall have the meaning set forth in Section 6.10(g).

"**Seller Benefit Plans**" shall mean each material Benefit Plan sponsored, maintained by, contributed to by or required to be contributed to by, Seller for the benefit of Current Seller Employees or Former Seller Employees.

"**Seller Multiemployer Plan**" shall have the meaning set forth in Section 4.9(a).

"**Seller Note**" shall mean an unsecured subordinated promissory note issued by the Purchaser in the principal amount of $1,500,000, bearing interest which shall accrue at the rate of five percent (5%) per annum, compounded annually, payable on or prior to (at the sole discretion of the Purchaser) the fifth (5th) anniversary of the Closing.  The Seller Note shall not contain any prepayment penalties or covenants and shall only include such other terms as are acceptable to the Purchaser.

"**Shortfall**" shall have the meaning set forth in Section 2.7(g).

"**Straddle Period**" shall mean any taxable period that commences on or before the Closing Date and that ends after the Closing Date.

"**Target Net Working Capital Amount**" shall mean $28,000,000.

"**Tax**" or "**Taxes**" shall mean any federal, state, local or foreign net income, gross income, gross receipts, commercial activity, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, payroll, social security, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, intangible taxes or environmental tax, escheat payments or any other tax, custom, duty, governmental fee or other like assessment or charge (together with any and all interest, penalties and additions to tax imposed with respect thereto) imposed on or with respect to the Purchased Assets by any Tax Authority.

"**Tax Authority**" means any Governmental Authority having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"**Tax Contest**" shall have the meaning set forth in Section 8.4(d).

"**Tax Return**" or "**Tax Returns**" shall mean all returns, declarations of estimated tax payments, reports, estimates, claims for refunds, information returns and statements, including any related or supporting information, disclosures, notices, elections, schedules or forms with respect to any of the foregoing, filed or to be filed with any Tax Authority in connection with the determination, assessment, collection or administration of any Taxes.

"**Transaction**" shall mean the transactions contemplated herein, including the purchase and sale of the Purchased Assets provided for in this Agreement.

"**Transfer Taxes**" shall mean any transfer, documentary, sales, use, stamp, registration and other such taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties, interest and additions to Tax in respect thereof).

"**Transferred Employee**" shall have the meaning set forth in Section 6.10(a).

"**Treasury Regulations**" shall mean final or temporary regulations promulgated under the IRC.

"**USDA**" shall have the meaning set forth in Section 4.11(b).

"**U.S. Publicly Traded Entity**" shall have the meaning set forth in Section 4.14.

"**Valuation Firm**" shall have the meaning set forth in Section 2.7(f).

"**WARN Act**" shall mean the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

"**Wells Fargo**" shall mean Wells Fargo Bank, N.A.

"**Working Capital Escrow Amount**" shall have the meaning set forth in Section 2.6(b).

**Section 1.3    Other Terms.**  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement. As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "*include*", "*includes*", and "*including*" will be deemed to be followed by "*without limitation*". Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "*this Agreement*", "*herein*", "*hereof*", "*hereby*", "*hereunder*", and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The word "or" is not exclusive.  References in this agreement to Articles, Sections, Schedules or Exhibits are to Articles or Sections of, Schedules or Exhibits to, this Agreement, except to the extent otherwise specified herein.

**Section 1.4    Headings.**  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

**Section 1.5** **Interpretation**. The parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

**Section 1.6** **Time**. Time shall be of the essence of this Agreement. Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period. If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day. Whenever action must be taken (including the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 5:00 p.m. (Eastern) on such date. The time limited for performing or completing any matter under this Agreement may be extended or abridged by an agreement in writing by the parties or by their respective solicitors. All references herein to time are references to New York time.

## ARTICLE II
## AGREEMENT OF PURCHASE AND SALE

**Section 2.1** **Purchase and Sale**. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver to the Purchaser all of the Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Encumbrances (including any Encumbrances or interests of John Z. Blazevich or any of his Affiliates or any of his family members, successors, assigns, designees, representatives, employees or agents (collectively, the "**Blazevich Parties**")) other than those granted by the Purchaser and other than Permitted Encumbrances. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.

**Section 2.2** **Assumed Liabilities**. Pursuant to the Sale Approval Order and to the extent permitted by Applicable Law, on the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume, effective as of the Closing, and shall timely perform, pay and discharge in accordance with their respective terms, the Assumed Liabilities.

**Section 2.3** **Excluded Liabilities**. Notwithstanding anything to the contrary in this Agreement, the Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for, and the Seller shall be solely and exclusively liable with respect to, any Liabilities of the Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, including any Liability of the Seller for Taxes, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**"), including:

(a) all Liabilities of the Seller or an Affiliate of the Seller relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services performed in connection with this Agreement or the Transactions;

(b) except to the extent expressly assumed by the Purchaser pursuant to Section 6.10, all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan;

13

(c)  all Liabilities with respect to any Former Seller Employee or Excluded Seller Employee with respect to any period and, except as expressly provided by Section 6.10, all Liabilities with respect to any Current Seller Employees for the period of time on or prior to the Closing;

(d)  all Liabilities relating to Excluded Assets, including the Excluded Contracts;

(e)  all Liabilities for Taxes (i) of the Seller or any Affiliate of the Seller and (ii) all Taxes relating to the Business or the Purchased Assets for all Pre-Closing Tax Periods; and

(f)  obligations, Liabilities or amounts payable to any Affiliate of the Seller, other than those incurred in the Ordinary Course of Business.

**Section 2.4**        **Procedures for Assumption and Assignment of Agreements**.

(a)  Pursuant to the Sale Approval Order, to the extent permitted by Applicable Law, the Seller shall provide for the assumption and assignment by the Seller to the Purchaser of the Purchased Assets on the terms and conditions set forth in this Section 2.4(a):

(i)        At the Closing, the Seller shall assign to the Purchaser the Assumed Contracts and Assumed Real Property Leases that constitute Purchased Assets.

(ii)        To the extent that any Assumed Contract or Assumed Real Property Lease that is a Purchased Asset is subject to Cure Costs pursuant to section 365 of the Bankruptcy Code, the Seller shall be responsible for such Cure Costs and shall pay any Cure Costs to the applicable non-debtor party and otherwise perform any such cure obligations prior to the Closing.

(iii)        Upon satisfaction of any Cure Costs and at Closing, pursuant to section 365(k) of the Bankruptcy Code, the assumption and assignment of the Assumed Contracts and Assumed Real Property Lease by the Seller to the Purchaser shall relieve the Seller's estate from any Liability for any breach of such Assumed Contracts and Assumed Real Property Leases.  Upon satisfaction of any Cure Costs, the Purchaser agrees that the Seller shall have no further liability or obligations with respect to such Assumed Contracts and Assumed Real Property Leases pursuant to section 365(k) of the Bankruptcy Code.

(iv)        With respect to any Contract that is not an Assumed Contract, and provided that such Contract is still in effect and has not been rejected by the Seller pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from the Purchaser, as soon as practicable, the Seller shall take all actions reasonably necessary to assume and assign to the Purchaser (including paying any applicable Cure Costs) pursuant to section 365 of the Bankruptcy Code any Contract(s) set forth in the Purchaser's notice(s); provided, that the Purchaser shall be responsible for paying any applicable Cure Costs arising after the date of this Agreement with respect to any such Contract if such Contract is added to Schedule 1.2(a).  The Seller agrees and acknowledges that it shall provide the Purchaser with reasonable advance notice of any motion(s) to reject any Contract; provided, however that in no case shall the Seller take any action to reject or terminate the San Pedro Lease prior to the end of the Designation Period, or such later date as agreed in writing in accordance with section 365(d)(4)(B)(ii) of the Bankruptcy Code and approved by the Bankruptcy Court.  Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to the Purchaser in writing pursuant to this Section 2.4(a)(iv), such Contract shall be deemed an Assumed Contract and deemed scheduled on Schedule 1.2(a) for all purposes under this Agreement.

(v)    Notwithstanding anything contained in this Agreement to the contrary, the Purchaser expressly reserves the right to exclude any Purchased Asset and/or Assumed Liability (including any Assumed Contract or Assumed Real Property Lease) from the Transactions at any time prior to Closing by giving a written notice to the Seller; provided however, that the Purchase Price shall remain unchanged as a result of such exclusion.

(b)    To the extent that any consent or authorization from any Governmental Authority or third party required to assign to the Purchaser any Purchased Assets, Assumed Real Property Lease, Assumed Contract or Permit or any Permit required by the Purchaser to operate the Business is not obtained by the Closing, the Seller will, with respect to each such Purchased Assets, Assumed Real Property Lease, Assumed Contract or Permit, from and after the Closing and until the date on which such applicable consent or authorization is obtained, (i) provide to the Purchaser the benefits under such Purchased Assets, Assumed Real Property Lease, Assumed Contract or Permit after the Closing Date, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract or Permit in trust for the Purchaser pending receipt of the required consent or authorization or acting as the Purchaser's agent thereunder) designed to provide such benefits to the Purchaser and (iii) enforce for the account of the Purchaser any rights of the Seller under such Purchased Assets, Assumed Real Property Lease, Assumed Contract or Permit (including the right to elect to terminate such Assumed Real Property Lease, Assumed Contract or Permit in accordance with the terms thereof upon the written direction of the Purchaser).  The Purchaser will cooperate with the Seller in order to enable the Seller to provide to the Purchaser the benefits contemplated by this Section 2.4(b).

Section 2.5    **Allocation of Purchase Price**.  Within ninety (90) days after the Closing Date, the Purchaser shall provide the Seller with a schedule (the "**Allocation Schedule**") setting forth the Purchaser's allocation of the Purchase Price for the purposes of, and in accordance with, §1060 of the IRC and the Treasury Regulations and any applicable provision of state, local or foreign law, among the various classes of assets listed on IRS Form 8594.  Such allocation shall be deemed final, as between the Seller and the Purchaser (but not in connection with matters affecting the Seller's creditors and the administration of the Seller's bankruptcy estate), unless the Seller has notified the Purchaser in writing of any disagreement with the Allocation Schedule within thirty (30) days after submission thereof by the Purchaser.  If the allocation is deemed final or the Purchaser and the Seller reach such agreement, the Purchaser and the Seller shall execute and file all Tax Returns in a manner consistent with the allocation determined pursuant to this Section 2.5.  If the parties do not agree to a purchase price allocation in accordance with this Section 2.5, then the Seller and the Purchaser shall refer the disagreement to the Valuation Firm.  The Valuation Firm shall resolve any disagreement within 30 days and the Seller and the Purchaser agree that the decision of the Valuation Firm  shall be conclusive and binding on both the Seller and the Purchaser (but shall not be conclusive or binding in connection with matters affecting the Seller's creditors and administration of Seller's bankruptcy estate).  The Valuation Firm will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed portions of the Allocation Schedule as originally submitted to the Valuation Firm.  For example, should the disputed portions total in amount to $1,000 and the Valuation Firm awards $600 in favor of the Seller's position, 60% of the costs of its review would be borne by the Purchaser and 40% of the costs would be borne by the Seller.  The Purchaser and the Seller shall execute and file all Tax Returns and other related documents in a manner consistent with the Valuation Firm's determination.

Section 2.6    Purchase Price; Closing Payment.

(a) In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Approval Order as of the Closing Date, the

Purchaser shall assume the Assumed Liabilities and pay the Purchase Price, as the same may be adjusted in accordance with Section 2.7.

(b)  At the Closing, the Purchase Price shall be satisfied by payment of an amount equal to the Purchase Price, *less* (i) the Deposit, *plus* (ii) the amount, if any, by which the Estimated Net Working Capital Amount exceeds the Target Net Working Capital Amount, *less* (iii) the amount, if any, by which the Target Net Working Capital Amount exceeds the Estimated Net Working Capital Amount, *less* (iv) $1,000,000 (the "**Working Capital Escrow Amount**"), by a wire transfer of immediately available funds to an account designated by the Seller or the Escrow Agent, as applicable, and delivering the Seller Note; it being understood that the Deposit shall be delivered to the Seller at the Closing in accordance with Section 2.8.

(c)  Subject to an in accordance with Section 2.7, the Seller and the Purchaser shall enter into an escrow agreement on such terms as reasonably acceptable to the Purchaser with U.S. Bank National Association as escrow agent (the "**Escrow Agent**"), and, at the Closing, the Purchaser shall deposit into escrow with the Escrow Agent an amount equal to the Working Capital Escrow Amount.

**Section 2.7**        Purchase Price Adjustment.

(a)        No later than three (3) Business Days before the Closing, the Seller shall deliver to the Purchaser a certificate of the Seller that (i) sets forth in reasonable detail the Seller's reasonable estimate of the Closing Net Working Capital Amount (the "**Estimated Net Working Capital Amount**"), in the form of the Closing Net Working Capital Schedule, along with reasonable supporting detail therefor, with such estimate prepared in accordance with GAAP applied in a manner consistent with the preparation of the Seller's financial statements on a going concern basis and using the same accounting methods, policies, practices and year-end procedures, with consistent classifications, judgments and estimation methodology, as were used in preparation of the Financial Statements, including a reconciliation of all significant accounts (the "**GAAP Accounting Principles**"), (ii) confirms that the Estimated Net Working Capital Amount was prepared in good faith and in accordance with the GAAP Accounting Principles, and (iii) is reasonably acceptable to the Purchaser.

(b)        As promptly as practicable, but in no event later than seventy-five (75) days following the Closing Date, the Purchaser shall, at its expense, (i) cause to be prepared, in accordance with the GAAP Accounting Principles, an unaudited Closing Balance Sheet (which shall contain all of the line items referred to in the definition of, and necessary to calculate, the Closing Net Working Capital Amount), together with a statement in the form of the Closing Net Working Capital Schedule (the "**Closing Date Schedule**") setting forth in reasonable detail each of the line items comprising, and the Purchaser's calculation of, the Closing Net Working Capital Amount, and (ii) deliver to the Seller, the Closing Balance Sheet and the Closing Date Schedule, together with a certificate of the Purchaser confirming that the Closing Balance Sheet and the Closing Date Schedule were prepared in good faith and in accordance with the GAAP Accounting Principles.

(c)        The Purchaser and the Seller shall, and shall cause their respective Affiliates and representatives to, cooperate and assist in the preparation of the Closing Balance Sheet, the Closing Date Schedule, and the calculation of the Closing Net Working Capital Amount, and in the conduct of the review referred to in this Section 2.7.  Without limiting the foregoing, from and after the Closing until the end of the Review Period (as defined herein), the Purchaser shall provide the Seller with reasonable access to the books, records and employees of the Purchaser relevant to the preparation of the Closing Date Schedule, upon reasonable notice and during regular business hours, for the purposes of enabling the Seller to calculate, and to review the Purchaser's calculation of, the Closing Net Working Capital Amount

and, and to review the Purchaser's preparation of the Closing Balance Sheet and the Closing Date Schedule.

(d)     If the Seller disputes the preparation of the Closing Balance Sheet or the Closing Date Schedule, the determination of any item shown thereon, or the omission of any item therefrom, or the calculation of the Closing Net Working Capital Amount, then the Seller shall deliver a written notice disagreeing with the preparation of the Closing Balance Sheet, the Closing Date Schedule or the calculation of the Closing Net Working Capital Amount and setting forth the Seller's disagreement with respect thereto (a "**Dispute Notice**") to the Purchaser at any time during the thirty (30) day period commencing upon receipt by the Seller of the Closing Balance Sheet, the Closing Date Schedule and the related certificate from the Purchaser, all as prepared by the Purchaser in accordance with the requirements of Section 2.7(b) (the "**Review Period**"); provided, however, that the only basis for such dispute shall be (i) that the Purchaser failed to apply GAAP Accounting Principles or (ii) mathematical errors. The Dispute Notice shall set forth the basis for the dispute of any relating calculation, to the extent applicable, in reasonable detail.

(e)     If the Seller does not deliver a Dispute Notice to the Purchaser prior to the expiration of the Review Period, the Closing Balance Sheet as delivered by the Purchaser and the Purchaser's calculation of the Closing Net Working Capital Amount set forth in the Closing Date Schedule, shall be deemed final and binding on the Seller and the Purchaser for all purposes, except to the extent otherwise agreed in writing by the Seller and the Purchaser.

(f)     If the Seller delivers a Dispute Notice to the Purchaser prior to the expiration of the Review Period, then the Seller and the Purchaser shall use commercially reasonable efforts to reach agreement on the disputed matter. If the Seller and the Purchaser are unable to reach agreement on such disputed matter within thirty (30) days after the end of the delivery of the Dispute Notice, the Seller and the Purchaser shall refer such dispute to BDO Seidman (the "**Valuation Firm**") for resolution and (A) each of the Purchaser and the Seller shall have a reasonable opportunity to meet with the Valuation Firm to provide its views to the Valuation Firm as to any disputed issues with respect to such disputed matter, (B) the Valuation Firm shall determine the final Closing Balance Sheet or Closing Date Schedule, in accordance with the terms of this Agreement within thirty (30) days of such referral and upon reaching such determination shall deliver a copy of the final Closing Balance Sheet and its calculations of the Closing Net Working Capital Amount (the "**Final Calculations**") to the Purchaser and the Seller, and (C) the Final Calculations shall be final and binding on the Seller and the Purchaser for all purposes of this Agreement. In preparing the final Closing Balance Sheet and calculating the Closing Net Working Capital Amount, the Valuation Firm, acting as an expert and not an arbiter, (x) shall be limited to addressing any particular disputes referred to in the Dispute Notice and (y) any such calculation of the Closing Net Working Capital Amount shall, with respect to any disputed item, be no greater than the higher amount calculated by the Seller or the Purchaser, and no less than the lower amount calculated by the Seller or the Purchaser, as the case may be. The Final Calculations shall reflect in detail the differences, if any, between the Closing Net Working Capital Amount reflected therein and the Closing Net Working Capital Amount set forth in the Closing Date Schedule. The Valuation Firm will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed portions of the Closing Net Working Capital Amount, the Closing Date Schedule and the Closing Balance Sheet as originally submitted to the Valuation Firm. For example, should the disputed portions total in amount to $1,000 and the Valuation Firm awards $600 in favor of the Seller's position, 60% of the costs of its review would be borne by the Purchaser and 40% of the costs would be borne by the Seller.

(g)     (i) If (A) the Estimated Net Working Capital Amount is greater or equal to (B) the Closing Net Working Capital Amount, as finally determined in accordance with Section 2.3(f) (such

greater amount, the "**Shortfall**"), then the Purchaser and the Seller shall instruct the Escrow Agent to pay or cause to be paid to the Purchaser an amount equal to the Shortfall and pay or cause to be paid the balance of the Working Capital Escrow Amount to the Seller. (ii) If the Shortfall is greater than the Working Capital Escrow Amount, the Purchaser and the Seller shall instruct the Escrow Agent to pay or cause to be paid the entire Working Capital Escrow Amount to the Purchaser and the Seller shall pay (or cause to be paid) to the Purchaser, an amount equal to the amount by which the Shortfall exceeds the Working Capital Escrow Amount.  (iii) If (A) the Closing Net Working Capital Amount, as finally determined in accordance with Section 2.7(f), is greater than (B) the Estimated Net Working Capital Amount, then the Purchaser and the Seller shall instruct the Escrow Agent to pay or cause to be paid to the Seller the Working Capital Escrow Amount and the Purchaser shall pay or cause to be paid to the Seller an amount equal to the difference between the Closing Net Working Capital Amount and the Estimated Net Working Capital Amount.

(h)        Any amounts payable pursuant to Section 2.7(g) shall be paid in cash within two (2) Business Days following the final determination of the Closing Net Working Capital Amount by wire transfer of immediately available funds to an account designated by the Seller or the Purchaser, as applicable.  Any amounts at any time payable under this Section 2.7 shall be deemed allowed administrative claims in the Chapter 11 Case of the Seller in accordance with sections 503(b) and 507 of the Bankruptcy Code.

**Section 2.8        Deposit**.  On the date hereof, the Seller and the Purchaser shall enter into an escrow agreement substantially in the form of Exhibit A (the "**Escrow Agreement**"), the Escrow Agent, and the Purchaser shall deposit into escrow with the Escrow Agent an amount equal to $3,970,148 (such amount, together with any interest accrued thereon prior to the Closing Date, the "**Deposit**") by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of the Seller or the Purchaser.  The Deposit shall become payable to the Seller upon the earlier of (i) the Closing, or (ii) the termination of this Agreement by the Seller pursuant to Section 9.1(e), (the termination of this Agreement in the circumstances described in clause (ii) shall be referred to herein as a "**Purchaser Default Termination**").  At the Closing, the Deposit shall be delivered to an account designated by the Seller by wire transfer of immediately available funds as payment of a portion of the Purchase Price.  If the Deposit becomes payable to the Seller by reason of a Purchaser Default Termination, the Escrow Agent shall, within ten (10) Business Days, but no earlier than five (5) Business Days after receiving notice of such the Purchaser Default Termination from the Seller (which notice the Seller shall simultaneously deliver to the Purchaser), disburse the deposit to an account designated by the Seller by wire transfer of immediately available funds to be retained by the Seller for its own account and as liquidated damages (and not as a penalty) and as Seller's sole and exclusive remedy, upon Seller's termination of this Agreement at its election pursuant to Section 9.1(e); *provided*, *however*, that no such funds shall be disbursed if the Purchaser delivers a written objection to the Purchaser Default Termination, signed by an officer of the Purchaser and setting forth in reasonable detail the reasons for such objection, to the Seller and the Escrow Agent within two (2) Business Days of receipt of notice thereof.  If this Agreement is terminated other than for a termination that constitutes a Purchaser Default Termination, the Seller and the Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to the Purchaser the Deposit by wire transfer of immediately available funds.  The Escrow Agent's escrow fees and charges shall be paid by the Purchaser.

# ARTICLE III
# BANKRUPTCY MATTERS

In addition to the conditions set forth in Article VII, it shall be a condition precedent to the obligations of each of the parties to this Agreement that the Bankruptcy Court shall have entered the Sale Approval Order, after notice and a hearing as defined in section 102(1) of the Bankruptcy Code, approving the terms and conditions of this Agreement and authorizing the Seller to perform all acts necessary to consummate the Transaction.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing Date, as follows:

**Section 4.1      Organization and Good Standing**.  The Seller (a) is duly formed and subsisting under the laws of jurisdiction in which it was formed, is properly qualified to do business in such jurisdiction and in each other jurisdiction in which it is required to register as a result of the conduct of its business, and (b) has the corporate power, authority, right and capacity to own, operate or lease the Purchased Assets and to operate the Business in all respects as currently conducted.  The Seller has the corporate power, authority, right and capacity to enter into, execute and deliver this Agreement and, subject to the entry of the Sale Approval Order, to carry out the Transaction in the manner contemplated by this Agreement.

**Section 4.2      Authorization of Agreement**.  The Transaction has been duly and validly authorized by all requisite corporate or other proceedings of the Seller and subject to the entry of the Sale Approval Order, upon execution and delivery by the Purchaser, this Agreement and all other documents and agreements to be delivered by the Seller pursuant to the Transaction shall constitute legal, valid and binding obligations of the Seller.

**Section 4.3      Conflicts; Consents of Third Parties**.  Except (i) as set forth on Schedule 4.3 or (ii) as otherwise provided for pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court, neither the execution of this Agreement nor its performance by the Seller will result in a breach of any material term or material provision, or constitute a default under, or conflict with or cause the acceleration of any material obligation of the Seller under its constituent documents or by laws or any indenture, mortgage, deed of trust or any other material agreement to which it is a party, or by which it is bound, and, other than the Sale Approval Order and any applicable approvals of any Governmental Authority, no consent, approval or other documentation is necessary to enable the Seller to complete the Transaction pursuant to this Agreement in compliance with all Company Licenses and existing obligations and Permits of the Seller and in compliance with all Applicable Laws, Permitted Encumbrances and any other obligations or agreements which affect the Seller.

**Section 4.4      Real Property**.

(a)  Schedule 4.4 sets forth a complete list of (i) all leases of (including amendments, extensions, renewals or guaranties thereof) of any land, buildings, fixtures or other real property (the "**Leased Real Property**") by the Seller, whether as lessee or lessor, sublessee or sublessor, or pursuant to any other real property right, used or held for use in connection with the operation and conduct of the Business (the "**Existing Real Property Leases**") and (ii) the Existing Real Property Leases which shall be assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or

other order of the Bankruptcy Court (each, an "**Assumed Real Property Lease**", and collectively, the "**Assumed Real Property Leases**"). Seller does not own (and no Seller affiliate owns) any land, buildings, fixtures or other real property in fee.

(b)  Leased Real Property.  The Seller has a valid leasehold or licensed interest in all of the Existing Real Property Leases, free any clear of any Encumbrances other than Permitted Encumbrances.  A true, complete and correct copy of each Existing Real Property Lease has been made available to the Purchaser and each such Existing Real Property Lease is legal, valid, binding and in full force and effect and enforceable against the Seller and, to the Knowledge of the Seller, the other parties thereto, in accordance with its terms.  The Existing Real Property Leases constitute all written and oral agreements of any kind for the leasing, rental, use or occupancy of the Leased Real Property and are the result of bona fide arms length negotiations between the parties.  Other than as may be expressly provided in any Existing Real Property Lease, there is no option to purchase, right of first refusal, right of first offer, or other agreement granting any person or entity any right to acquire, sublease or use the Leased Real Property. The Seller's possession and quiet enjoyment of the Leased Real Property has not been disturbed.  No security deposit or portion thereof deposited with respect to such Existing Real Property Lease has been applied in respect of a breach or default under such Existing Real Property Lease which has not been redeposited in full. There are no unsatisfied capital expenditure requirements or remodeling obligations of the Seller with respect to any Leased Real Property other than ordinary maintenance and repair obligations. Except as set forth on Schedule 4.4 hereto, there are no disputes with respect to the Existing Real Property Leases, and no party is in material default under, and there are no outstanding notices of default or termination under, any of the Existing Real Property Leases.  At the Closing, there shall not exist a default or an event which, with the passage of time or the giving of notice or both, would constitute a material default on the part of the Seller or, to the Knowledge of the Seller, the other parties thereto, under any of the Existing Real Property Leases.  The Seller has not assigned, transferred, sublet, or granted any person the right to use or occupy such Leased Real Property or granted any other security interest in such Lease or any interest therein, except as set forth in this Agreement.

(c)  Condition of Improvements and Systems.  There are no defects in the buildings, improvements and structures or fixtures located on or at the Leased Real Property which would materially impair the conduct of the Business by Purchaser immediately following the Closing.  The mechanical, electrical, plumbing, HVAC and other systems servicing the Leased Real Property are in good working order and repair, ordinary wear and tear excepted, and there are no defects in such systems which would reasonably be expected to impair the conduct of the Business by the Purchaser immediately following the Closing.

**Section 4.5      Material Contracts**.  (i) Other than the Excluded Contracts, the Assumed Contracts are the only material Contracts relating to the Purchased Assets or otherwise material to the operation and conduct of the Business, and at Closing there shall not be any Contracts affecting the Purchased Assets or otherwise material to the operation and conduct of the Business, other than the Assumed Contracts; (ii) other than as set forth on Schedule 4.5, the Seller has neither given or received notice of any default, and the Seller is not in material default under any of the Assumed Contracts and, on the Closing Date, there shall not exist any default or event which, with the passage of time or the giving of notice or both, would constitute a material default in the performance or observance of the obligations on the part of the Seller under any of the Assumed Contracts (including the Permitted Encumbrances); and (iii) each of the Assumed Contracts (including the Permitted Encumbrances) is in full force and effect, in all material respects and is a valid and binding obligation of the Seller and, to the Knowledge of the Seller, the other parties thereto, in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, and (y) as

set forth on Schedule 4.5.  Neither John Z. Blazevich nor any of the Blazevich Parties (other than the Seller) are a party to any of the Assumed Contracts or Assumed Real Property Leases.

**Section 4.6    Environmental Matters**.  The representations and warranties contained in this Section 4.6 are the sole and exclusive representations and warranties of the Seller pertaining to or relating to any environmental, health or safety matters, including any arising under any Environmental Laws.  (i) The Green Cuisine Plant and the use thereof is in material compliance with Environmental Laws; (ii) the Seller is in material compliance with Environmental Laws, which compliance includes obtaining, maintaining, and complying with any Environmental Permits; (iii) the Seller is not subject to any Claim or, to the Knowledge of the Seller, any threatened Claim alleging that the Seller may be in material violation of any Environmental Law or Environmental Permit, or may have any material liability under Environmental Law; and (iv) to the Knowledge of the Seller, no facts, circumstances or conditions exist with respect to the Purchased Assets or the Seller that would in each case or in the aggregate reasonably be expected to result in material liability under Environmental Laws.

**Section 4.7    Intellectual Property**.  Schedule 4.7(a)(i) sets forth a list of all Owned Intellectual Property that is the subject of a patent, registration, or pending application; and all material unregistered Owned Intellectual Property (other than know-how) .  Schedule 4.7(a)(ii) identifies all Contracts granting any third party a right to or under any Owned Intellectual Property ("**Licenses-Out**"); and all Contracts granting Seller any rights to or under any third-party Intellectual Property ("**Licenses-In**") (provided, however, that Schedule 4.7(a)(ii) need not list Licenses-In for generally-commercially-available, off-the-shelf software that in each case has incurred license fees of less than $5,000).  To the Knowledge of the Seller, all such Contracts are valid and enforceable in accordance with their terms, and the Seller is and all counterparties thereto are, in compliance with all material terms of such Contracts. The Owned Intellectual Property together with the Licenses-In ("**Business Intellectual Property**") constitute all of the Intellectual Property used in and/or necessary to the conduct of the Business as such Business is currently conducted or contemplated to be conducted.  All Owned Intellectual Property is valid and enforceable, and the Seller owns all right, title, and interest to each item of Owned Intellectual Property, free and clear of Encumbrances (other than Permitted Encumbrances), and has the right to use all Business Intellectual Property without payment to a third party (other than license fees under the Licenses-In).  The Seller has taken commercially reasonable precautions to protect the secrecy of its trade secrets.  The Seller possesses, and the Purchaser shall obtain, documentation relevant to the trade secrets that is current, accurate and sufficient in detail and content to identify and explain it and allow its full and proper use without relevance on the special knowledge or memory of others.  Neither the Owned Intellectual Property, nor the operation of the Business as currently conducted or proposed to be conducted infringes or otherwise violates, or has infringed or violated, the Intellectual Property of any third party, and there is no claim or action pending or, to the Knowledge of the Seller, any basis for any such claim of infringement or violation.  To the Knowledge of Seller no third party is manufacturing, using, selling, distributing any product or service or is engaged in or has engaged in, any other activity that infringes any Owned Intellectual Property.  All software (including data, databases and related documentation) used internally by the Seller is owned by the Seller or used pursuant to a valid license and is not a "bootleg" version or unauthorized copy.

**Section 4.8    Insurance**.  Schedule 4.8 hereto sets forth a complete list of all material insurance policies with respect to which the Seller is a party, a named insured or otherwise the beneficiary of coverage relating to the Business.  There are no defaults with respect to such policies and all premiums have been paid when due.

**Section 4.9**    Employee Benefits Plans.

(a)  Schedule 4.9(a) sets forth a complete and correct list of each Seller Benefit Plan and identifies each Seller Benefit Plan.  Neither the Seller nor any ERISA Affiliate of the Seller has ever maintained or contributed to, or had any obligation to contribute to (or borne any Liability with respect to) any Benefit Plan that is (i) a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA ("Multiemployer Plan"), (ii) a single employer plan subject to Title IV of ERISA (a "Title IV Plan") or (iii) an employee benefit plan that is maintained by more than one employer within the meaning of Section 413(i) of the Code.

(b)  True and complete copies of the following documents, with respect to each Seller Benefit Plan have been made available to the Purchaser by the Seller, to the extent applicable: (i) any plans, all amendments thereto and related trust documents, and amendments thereto; (ii) the most recent Forms 5500 and all schedules thereto and the most recent actuarial report, (iii) the most recent IRS determination letter, if any, and (iv) the most recent summary plan descriptions

(c)  Each Seller Benefit Plan intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter from the Internal Revenue Service covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and since the date of such determination, no event has occurred and no condition or circumstance has existed that resulted or is likely to result in the revocation of any such determination letter or opinion letter.  Full payment has been timely made of all amounts which the Seller is required under applicable law or under any Seller Benefit Plan or any agreement relating to any Seller Benefit Plan to have paid as contributions or premiums thereunder.  No litigation or administrative or other proceeding, audit, examination or investigation is pending or asserted, or, to the best knowledge of the Seller, threatened, anticipated or expected to be asserted with respect to any Seller Benefit Plan or the assets of any such plan (other than routine claims for benefits arising in the ordinary course).

**Section 4.10    Employee Relations**.

(a)  The Seller is and has not been a party to, involved in or to the Knowledge of the Seller, threatened by, any labor dispute or unfair labor practice charge.  Seller is not a party to or currently negotiating any collective bargaining agreement or other similar agreement or arrangement with a union, works council, trade union or other employee organization.

(b)  Except as set forth on Schedule 4.10, the Seller has not experienced any (i) strikes, work stoppages, work slowdowns, lockouts, or union organizing campaigns during the past three (3) years, or to the Knowledge of the Seller, threatened against or involving it or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Seller, threatened by or on behalf of any employee or group of employees of the Seller.

(c)  The Seller has paid or accrued in accordance with GAAP and all applicable laws, all wages and compensation to due employees, including all paid time off such as vacations or vacation pay, holidays or holiday pay, sick days or sick pay, and bonuses.  Seller has not violated the WARN Act.

(d)  To the Knowledge of the Seller, its employees who work in the United States are legally able to do so and have provided the Seller with appropriate documentation indicating their eligibility to legally work in the United States.

**Section 4.11    Permits; Compliance with Laws**.

(a)     The Seller holds all material licenses, Permits, approvals, consents, certificates, registrations and similar authorizations (whether governmental, regulatory or otherwise) necessary to

conduct the Business as currently conducted by it or to own, lease or utilize any of the property or assets utilized by it in the Business as such property or assets are currently owned, leased or utilized (a "**Company License**"). Each Company License is valid, subsisting and in good standing and Seller is not in default or breach of such Company License or, to the Knowledge of the Seller, no Legal Proceeding is pending or threatened to revoke or materially limit any Company License.

(b)    Seller (A) is, (B) at all times since July 20, 2007 has been, and (C) to the Knowledge of the Seller, at all times prior to July 20, 2007 was, in material compliance with all Applicable Law that is or was applicable to it or to the conduct or operation of the Business or the lease, ownership or use of any the Purchased Assets including, (1) the Federal Food, Drug and Cosmetic Act (the "**FFDCA**"), including but not limited to the Section 403(w) of the FFDCA pertaining to food allergen labeling and reporting and applicable current Good Manufacturing Practices (cGMPs); (2) United States Food and Drug Administration (the "**FDA**") Applicable Laws promulgated thereunder, or similar legal provisions in any state, local or foreign jurisdiction, (3) Applicable Laws promulgated and enforced by the United States Department of Agriculture ("**USDA**"), (4) the Federal Trade Commission Act and Applicable Laws promulgated and enforced by the Federal Trade Commission (the "**FTC**") and (5) the Organic Foods Production Act, and its applicable regulations at 7 C.F.R. 205, and the National Organic Program.

(c)    No circumstance exists and, at any time since July 20, 2007, and to the Knowledge of the Seller, at any time prior to July 20, 2007, no event has occurred that (with or without notice or lapse of time) (A) may constitute or result in a material violation by Seller of, or a failure on the part of the Seller to comply with, any Applicable Law, or (B) may give rise to any obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(d)    The Seller has not received at any time since July 20, 2007, and to the Knowledge of the Seller, prior to July 20, 2007, any notice or other communication (whether oral or written), including notices of inspection deficiencies on FDA Form 483, from any Governmental Authority (including, without limitation, from the FDA, USDA, FTC or similar federal or state Governmental Authority in the United States or any foreign jurisdiction) or any other Person regarding (A) any actual, alleged, possible, or potential material violation of, or failure to comply with, any Applicable Law, or (B) any actual, alleged, possible, or potential material obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

**Section 4.12    Taxes**.

(a)    All federal Tax Returns and all other material Tax Returns required to be filed by the Seller have been timely filed with the appropriate Tax Authorities (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, correct, and complete in all material respects.  All material Taxes (whether or not shown as due and payable on such Tax Returns) have been fully and timely paid. The Seller is not currently the beneficiary of any extension of time within which to file any Tax Return concerning the Business or the Purchased Assets, and the Seller has not waived in writing or been requested in writing to waive any statute of limitations in respect of Taxes concerning the Business or the Purchased Assets.

(b)    There are no audits, examinations, or investigations by any Tax Authority in progress, pending, or threatened in writing with respect to Taxes of the Seller.  There are no administrative or court proceedings in progress, pending, or threatened in writing with respect to Taxes of the Seller.  Except as set forth on <u>Schedule 4.12(b)</u>, there is no existing, pending, or threatened claim, proposal, audit or assessment with respect to Taxes of the Seller.  The Seller has withheld and timely paid

all Taxes required to have been withheld and paid and has complied with all information reporting and backup withholding requirements, including maintenance of required records with respect thereto.

(c)  There are no Encumbrances for Taxes owed by the Seller or concerning the Business or the Purchased Assets other than Permitted Encumbrances.

Section 4.13    **Financial Advisors**.  Except as set forth on Schedule 4.13, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller in connection with the Transactions and no such Person is entitled to any fee or commission or like payment from the Purchaser in respect thereof (any such fees shall be paid by Seller).

Section 4.14    **OFAC**.  Neither the Seller nor any Person owning an interest in the Seller is:  (a) identified on the "Specially Designated Nationals or Blocked Persons List" maintained by the Office of Foreign Purchased Assets Control, Department of Treasury (the "**OFAC**") or any other similar list maintained by the OFAC or the United States Department of Commerce, Bureau of Industry and Security of any other United States Governmental Authority pursuant to Applicable Laws; or (b) a Person with whom a United States person is prohibited to engage in transactions pursuant to any trade embargo, economic sanction, or other prohibition of Applicable Laws, or Executive Order of the President of the United States or United Nations decree or resolution; *provided*, *however*, that this Section shall not apply to any Person to the extent that such Person's interest in the Seller is through a U.S. Publicly-Traded Entity and as used in this Agreement, "**U.S. Publicly-Traded Entity**" means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person.

Section 4.15    **Legal Proceedings**.  Except as set forth on Schedule 4.15, there are no material Legal Proceedings pending or, to the Knowledge of the Seller, threatened against the Seller relating to the Business or the Purchased Assets.

Section 4.16    **Title to Purchased Assets; Sufficiency of Purchased Assets**.  Except as set forth in Schedule 4.16, the Seller owns and has, and upon entry of the Sale Approval Order, shall have the ability to convey to the Purchaser, good, valid and marketable title to each of the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances.  The Purchased Assets constitute all of the assets necessary for the Purchaser to conduct the Business as of the Closing Date without interruption and in the Ordinary Course of Business in substantially the same way it was conducted prior to the Closing, except the Excluded Assets.

Section 4.17    **Financial Statements**.  Attached to Schedule 4.17 are true, correct and complete copies of the audited financial statements consisting of the balance sheet of the Business as of December 31 in each of the years 2009 and 2010 and the related statements of operations, shareholders' equity and cash flows for the years then ended (the "**Audited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Business as of April 30, 2011 and the related statements of income and cash flows for the four month period then ended (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**"). The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements). The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

**Section 4.18    No Adverse Changes**.  Except for actions taken in connection with the Chapter 11 Cases, since December 31, 2010, the Seller has conducted the Business in the Ordinary Course of Business, and without limiting the generality of the foregoing, since that date there has been no (a) disposition of any material Purchased Assets (other than sales of inventory in the Ordinary Course of Business); (b) material change in the accounting methods or practices (including assumptions underlying estimates of reserves for inventory and accounts receivable and accruals for Liabilities) of the Seller, other than as required by GAAP; (c) material damage, destruction or loss (whether or not covered by insurance) to any Purchased Assets, including the Green Cuisine Plant; (d) (i) adoption of, entry into or amendment of any Seller Benefit Plan or (ii) agreement to any material increase in the compensation payable or to become payable to, or any increase in the contractual term of employment of, any officer, director or salaried employee (other than annual salary increases in the Ordinary Course of Business and other than retention bonuses paid to certain managers); (e) settlement or compromise of any Legal Proceeding where the amount paid in settlement or compromise exceeds $500,000 individually, or $1,000,000 in the aggregate for all such Legal Proceeding, and which do not involve any other obligation of the Seller other than a customary release with respect to such Legal Proceeding; (f) sale, transfer or assignment of any Purchased Assets to any Affiliate of the Seller; (g) change in sale practices or collections of accounts receivable, in each case, other than in the Ordinary Course of Business; or (h) enforceable commitment to do any of the foregoing.

**Section 4.19    Foreign Corrupt Practices Act**.  Neither the Seller, nor, to the Knowledge of the Seller, any Representative, consultant or agent thereof acting on the Seller's behalf, has made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to (a) any foreign official (as such term is defined in the Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a foreign government, or any agency or subdivision thereof, or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign government or agency or subdivision thereof, in the case of both clauses (a) and (b) above in order to assist the Seller to obtain, retain business for or direct business to the Seller and under circumstances which would subject the Seller to liability under the FCPA or any corresponding foreign requirement.

**Section 4.20    No Other Representations or Warranties; Schedules; Disclaimer of Warranty**.  Except for the representations and warranties contained in this Article IV (as modified by the Schedules hereto), neither the Seller nor any other Person makes any other express or implied representation or warranty with respect to the Seller, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and the Seller disclaims any other representations or warranties, whether made by the Seller, any Affiliate of the Seller or any of their respective Representatives.  Except for the representations and warranties contained in Article IV hereof (as modified by the Schedules hereto as supplemented or amended), **the Seller (i) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials)** and (ii) hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Purchaser by any Representative of the Seller or any of its Affiliates).  The Seller makes no representations or warranties to the Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to and in favor of the Seller, as follows:

**Section 5.1** <u>**Organization and Good Standing**</u>. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power, authority, right and capacity to enter into this Agreement and to carry out the Transaction in the manner contemplated by this Agreement.

**Section 5.2** <u>**Authorization of Agreement**</u>. The Purchaser has full corporate company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "**Purchaser Documents**"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Purchaser of this Agreement and each the Purchaser Document have been duly authorized by all necessary corporate action on behalf of the Purchaser.  This Agreement has been, and each the Purchaser Document will be at or prior to the Closing, duly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each the Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.3** Conflicts; Consents of Third Parties.

(a)  Except (i) as set forth on <u>Schedule 5.3(a)</u> hereto, or (ii) as otherwise provided for pursuant to section 365 of the Bankruptcy Code, the Sale Approval Order or other order of the Bankruptcy Court, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any material violation of or material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and by-laws of the Purchaser; (ii) any Contract or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound; (iii) any Order of any Governmental Authority applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound; or (iv) any Applicable Laws (in each case except as would not materially interfere with or prevent the Purchaser from consummating the Transaction).

(b)  No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of the Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by the Purchaser of any other action contemplated hereby.

**Section 5.4** <u>**Litigation**</u>.  There are no Legal Proceedings pending or, to the knowledge of the Purchaser, threatened that are reasonably likely to prohibit or restrain the ability of the Purchaser to enter into this Agreement or consummate the transactions contemplated hereby.

Section 5.5 **Financial Advisors**. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

Section 5.6 **Financial Capability**. The Purchaser, at the Closing, will have sufficient funds available to pay the Purchase Price and any expenses incurred by the Purchaser in connection with the Transactions contemplated by this Agreement.

Section 5.7 **Condition of the Business**. Notwithstanding anything contained in this Agreement to the contrary, the Purchaser acknowledges and agrees that the Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Seller in Article IV hereof (as modified by the Schedules hereto as supplemented or amended), and the Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" and "with all faults" basis. Any claims the Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of the Seller set forth in Article IV hereof (as modified by the Schedules hereto as supplemented or amended). The Purchaser further represents that neither the Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Seller, the Business or the Transactions not expressly set forth in this Agreement, and none of the Seller, any of its Affiliates nor or any other Person will have or be subject to any liability to the Purchaser or any other Person resulting from the distribution to the Purchaser or its representatives or the Purchaser's use of, any such information distributed on behalf of the Seller relating to the Business or other publications or data room information provided to the Purchaser or its representatives, or any other document or information in any form provided to the Purchaser or its representatives in connection with the sale of the Business and the Transactions contemplated hereby. The Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, the Purchaser has relied on the results of its own independent investigation.

### ARTICLE VI
### COVENANTS AND AGREEMENTS

Section 6.1 **Covenants of the Seller**.

(a) If following the Closing, the Seller receives or become aware that it holds any property, right, claim, demand or asset that constitutes a Purchased Asset, including any Accounts Receivable or any other asset of the Purchaser, then the Seller shall transfer such property, right, claim, demand or asset to the Purchaser as promptly as practicable for no additional consideration.

(b) From and after the date hereof, the Seller covenants and agrees unless the Purchaser otherwise agrees in writing, which approval of the Purchaser shall not be unreasonably withheld or delayed, between the date of this Agreement and the Closing Date, the Seller shall conduct its business in the Ordinary Course of Business. Without limiting the foregoing, except as expressly contemplated by this Agreement or with the Purchaser's prior written consent, the Bankruptcy Code, other Applicable Laws or any ruling or order of the Bankruptcy Court:

(i) The Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Purchased Assets other than as required in the ordinary course of business;

(ii)     The Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Encumbrance;

(iii)     The Seller shall notify the Purchaser promptly in writing of any Material Adverse Effect;

(iv)     The Seller shall not materially change the remuneration or terms or conditions of employment of any employee other than as required by Applicable Law;

(v)     The Seller shall comply in all material respects with all Applicable Laws;

(vi)     The Seller shall not cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes a Purchased Asset;

(vii)     The Seller shall not assume, assign, transfer, terminate, reject, amend or modify in any manner any Existing Real Property Lease

(viii)     The Seller shall maintain its assets, including the Leased Real Property, in good condition and repair in accordance with past practices (normal wear and tear excepted); and

(ix)     The Seller shall not make any Tax election, change its method of Tax accounting or settle any claim relating to Taxes with respect to the Business or a Purchased Asset that would be binding on the Purchaser; and

(x)     The Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

(c)     The Seller shall, and shall cause its Affiliates to, refrain from taking any action which would cause any representation or warranty contained in Article IV to be untrue or incorrect in any material respect as of the Closing.

(d)     Subject to the express provisions of this Agreement, the Seller shall use reasonable efforts (i) to perform and satisfy all conditions to each of the Purchaser's and the Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by the Seller under this Agreement, and (ii) to cause the Closing to occur as promptly as practicable and the Seller shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby

(e)     The Seller hereby grants to the Purchaser a limited license to access and utilize that certain Leased Real Property located at Pacific Place, 222 West Sixth Street, San Pedro, California 90731 (the "**San Pedro Office**") for the duration of the Designation Period applicable to the lease governing such Leased Real Property (as more fully set forth on <u>Schedule 4.4</u> of this Agreement, the "**San Pedro Office Lease**"), or such later date as agreed in writing in accordance with Section 365(d)(4)(B)(ii) of the Bankruptcy Code and approved by the Bankruptcy Court, (i) consistent with past practice and pursuant to the terms of the San Pedro Office Lease, and in the manner the San Pedro Office was used by the Seller prior to the Closing, including without limitation in the operation of the Business, (ii) in connection with consummating the Closing and any other matters or actions contemplated by this Agreement, (iii) in connection with, or in furtherance of, the transfer of the Purchased Assets, (iv) to allow the Seller to determine whether to assume and obtain an assignment of the San Pedro Office Lease

or any other Contract of the Seller in accordance with the terms of this Agreement, and (v) for any other use not prohibited by law or by the San Pedro Office Lease.

(f)      The limited license granted pursuant to Section 6.1(e) shall expressly survive Closing and shall expire on the earlier of (x) the expiration of the Designation Period with respect to the San Pedro Office Lease and its rejection by the Debtor or the Purchaser, or such later date as agreed in writing in accordance with Section 365(d)(4)(B)(ii) of the Bankruptcy Code and approved by the Bankruptcy Court, and (y) the assumption of the San Pedro Office Lease as an Assumed Real Property Lease pursuant to this Agreement and a final Sale Approval Order.  Without limiting the foregoing, and for the avoidance of doubt, the Seller understands and agrees that unless and until the San Pedro Office Lease is assumed and assigned as an Assumed Real Property Lease pursuant to the terms of this Agreement and the final Sale Approval Order, the Purchaser shall have no liability under, arising out of or relating to the San Pedro Office Lease other than with respect to (1) base rent due under the San Pedro Office Lease during the period of utilization by the Purchaser pursuant to the license granted herein, and (2) any loss or damage directly caused by the Purchaser's negligent act or omission while exercising its license to use the San Pedro Office and for which Seller as tenant would be responsible under the San Pedro Office Lease.  The license granted herein shall not be deemed an assumption by or assignment to the Purchaser of the San Pedro Office Lease.

Section 6.2      **Covenants of the Purchaser**.

(a)      The Purchaser shall, and shall cause its Affiliates to, refrain from taking any action which would cause any representation or warranty contained in Article V to be untrue or incorrect in any material respect as of the Closing.

(b)      Subject to the express provisions of this Agreement, the Purchaser shall use reasonable efforts (i) to perform and satisfy all conditions to each of the Purchaser's and the Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by the Purchaser under this Agreement, and (ii) to cause the Closing to occur as promptly as practicable and the Purchaser shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

(c)      If following the Closing, the Purchaser receives or becomes aware that it holds any property, right, claim, demand or asset that constitutes an Excluded Asset, then the Purchaser shall transfer such property, right, claim, demand or asset to the Seller as promptly as practicable for no additional consideration.

Section 6.3      **Access to Information**.

(a)  Prior to the Closing, the Purchaser shall be entitled, through its Representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Seller relating to the Business and the Purchased Assets and such examination of the books and records of the Seller relating to the Business and the Purchased Assets as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under Applicable Law.  The Seller shall cause its Representatives to cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigation and examination, and (i) the Purchaser and its Representatives shall cooperate with the Seller and its Representatives and shall use reasonable efforts to minimize any disruption to the Business, (ii) a Representative of the Seller shall accompany the Purchaser and its Representatives during all

inspections if reasonably practicable, (iii) the Purchaser and its Representatives shall not conduct any inspections or take any actions not permitted under the Seller's real property leases, and (iv) the Purchaser shall indemnify Seller from any and all costs, damages, expenses and fees arising from the acts or omissions of the Purchaser and its Representatives in connection with such inspection.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require the Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which the Seller is bound.

(b)  For a period of two years after the Closing, other than in the case of a dispute between the Purchaser and the Seller, the Purchaser will give the Seller or its Representatives reasonable access during the Purchaser's regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under Applicable Law to books and records transferred to the Purchaser and to employees to the extent necessary for the preparation of financial statements and regulatory filings of the Seller or any of its Affiliates in respect of periods ending on or prior to Closing, or in connection with any Legal Proceedings.  The Seller shall be entitled, at its sole cost and expense, to make copies of the books and records to which they are entitled to access pursuant to this Section 6.3(b).

**Section 6.4**      **Joint Obligations**.  The parties shall proceed diligently and in good faith to attempt to settle, on or before the Closing Date or such earlier date as may be expressly set forth herein, the contents of all Closing Documents to be executed and delivered by the Seller and the Purchaser; *provided*, *however*, that, in the case of any Closing Documents to be executed and delivered in the forms attached hereto as Exhibits, such forms shall not be subject to further negotiations and the Seller and the Purchaser shall provide all details or information necessary to complete such documents, subject to the other's approval of the accuracy of such details and information, such approval not to be unreasonably withheld or delayed.

**Section 6.5**      **Consents; Further Assurances**.

(a)  The Purchaser and the Seller shall use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions contemplated by this Agreement, *provided, however*, that the Purchaser shall not be obligated to pay any consideration to any third party from whom consent or approval is requested.

(b)  Subject to, and not in limitation of, Section 6.5, each of the Purchaser and the Seller shall use their respective commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

**Section 6.6**      **Notice of Default**.

(a)  The Seller shall, within five (5) Business Days of receipt thereof, provide to the Purchaser a copy of any notices of any default that it receives in respect of any Assumed Contract and any notices of default under any Assumed Contract or Assumed Real Property Lease that it sends to another Person, in either case after the date of this Agreement.

(b)  The Seller on the one hand and the Purchaser on the other hand shall promptly notify the other, along with the Creditor Notice Parties, of:

(i)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transaction, and

(ii)    any inaccuracy of any representation or warranty or breach of covenant or agreement contained in this Agreement at any time during the term hereof that would make any of such Party's representations under Articles IV or V of this Agreement, as applicable, false in any material respect,

*provided*, *however*, that delivery of any notice pursuant to this Section 6.6(b) shall not modify the representations, warranties, covenants, agreements or obligations of the parties (or remedies with respect thereto) or the conditions to the obligations of the parties under this Agreement.

**Section 6.7    Confidentiality**. The Purchaser acknowledges that the information provided to it in connection with this Agreement and the Transactions is subject to the terms of the confidentiality and non-disclosure agreement between Sun Capital Partners Group V, LLC and the Seller dated December 10, 2010 (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate

**Section 6.8    Name Change**. As promptly as possible after the Closing Date, and in no event later than 90 days thereafter, the Seller shall take such action necessary to change its corporate and company name to a name that does not contain or comprise and is not similar to, or confusing with, its current name, including any necessary filings required by Applicable Laws.

**Section 6.9    Disclosure Schedules; Supplementation and Amendment of Schedules**. The Seller may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement to the extent the relevance of such disclosure for such purpose is reasonably apparent on the face of such disclosure. From time to time prior to the Closing, the Seller shall supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement; provided that such disclosure shall not modify the representations, warranties, covenants, agreements or obligations of the parties (or remedies with respect thereto) or the conditions to the obligations of the parties under this Agreement.

**Section 6.10    Post-Closing Employee Covenants**.

(a)    Prior to the Closing, the Purchaser shall offer to employ all or substantially all Current Seller Employees relating to the Business with employment commencing as of the Closing. Schedule 6.10 sets forth a list, as of the date hereof, of all Current Seller Employees relating to the Business, identified by name. The Seller shall provide the Purchaser with details regarding the Current Seller Employees' existing and/or former contracts, salaries, incentive compensation, benefits and employment records as the Purchaser may request. For purposes of this Agreement, each Current Seller Employee who receives such an offer of employment shall be referred to as an "**Offeree**." At least five (5) Business Days prior to the Closing Date, the Purchaser will provide the Seller with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "**Transferred Employee**". The Purchaser hereby agrees that the offer to an Offeree shall include a level of base salary, base wages and benefits that is substantially comparable in the aggregate to the base salary, base wages and benefits (excluding any equity-based, retiree medical,

defined benefit pension, nonqualified retirement, retention, post-employment healthcare, deferred compensation, corporate owned or key man life insurance and/or other long term benefits or any other benefit or compensation not set forth on Schedule 4.9(a)) provided to such Offeree as of the Closing Date. The Seller shall waive any non-competition or other restrictions which might prevent or restrict any Current Seller Employee to whom the Purchaser wishes to make an employment offer from accepting such employment offer, including by forwarding a letter to any Offeree upon request by the Purchaser and in a form satisfactory to the Purchaser, expressly releasing such Offeree from any obligations he or she may have to the Seller in order allow such Offeree to accept an employment offer from the Purchaser. The Seller agrees not to discourage any Offeree from consulting with the Purchaser or accepting an employment offer from the Purchaser.  The Seller shall make available to the Purchaser such personnel and similar information as the Purchaser may request with respect to any Transferred Employee, including compensation and employment records.  Notwithstanding anything to the contrary contained in this Section 6.10(a), with respect to each "site of employment" (within the meaning of the WARN Act) of the Seller, the Purchaser shall offer a sufficient number of Offerees at each such site of employment such that the Seller shall incur no obligations or Liability under the WARN Act with respect to such site of employment.   The Purchaser shall be exclusively liable for any claims related to discrimination arising out of its selection of Offerees.

(b)      As of the Closing, Transferred Employees shall receive credit for all purposes (including for purposes of eligibility to participation and vesting, but not for purposes of benefit accrual) under each Benefit Plan established or maintained by the Purchaser or its Affiliate after the Closing (the "**Purchaser Benefit Plan**") under which each Transferred Employee may be eligible to participate on or after the Closing.  With respect to any Purchaser Benefit Plan that is a welfare benefit plan and in which a Transferred Employee may be eligible to participate on or after the Closing, the Purchaser shall, to the extent commercially reasonable, (i) waive, or cause its insurance carrier to waive, all limitations as to pre-existing, waiting period or actively-at-work conditions, if any, with respect to participation and coverage requirements applicable to each Transferred Employee under such Purchaser Benefit Plan, and (ii) provide credit to each Transferred Employee (and such Transferred Employee's beneficiaries) for any co-payments, deductibles and out of pocket expenses paid by such Transferred Employee (and such Transferred Employee's beneficiaries) under the Seller Benefit Plans that are medical, dental, vision or other welfare plans during the relevant plan year; provided, however, that such credit shall not operate to duplicate any benefit.

(c)      The Seller shall provide COBRA continuation coverage (within the meaning of Section 4980B of the IRC and the Treasury Regulations thereunder) to all Current Seller Employees (including Current Seller Employees who are Transferred Employees), Former Seller Employees and their respective qualified beneficiaries, in each case, who are M&A Qualified Beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation Section 54.4980B-9) with respect to the sale of the Purchased Assets to the Purchaser.

(d)      The Seller shall retain all Liabilities for all short- and long-term disability benefits expenses for each Current Seller Employee (including Current Seller Employees who are Transferred Employees) and Former Seller Employee and their eligible beneficiaries and dependents with respect to claims incurred before the Closing Date, regardless of when such claims are submitted.  The Purchaser shall be responsible for all Liabilities with respect to claims incurred on or after the Closing Date by the Transferred Employees and their eligible beneficiaries and dependents for short- and long-term disability benefits.

(e)      Nothing in this Agreement shall affect the Purchaser's right to terminate the employment of its employees.  Nothing in this Agreement shall be construed to grant any employee of the Seller a right to continued employment by, or to receive any payment or benefits from, Seller or the

Purchaser or through any Benefit Plan.  This Agreement shall not limit the Purchaser's or its Affiliates' ability or right to amend or terminate any benefit or compensation plan or program of the Purchaser or its Affiliates and nothing contained herein shall be construed as an amendment to or modification of any such plan. Nothing contained in this Section 6.10, express or implied, shall constitute an amendment to any Seller Benefit Plan, or the Purchaser Benefit Plan, create any third party beneficiary rights or inure to the benefit of or be enforceable by any employee of the Purchaser or Seller or any Person representing the interest of employees.

(f)    Except as specifically set forth in this Agreement: (i) the Purchaser shall not be obligated to assume, continue or maintain any of the Seller Benefit Plans; (ii) no assets or liabilities of the Seller Benefit Plans shall be transferred to, or assumed by, the Purchaser or the Purchaser's benefit plans; and (iii) the Seller shall be solely responsible for funding and/or paying any benefits under any of the Seller Benefit Plans, including any termination benefits and other employee entitlements accrued under such plans by or attributable to Current Seller Employees or Former Seller Employees.

(g)    The Seller shall take such action as is necessary to provide that all employees of the Seller who are participants in the any Benefit Plan of the Seller intended to be qualified under Section 401(k) of the IRC (the "**Seller 401(k) Plan**") have a fully vested and nonforfeitable interest in their entire respective account balances under such plan as of the Closing Date (regardless of their years of vesting credit under the Seller 401(k) Plan).  On or prior to the Closing Date, with respect to all of the Seller's employees, the Seller shall contribute all contributions to the Seller 401(k) Plan (i) which are required to be made on or before the Closing Date under the Seller 401(k) Plan, and (ii) which relate to service or employee salary deferral contributions on or prior to the Closing Date, whether or not required to be made on prior to the Closing Date under the Seller 401(k) Plan.

**Section 6.11    Publicity**.  Except as required by Applicable Law or the rules or regulations of any applicable securities exchange or for any filings by the Seller with the Bankruptcy Court, neither the Seller nor the Purchaser shall issue any press release or public announcement concerning this Agreement or the Transaction without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, provided that the party intending to make any such release it deems required by Applicable Law shall use its commercially reasonable efforts consistent with such Applicable Law to consult with the other parties with respect to the text thereof.

**Section 6.12    Survival**.  The parties agree that the representations contained in this Agreement or in any Closing Documents shall not survive the Closing.  All covenants and agreements of the parties shall survive the Closing until fully performed.

**ARTICLE VII
CONDITIONS TO CLOSING**

**Section 7.1    Conditions for the Purchaser**.  The obligation of the Purchaser to complete the Transaction shall be subject to the satisfaction of each of the following conditions:

(a)    All the terms, covenants and conditions of this Agreement to be complied with or performed or satisfied by the Seller shall have been complied with or performed or satisfied in all material respects, *provided*, *however*, that, in the case of any term, covenant or condition qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such term, covenant or condition shall have been complied with or performed in all respects;

(b)  The representations and warranties of the Seller set forth in Article IV hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing (except to the extent such representations and warranties relate to an earlier date in which case such representations and warranties shall be true and correct on and as of such earlier date); *provided*, *however*, that, in the case of any representation or warranty qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such representation or warranty shall be true and correct in all respects as of the date of this Agreement and as of the Closing;

(c)  No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to seek leave to appeal;

(d)  There shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect;

(e)  Each of the Sale Procedures Order and the Sale Approval Order (such Sale Order in form and substance satisfactory to the Purchaser) shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been modified, amended, reversed or stayed;

(f)  The Purchaser and each of GECC and GECPF shall have entered into one or more agreements that together contain the terms set forth on <u>Schedule 7.1(f)</u> (the "**GE Modification Terms**"), as determined in the Purchaser's sole discretion and on such other terms as are acceptable to the Purchaser;

(g)  The Purchaser shall have received a fully executed amendment to the Existing Real Property Lease between the Seller and Dedeaux and or its Affiliates in substantially in the form and substance attached hereto as <u>Exhibit E</u> (the "**Lease Amendment**");

(h)  The landlord under the San Pedro Office Lease shall have consented to the Designation Period in writing in accordance with Section 365(d)(4)(B)(ii) of the Bankruptcy Code;

(i)  The Purchaser shall have obtained each permit, license and governmental approval required to operate the Business immediately after the Closing in the Ordinary Course of Business, whether by assignment from the Seller of the Company Licenses, entry into a transition arrangement for the operation under the Company Licenses on terms reasonably satisfactory to the Purchaser, or otherwise; and

(j)  The Seller shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 8.2.

The conditions set forth in this Section 7.1 are for the sole benefit of the Purchaser, and may be waived in whole or in part by the Purchaser by notice to the Seller and the Creditor Notice Parties in writing without prejudice to the Purchaser's rights under this Agreement or at law, if any, in the event of the non-fulfillment of any other condition or conditions.

**Section 7.2    Conditions for the Seller**.  The obligation of the Seller to complete the Transaction shall be subject to the satisfaction of the following conditions:

(a)  All the terms, covenants and conditions of this Agreement to be complied with or performed or satisfied by the Purchaser shall have been complied with or performed or satisfied in all

material respects, including all deliveries required to be made pursuant to Article VIII hereof; *provided*, *however*, that, in the case of any term, covenant or condition qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such term, covenant or condition shall have been complied with or performed in all material respects;

(b) The representations and warranties of the Purchaser set out in Article V hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing; *provided*, *however*, that, in the case of any representation or warranty qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such representation or warranty shall be true and correct in all material respects as of the date of this Agreement and as of the Closing;

(c) No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to such leave to appeal;

(d) Each of the Sale Procedures Order and the Sale Approval Order (such Sale Order in form and substance satisfactory to the Purchaser) shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been modified, amended, reversed or stayed; and

(e) The Purchaser shall have delivered, or caused to be delivered, to the Seller all of the items set forth in Section 8.3.

The conditions set forth in this Section 7.2 are for the sole benefit of the Seller, and may be waived in whole or in part by the Seller by notice to the Purchaser and the Creditor Notice Parties in writing without prejudice to the Seller's rights under this Agreement or at law, if any, in the event of non-fulfillment of any other condition or conditions.

### ARTICLE VIII
### CLOSING

**Section 8.1    Closing Arrangements**.  Upon all conditions precedent to the Purchaser's and the Seller's obligation to close the transactions as set forth in this Agreement having been satisfied and fulfilled, or waived, as the case may be, the Closing shall take place on the Closing Date, at 10:00 a.m., local time, at the offices of Kelley Drye/White O'Connor, 10100 Santa Monica Blvd., Twenty Third Floor, Los Angeles, CA 90067, or at such other time or place as may be mutually agreed to by the parties; *provided, however*, that the Closing shall not occur prior to July 15, 2011, without the prior written consent of the Purchaser.

**Section 8.2    Seller's Deliveries**.  On or before the Closing Date, the Seller shall deliver or cause to be delivered the following items and documents to the Purchaser, with each such document to be effective as of the Closing:

(a) a certified copy of each of the Sale Procedures Order and the Sale Approval Order;

(b) the Bill of Sale executed by Seller;

(c) the Assignment and Assumption Agreement executed by the Seller;

(d) assignments of all Intellectual Property in the form and substance reasonably acceptable to the Purchaser;

(e)  assignment of all Assumed Real Property Leases, in form and substance reasonably acceptable to Purchaser;

(f)  a certificate of good standing of the Seller;

(g)  a completed certification of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury regulations duly executed by Seller; and

(h)  all other conveyances and other documents which are required and which the Purchaser has reasonably requested on or before the Closing Date to give effect to this Transaction, including the proper transfer, assignment and conveyance of the Purchased Assets by the Seller to the Purchaser, free and clear of all Encumbrances except the Permitted Encumbrances.

**Section 8.3**    **Purchaser's Deliveries**.  On or before the Closing Date, the Purchaser shall deliver or cause to be delivered the following items and documents to the Seller, with each such document to be effective as of the Closing:

(a)    the Purchase Price in accordance with Section 2.6;

(b)    the Assignment and Assumption Agreement executed by the Purchaser;

(c)    the Seller Note; and

(d)  all documents required or necessary to demonstrate adequate assurance of Purchaser's future performance under and in respect of each Assumed Contract and Assumed Real Property Lease as required pursuant to section 365(b)(1)(C) of the Bankruptcy Code, with a copy to each non-debtor party to an Assumed Contract or Assumed Real Property Lease.

**Section 8.4**    **Tax Matters**.

(a) (i)  The Seller shall be responsible for (A) Taxes relating to the Business or the Purchased Assets for any Pre-Closing Tax Period and (B) all Taxes that form a part of the Cure Costs in respect of the Assumed Real Property Leases, Assumed Contracts and Assumed Liabilities.  The Purchaser shall be responsible for all Taxes relating to the Business or the ownership, leasing, possession or use of the Purchased Assets for all Post-Closing Tax Periods.  The Seller and the Purchaser, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party pursuant to this Section 8.4(a)(i).  Within 10 days prior to the payment of such Tax, the party paying such Tax shall give notice to the other party of its portion of the Tax payable, and such party shall promptly deliver its portion of such Tax. Failure to do so will not relieve the other party from its liability hereunder. The Seller shall prepare or cause to be prepared all Tax Returns relating to the Business or the Purchased Assets for taxable periods ending on or before the Closing Date in accordance with past practice, except as required by law.  The Purchaser shall prepare or cause to be prepared all Tax Returns relating to the Business or the Purchased Assets for all taxable periods beginning after the Closing Date and for Straddle Tax Periods, in accordance with past practice, except as required by Applicable Law.

(ii)    For the purposes of this Section 8.4, whenever it is necessary to determine liability for Taxes in respect of the Purchased Assets or the Business for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (A) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the

number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (B) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.

(b)  Solely to the extent not exempt in accordance with Section 1146 of the Bankruptcy Code, the Purchaser shall have the responsibility of payment of all state and local Transfer Taxes, if any, as well as any notary fees incurred in connection therein; *provided, however*, that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes, including a request that the Seller's sale of the Purchased Assets be exempted from Transfer Taxes pursuant to Section 1146 of the Bankruptcy Code.

(c)  Any refunds (and any interest received thereon) of any Tax relating to any of the Business or the Purchased Assets received by the Purchaser for any Pre-Closing Tax Period, provided that such Tax was either paid on or before the Closing Date or was paid by any of the Seller (or any Affiliate thereof) after the Closing Date, shall be paid over to the Seller within five (5) Business Days of receipt. The Purchaser shall, if the Seller so requests and at its expense, file for and obtain any refunds to which it is entitled under this Section 8.4(c). The Purchaser shall permit the Seller to control (at the Seller's expense) the prosecution of any such refund claim; *provided, however*, that the Seller shall not take any action in the prosecution of such refund claims that would be reasonably expected to be detrimental to the Purchaser.

(d)  After the Closing, the Purchaser shall promptly notify the Seller in writing upon the commencement of any Tax audit, suit, action or proceeding (each a "**Tax Contest**") relating to the Business or the Purchased Assets with respect to a Pre-Closing Tax Period for which the Seller is primarily liable under this Agreement. The Seller shall have control over such Tax Contests, which control shall include, the right to settle, compromise or concede any such Tax Contest and the right to employ counsel of its choice at its expense; *provided, however*, that the Seller shall (i) keep the Purchaser apprised of all developments relating to the Tax Contest, (ii) provide the Purchaser with copies of all correspondence from any Tax Authority relating to any such Tax Contest, (iii) conduct the defense of such Tax Contest diligently and in good faith and (iv) if it would be reasonably expected to be detrimental to the Purchaser, not settle, compromise or concede such Tax Contest without the consent of the Seller, which consent shall not be unreasonably withheld or delayed. In the case of a Tax Contest that relates to a Straddle Period, the Purchaser shall control the conduct of such Tax Contest, but Seller shall have the right to participate in such Tax Contest at its own expense, and the Purchaser shall not settle, compromise or concede such Tax Contest without the consent of the Seller, which consent shall not be unreasonably withheld or delayed.

(e)  The Seller and the Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax Authorities. The Seller and the Purchaser shall retain all Tax Returns, schedules and work papers, records and other documents in its possession relating to Taxes relating to the Business or the Purchased Assets for a taxable period first ending after the Closing Date and for all prior taxable periods until the later of: (a) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods; or (b) six (6) years following the due date (without extension) for such Tax Returns. Any information obtained under this Section 8.4(e) shall be

kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(f)   Except as required by Applicable Law, neither the Purchaser nor any of its Affiliates shall amend, refile, or otherwise modify any Tax Return relating to the Business or the Purchased Assets with respect to Pre-Closing Tax Periods without the prior written consent of the Seller, which consent shall not be unreasonably withheld or delayed.

## ARTICLE IX
## TERMINATION OF AGREEMENT

**Section 9.1**      **Termination**.  This Agreement may be terminated:

(a)  by written mutual consent of the Seller and the Purchaser;

(b)  by either the Purchaser or the Seller, if the Closing has not occurred on or prior to 5:00 p.m. on August 15, 2011 (the "**Outside Date**"); *provided*, *however*, that, if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by the Purchaser or the Seller, then the breaching party may not terminate this Agreement pursuant to this Section 9.1(b);

(c)  by either the Purchaser or the Seller, if a court or other Governmental Authority of competent jurisdiction shall have issued a final order or taken any other nonappealable final action, in each case, having the effect of permanently restraining, enjoining or otherwise prohibiting the Transaction; *provided*, *however*, that if such final order or other nonappealable final action shall have been issued or taken by such Governmental Authority primarily due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by either the Purchaser or the Seller then the breaching party may not terminate this Agreement pursuant to this Section 9.1(c);

(d)  by the Purchaser, if the Seller has breached in any material respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in Section 7.1 if occurring or continuing on the Closing Date, and (ii) is either incapable of being cured or, if capable of being cured, is not cured within the earlier of (x) ten (10) calendar days after written notice thereof and (y) the Outside Date; *provided*, *however*, that the Purchaser's right to terminate this Agreement under this Section 9.1(d) shall not be available if, at the time of such intended termination, the Seller has (or would have after the passage of time) the right to terminate this Agreement under Section 9.1(e);

(e)  by the Seller, if the Purchaser has breached in any material respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in Section 7.2 if occurring or continuing on the Closing Date and (ii) is either incapable of being cured or, if capable of being cured, is not cured within the earlier of (x) ten (10) calendar days after written notice thereof and (y) the Outside Date; *provided*, *however*, that the Seller' right to terminate this Agreement under this Section 9.1(e) shall not be available if, at the time of such intended termination, the Purchaser has (or would have after the passage of time) the right to terminate this Agreement under Section 9.1(d);

(f)  (i) by the Purchaser, if the Sale Approval Order is not entered by the Bankruptcy Court in form and substance satisfactory to the Purchaser on or prior to July 1, 2011 and (ii) by the Seller, if the Sale Approval Order is not entered by the Bankruptcy Court in form and substance satisfactory to the Purchaser on or prior to July 8, 2011; *provided*, *however*, that the right to terminate pursuant to this

Section 9.1(f) shall not be available to any party or its Affiliates whose failure to perform or comply in all material respects with the covenants and agreements of such party or its Affiliates set forth in this Agreement shall have been the principal cause of or resulted in the failure of the Sale Approval Order to be entered by the Bankruptcy Court by such date;

(g) by the Purchaser, if the auction conducted pursuant to the Sale Procedures Order shall not have commenced on or prior to June 28, 2011 and have concluded by June 29, 2011;

(h) by the Purchaser, if (i) John Z. Blazevich or any other Person seeks to delay, prevent or hinder the transfer to the Purchaser of all or any portion of the Purchased Assets (any such property, including without limitation any intellectual property, whether or not Intellectual Property, the "**Disputed Property**"), whether by objecting to the entry of the Sale Approval Order, the Closing, or taking other action to delay, prevent or hinder such transfer, and (ii) the Bankruptcy Court or other applicable tribunal either (A) does not make a determination with respect to title to the Disputed Property on or prior to July 29, 2011 or (B) determines that the Seller cannot convey to the Purchaser good and marketable title to such Disputed Property;

(i) by the Purchaser, if the Seller (i) seeks or supports Bankruptcy Court approval of an Acquisition Proposal (other than to or by the Purchaser) or (ii) executes and delivers an agreement or understanding of any kind with respect to an Acquisition Proposal;

(j) by the Purchaser, if the Bankruptcy Court enters an order approving any Acquisition Proposal (other than the sale of the Purchased Assets to the Purchaser); and

(k) by the Purchaser or the Seller, if the Chapter 11 Case is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason.

**Section 9.2**    Breakup Fee and Expense Reimbursement.

(a) Upon the first to occur of (i) the date the Seller consummates an Acquisition Proposal or (ii) the date the Seller consummates a plan of reorganization for the Purchased Assets, the Seller shall immediately pay (in cash) to the Purchaser a breakup fee equal to $1,434,720.33 (the "**Breakup Fee**"); provided, however, that the Breakup Fee shall not be payable to Purchaser if this Agreement is terminated by the Seller for any reason other than pursuant to Section 9.1(e).

(b) If the transactions contemplated hereby are not consummated as a result of a termination of this Agreement pursuant to Sections 9.1(d) or 9.1(i), then the Seller shall immediately pay (in cash) to the Purchaser an amount equal to the costs and out-of-pocket expenses incurred by the Purchaser in connection with its legal, environmental, accounting and business due diligence and the preparation and negotiation of this Agreement up to a maximum of $1,434,720.33 (the "**Expense Reimbursement**").

(c) The Seller's obligation to pay the Breakup Fee and the Expense Reimbursement pursuant to this Section 9.2 shall survive termination of this Agreement and shall constitute an administrative expense (which shall be a super-priority administrative expense claim senior to all other administrative expense claims, other than Wells Fargo, and payable out of the Seller's cash or other collateral securing the Seller's obligations to its senior secured lenders, prior to any recovery by such lenders) of the Seller's under section 364(c)(1) of the Bankruptcy Code.

**Section 9.3**    **Effect of Termination**. Except as otherwise provided herein and subject to Sections 2.8, 6.12 and 9.2, in the event of termination of this Agreement, this Agreement (other than

the terms and provisions set forth in this Section 9.3 and Sections 2.8 and 9.2 and Article X, which shall survive such termination) shall become null and void and be deemed of no force and effect, with no liability on the part of any party hereto (or of any of its Representatives), and no party hereto shall have any obligations to any other party hereto arising out of this Agreement; *provided*, *however*, that no such termination shall relieve or release any Party from any liabilities or damages resulting from any willful or intentional breach by a Party of any of its representations, warranties, covenants or agreements set forth in this Agreement.  If this Agreement is terminated by the Seller for any reason other than pursuant to Section 9.1(e) (the Seller's sole and exclusive remedy for which is as set forth in Section 2.8), the Seller shall not be entitled to any damages, losses, or payment from the Purchaser, and the Purchaser shall have no further obligation or liability of any kind to the Seller or any third party on account of this Agreement, and the Seller shall promptly instruct the Escrow Agent to return to the Purchaser the Working Capital Escrow Amount.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1    Obligations as Covenants**.  Each agreement and obligation of each party hereto in this Agreement, even though not expressed as a covenant, shall be considered for all purposes to be a covenant.

**Section 10.2    Relationship of the Parties**.  Nothing in this Agreement shall be construed so as to make the Purchaser a partner of the Seller.

**Section 10.3    Amendment of Agreement**.  This Agreement may not be supplemented, modified or amended except by a written agreement executed by each Party to be affected by such supplement, modification or amendment.

**Section 10.4    Notices**.  Any Notice shall be in writing and shall be deemed to have been duly given or made when personally delivered or when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows, or to such other addresses as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) Business Days' prior notice, to the following parties:

(a)    If to the Purchaser, to:

c/o Sun Capital Partners, Inc.
5200 Town Center Circle
Suite 600
Boca Raton, Florida  33486
Attention:  Jared Wien and C. Deryl Couch
Telecopy:  (561) 394-0540

with a copy given in like manner to:

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania  19103
Attention:  David A. Gerson
Telecopy:  (215) 963-5001

Morgan, Lewis & Bockius LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, Pennsylvania  15219
Attention:  W. Ryan Davis
Telecopy:  (412) 560-7001

(b)    If to the Seller, to:

Attention:
Telecopy:  (905) 726-2585

with a copy given in like manner to:

Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Attention:  Craig A. Wolfe
Telecopy:  (212) 808-7896

-and-

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA  90067-4100
Attention:  Jeffrey N. Pomerantz, Esq.
Telecopy:  (310) 201-0760

(c)    If to Creditor Notice Parties, to:

Wells Fargo Bank, N.A.
333 South Grant Avenue, Suite 940
Los Angeles, CA 90071
Attention:  Art Brokx
Telecopy:  (213( 253-5913

-and-

General Electric Capital Corporation
3 Capital Drive
Mail Station 1-3
Eden Prairie, MN  55344
Attention:  Dale Shores
Telecopy: (866) 648-5880

-and-

GE Capital Public Finance, Inc.
3 Capital Drive
Mail Station 1-3
Eden Prairie, MN  55344
Attention:  Dale Shores
Telecopy: (866) 648-5880

-and-

Dedeaux Enterprises, LLC
1430 South Eastman Ave.
Los Angeles, CA 90023
Attention:  Robert Santich
Telecopy:  (213) 262-0655

-and-

Creditor's Committee:

Band D Foods
c/o Timothy B. Anderson
3494 S. TK Avenue
Boise, ID 83705
Telecopy:  (208) 344-1183

BrucePac
c/o Glen Golomski
811 North 1st Street
Silverton, OR 97381
Telecopy: (503) 874-3015

Dedeaux Properties, LLC
1430 South Eastman Ave.
Los Angeles, CA 90023
Attention:  Robert Santich and Ashok Aggarwal
Telecopy:  (323) 981-8100 and (323) 264-6925

Pacific Southwest Container
c/o James D. Mayol
P.O. Box 3049
Modesto, CA 95353
Telecopy:  (209) 544-9875

Sage V Foods, Inc.
c/o Victor P. Vegas
12100 Wilshire Blvd., Suite 605
Los Angeles, CA 90025
Telecopy:  (310) 820-2559

        Any Notice which is delivered or is sent by telecopy shall be deemed to have been validly
and effectively given and received on the date it is delivered or sent, unless it is delivered or sent after

5:00 p.m. on any given day or on a day which is not a Business Day, in which case it shall be deemed to have been validly and effectively given and received on the Business Day next following the day it was delivered or sent, provided that, in the case of a Notice sent by telecopy it shall not be deemed to have been sent unless there has been confirmation of transmission.

   **Section 10.5**  **Specific Performance**.  It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by the Seller and the Purchaser should be entitled to specific performance and injunctive or other equitable relief as a remedy of such a breach.

   **Section 10.6**  **Fees and Expenses**.  If any party hereto brings an action against any other party hereto based upon a breach by the other party hereto of its obligations under this Agreement, the prevailing party shall be entitled to all reasonable expenses incurred, including reasonable attorneys' fees and expenses.  Except as expressly provided in this Agreement, the parties agree that all costs and expenses of the parties relating to the Transaction shall be paid by the party incurring such expenses.

   **Section 10.7**  **Governing Law; Jurisdiction; Service of Process**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any principles of conflicts of law.  By its execution and delivery of this Agreement, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any of the Seller, on the one hand, and the Purchaser, on the other hand, with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  In the event any such action, suit or proceeding is commenced, the parties hereby agree and consent that service of process may be made, and personal jurisdiction over any party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the party at the address of such party set forth in Section 10.4 hereof, unless another address has been designated by such party in a notice given to the other parties in accordance with the provisions of Section 10.4 hereof.

   **Section 10.8**  **Further Assurances**.  Each of the parties hereto shall, at its own cost, from time to time hereafter and upon any reasonable request of the other, execute and deliver, make or cause to be made all such further acts, assignments, deeds, assurances and things as may be required or necessary to more effectually implement and carry out the true intent and meaning of this Agreement.

   **Section 10.9**  **Entire Agreement**.  This Agreement constitutes the full and entire agreement between the parties hereto pertaining to the Transaction and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto made by any Party, and there are no other warranties or representations and no other agreements between the parties hereto in connection with the Transaction except as specifically set forth in this Agreement.

   **Section 10.10**  **Waiver**.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided.  All waivers hereunder must be in writing to be effective.

   **Section 10.11**  **Survival**.  None of the representations and warranties contained in Article IV shall survive the Closing and shall thereupon terminate, including any actions for damages in

respect of any breach.  This Section 10.11 shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be preformed, or prohibit actions, subsequent to the Closing.

Section 10.12    **Assignment**.  Neither the Seller nor the Purchaser shall assign their respective rights or obligations hereunder (or agree to do so) without the prior written consent of the other Party, which consent may be withheld by such Party in its sole and absolute discretion; provided that, notwithstanding the foregoing, the Purchaser may assign its rights under this Agreement, in whole or in part, (A) to any of its Affiliates, (B) for collateral security purposes to any lender providing financing to the Purchaser or its Affiliates or (C) to any subsequent purchaser of all or substantially all of the Business.

Section 10.13    **Successors and Assigns**.  All of the covenants and agreements set forth in this Agreement are intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns and be enforceable by the parties hereto and their respective successors and their permitted assigns pursuant to the terms and conditions of this Agreement.

Section 10.14    **No Third-Party Beneficiaries**.  No provision of this Agreement is intended to, or shall, confer any third-party beneficiary or other rights or remedies upon any Person other than the parties hereto.

Section 10.15    **Severability of Provisions**.  If any provision or any portion of any provision of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby.  If the application of any provision or any portion of any provision of this Agreement to any Person or circumstance shall be held invalid or unenforceable, the application of such provision or portion of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby.

Section 10.16    **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof.  Any delivery of an executed copy of this Agreement by way of telecopy shall constitute delivery hereof, provided that any party delivering by way of telecopy shall, as soon as reasonably practicable, deliver an originally executed counterpart of this Agreement to the other parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the day and year first above written.

**PREMIUM FOODS ACQUISITION, INC.**

By: _____

    Name:  Jared D. Wien

    Title:    Vice President

**CONTESSA PREMIUM FOODS, INC.**

By: _____

    Name:

    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the day and year first above written.

**PREMIUM FOODS ACQUISITION, INC.**

By: _____
      Name:  Jared D. Wien
      Title:    Vice President

**CONTESSA PREMIUM FOODS, INC.**

By: _____
      Name:  JOHN Z. BLAZEVICH
      Title:    PRESIDENT/CEO

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 11th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document ***NOTICE OF FILING EXHIBIT "A" TO ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 30, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **June 30, 2011** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 30, 2011** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**By Personal Delivery**
Honorable Peter H. Carroll, United States Bankruptcy Judge
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Bin outside of Suite 1534
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 30, 2011 | Myra Kulick | /s/ Myra Kulick |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                          **F 9013-3.1.PROOF.SERVICE**

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

*Russell Clementson on behalf of U.S. Trustee United States Trustee (LA)*
*russell.clementson@usdoj.gov*

*Bradley L Cornell on behalf of Creditor Superior Foods International LLC*
*bcornell@cornell-lawfirm.com*

*Jeffrey W Dulberg on behalf of Debtor Contessa Premium Foods Inc*
*jdulberg@pszjlaw.com*

*M Douglas Flahaut on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*flahaut.douglas@arentfox.com*

*Jeffrey B Gardner on behalf of Creditor Haliburton International Foods, Inc.*
*Jeff.Gardner@sbgk.com, mary.do@sbgk.com*

*Jeffrey M Goldman on behalf of Creditor Jenny Craig, Inc.*
*goldmanj@pepperlaw.com*

*Richard H Golubow on behalf of Creditor Louis Wang*
*rgolubow@winthropcouchot.com, pj@winthropcouchot.com*

*Jeffrey S Goodfried on behalf of Creditor Boardman Foods, Inc.*
*jgoodfried@perkinscoie.com*

*Peter L Isola on behalf of Creditor Farm Credit Services of Mid-America*
*peterisola@dwt.com*

*John H Kim on behalf of Interested Party Courtesy NEF*
*jkim@cookseylaw.com*

*Andy Kong on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*Kong.Andy@ArentFox.com*

*Mette H Kurth on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*kurth.mette@arentfox.com*

*Katie A Lane on behalf of Attorney Arent Fox LLP*
*lane.katie@arentfox.com*

*Nicole S Magaline on behalf of Interested Party U.S. Foodservice, Inc.*
*nmagaline@schiffhardin.com*

*Scotta E McFarland on behalf of Attorney ----- Pachulski Stang Etal*
*smcfarland@pszjlaw.com, smcfarland@pszjlaw.com*

*Frank F McGinn on behalf of Interested Party Courtesy NEF*
*ffm@bostonbusinesslaw.com*

*Lawrence H Meuers on behalf of Creditor Agroindustria Legumex, S.A.*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1.PROOF.SERVICE**

DOCS_LA:240733.1  15343-001

*lmeuers@meuerslawfirm.com,*
*sdefalco@meuerslawfirm.com;nbucciarelli@meuerslawfirm.com;lcastle@meuerslawfirm.com*

*Aram Ordubegian on behalf of Creditor Committee The Official Committee of Unsecured Creditors*
*ordubegian.aram@arentfox.com*

*Bertrand Pan on behalf of Creditor Dedeaux Properties, LLC*
*bertrand.pan@dlapiper.com*

*David M Poitras on behalf of Interested Party Courtesy NEF*
*dpoitras@jmbm.com*

*Jeffrey N Pomerantz on behalf of Interested Party Courtesy NEF*
*jpomerantz@pszjlaw.com*

*Kurt Ramlo on behalf of Creditor Dedeaux Properties, LLC*
*kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com*

*Christopher O Rivas on behalf of Creditor Sargento Foods Inc.*
*crivas@reedsmith.com*

*Katherine A Traxler on behalf of Creditor Wells Fargo Bank, N.A. and Wells Fargo Bank Northwest, N.A.*
*katietraxler@paulhastings.com*

*United States Trustee (LA)*
*ustpregion16.la.ecf@usdoj.gov*

*Joseph M VanLeuven on behalf of Interested Party Courtesy NEF*
*joevanleuven@dwt.com*

*Elizabeth Weller on behalf of Creditor Tarrant County*
*dallas.bankruptcy@publicans.com*

*Marc J Winthrop on behalf of Creditor Louis Wang*
*mwinthrop@winthropcouchot.com, pj@winthropcouchot.com*

*Craig A Wolfe on behalf of Debtor Contessa Premium Foods Inc*
*kdwbankruptcydepartment@kelleydrye.com*

## II. <u>SERVED BY U.S. MAIL</u>

*Please see attached Service List*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                        **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:240733.1  15343-001

Dedeaux Properties, LLC.
c/o Robert Santich, Mgr & Executive V.P.
c/o Ashok Aggarwal, Sr. V.P. Finance
1430 S. Eastman Avenue
Los Angeles, CA 90023

Counsel to Dedeaux Enterprises (a/k/a DART)
John J. Duffy, Esq.
DLA Piper LLC
550 South Hope Street, Ste. 2300
Los Angeles, CA 90071

Attorneys for Dedeaux Properties, LLC
Kurt Ramlo
DLA Piper LLP (US)
550 South Hope Street Suite 2300
Los Angeles, California 90071

Attorneys for Dedeaux Properties
George B. South III
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Dedeaux Properties
Bertrand Pan
DLA Piper LLP (US)
550 South Hope Street Suite 2300
Los Angeles, California 90071

General Electric Capital Corp.
Dale Shores, VP, Restructuring
3 Capital Drive
Mail Station 1-3
Eden Prairie, MN 55344

Counsel to GECC
Harvey S. Schochet
Peter L. Isola
Davis Wright Tremaine LLP
505 Montgomery Street, Ste 800
San Francisco, CA 94111

Counsel to GECC
Davis Wright Tremaine LLP
865 South Figueroa
Los Angeles, CA 90017

Roy L. Bennett, Senior Credit Officer
Farm Credit Services of Mid-America
1601 UPS Drive
Louisville, KY 40223

Attorneys for Jenny Craig
Jeffrey Goldman, Esq. (SBN 233840)
Pepper Hamilton LLP
4 Park Plaza, Suite 1200
Irvine, California 92614

Robert S. Hertzberg, Esq.
Pepper Hamilton LLP
Suite 3600, Renaissance Center
Detroit, Michigan 48243

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                          **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:240733.1  15343-001